FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

MAR 1 5 2017

JAMES N. HATTEN, Clerk
By ⎯⎯⎯⎯⎯ Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

DEMARKUS R. HORNE,          )
                            )
        Plaintiff,          )
                            )   CIVIL ACTION
    vs.                     )
                            )   FILE NO. _____
HARBOUR PORTFOLIO VII, LP   )
and CWAM II, LLC,           )
                            )
        Defendants.         )   **1:17-CV-0954**
                            )

## COMPLAINT

### I. Introduction and Summary

1.      Plaintiff DeMarkus Horne is an African-American citizen of the United

States and a resident of Lithonia, DeKalb County, Georgia.  This action arises out

of the discriminatory targeting for abusive credit terms in a home purchase

"contract for deed" transaction extended by Harbour Portfolio VII, LP ("Harbour

Portfolio" or "Harbour"). Defendant Harbour Portfolio, through both intentional

targeting of African-American consumers and practices that have a foreseeable

disparate impact on African-American consumers, has violated the Fair Housing

Act of 1968, as amended, 42 U.S.C. § 3601, *et seq*., and the Equal Credit

Opportunity Act, 15 U.S.C. § 1691, *et seq*.  Mr. Horne also raises claims for

equitable mortgage, unjust enrichment, and declaratory judgment against Harbour and its assignee, CWAM II, LLC.

## II. JURISDICTION AND VENUE

2.     Jurisdiction is conferred on this Court by 42 U.S.C. § 3613(a), 15 U.S.C. § 1691e(f), and 28 U.S.C. §§ 1331 and 1367.

3.     Venue is proper in this District and Division pursuant to 28 U.S.C. § 1391 because the claims arose in this District, the Defendants do business and/or reside in this District, and the events giving rise to this action occurred in this District.

## III. PARTIES

4.     Mr. Horne is a United States citizen and resident of DeKalb County, Georgia.

5.     Defendant Harbour Portfolio is a Texas limited partnership that regularly engages in the business of contract for deed lending and does substantial contract for deed business in the state of Georgia.  Harbour's principal address is 8214 Westchester Drive, Suite 635, Dallas, Texas 75225.

6.     Defendant CWAM II, LLC is a California limited liability company that regularly engages in the business of purchasing non-performing notes, including contract for deed notes, and has done substantial business purchasing

2

contract for deed notes in the state of Georgia.  CWAM II, LLC's principal office address is 964 5ᵗʰ Ave. Suite 518, San Diego, California 92101.

## IV.  FACTUAL BACKGROUND

### *A. Historical background of redlining and reverse redlining*

7.     In a not too distant chapter of American history, government-backed home lending programs carried out the explicit, intentional exclusion of African-American borrowers and communities with a certain percent of African-American residents from access to mortgage loans.  This practice, known as redlining, involved banks (following the lead of the federal Home Owners Loan Corporation) literally drawing a red line around particular neighborhoods deemed too racially "inharmonious" and excluding borrowers in these neighborhoods from access to mortgage loans.  The Secretary of the United States Department of Housing and Urban Development admitted in 1970 that the federal government had "refus[ed] to provide insurance in integrated neighborhoods, promot[ed] the use of racially restrictive covenants," and engaged in other methods of redlining. *Thompson v. U.S. H.U.D.*, 348 F. Supp. 2d 398, 466 (D. Md. 2005).

8.     With passage of the federal Fair Housing Act, the practice of redlining became illegal and was curtailed to some extent.  However, communities of color have never enjoyed equal access to prime rate home lending.

9.     Soon enough, lenders began to pump subprime loans—high rate, high cost loans issued without regard to the borrower's ability to repay—into communities of color. This practice grew with the advent of mortgage securitization, a financial technique of repackaging large groups of loans for sale that allows lenders to decrease their risk without actually improving the quality of individual loans.

10.     The disproportionate targeting of communities of color for subprime loans came to be known as "reverse redlining." Communities and borrowers that had been unable to access prime rate loans were explicitly target for home mortgages with predatory terms. Studies have shown that African-American borrowers were often steered into subprime loans when they could have qualified for prime rate loans. The targeting of subprime loans to communities of color through reverse redlining has been well documented in empirical research.[1]

---

[1] *See* Abt Associates, Using Credit Scores to Analyze High-Cost Lending in Central City Neighborhoods (2008); Calvin Bradford, Center for Community Change, Risk or Race? Racial Disparities and the Subprime Refinance Market (2002), at vii-ix; Center for Responsible Lending, Unfair Lending: The Effect of Race and Ethnicity on the Price of Subprime Mortgages (2006), at 16-17 (available at http://www.responsiblelending.org/mortgage-lending/research-analysis/rr011-Unfair_Lending-0506.pdf); HUD & Dept. of the Treasury, Curbing Predatory Home Mortgage Lending (2000), at 72 (available at http://www.huduser.org/Publications/ pdf/treasrpt.pdf); HUD, Unequal Burden: Income and Racial Disparities in Subprime Lending in America (2000), at 4-5 (available at https://www.huduser.gov/portal/publications/fairhsg/ unequal.html); National Community Reinvestment Coalition, The Broken Credit System:

11.     The practice of reverse redlining, targeting a protected class for a predatory home loan product, has repeatedly been held to violate the federal Fair Housing Act. *See, e.g., Barkley v. Olympia Mortgage Co.*, No. 04-cv- 875, 2007 WL 2437810 (E.D.N.Y. Aug. 22, 2007); *Hargraves v. Capital City Mortgage Corp.*, 140 F. Supp. 2d 7 (D.D.C. 2000).

12.     Reverse redlining is most effective in cities where two basic conditions exist:  racial minorities have been denied equal access to credit and racially segregated residential living patterns persist.  Both of these conditions exist in Atlanta.  Atlanta's housing conditions favored reverse redlining during the subprime lending boom, and those same conditions exist today.

13.     The same communities of color that were targeted for subprime lending through reverse redlining were then disproportionately eviscerated by the foreclosure crisis that flowed from the abuses of subprime lending.  The practice of lending without regard to borrowers' ability to pay and masking unaffordability with features like interest-only periods and initial low teaser rates followed by a much higher adjustable interest rate led directly to the subprime foreclosure crisis. The rate of African-American homeownership fell from 49.7% in 2004 (at its

Discrimination and Unequal Access to Affordable Loans by Race and Age – Subprime Lending in Ten Large Metropolitan Areas (2003), at 31-34 (available at http://www.ncrc.org/images /stories/pdf/research/ncrcdiscrimstudy.pdf).

5

peak) to 41.7% in 2016. The homeownership rate for white households in 2016 was 72.2%.

14.     The foreclosure crisis was followed by a tightening of access to credit that has impacted low-income communities, but especially communities of color. One study by the National Community Reinvestment Coalition released in July 2016 found that in St. Louis and Milwaukee, racial makeup of a neighborhood was a significant predictor of access to mortgage lending. In Milwaukee, white people make up 70% of the population but were getting 81% of the mortgage loans; African-Americans make up 16% of the population but were getting only 4% of the mortgage loans. Similarly, in St. Louis, African-Americans make up 18% of the population, but were receiving 4% of the mortgage loans.[2]

### *B. Contract for deed – the instrument*

15.     A contract for deed, also referred to as a land installment contract or land contract, is a method of seller financing used to purchase a home. However, in these contracts, while the buyer becomes obligated to pay a certain purchase price, at a certain interest rate, over a term of years (often 20 or 30 years), he or she does not obtain the deed to the property until the full purchase price has been paid.

---

[2] NCRC, *Home Mortgage Lending in St. Louis, Milwaukee, Minneapolis, and Surrounding Areas* (July 2016).

Immediately upon signing the contract the buyer takes on the obligation to pay the property taxes, obtain homeowner's insurance, and make any needed repairs to the property – all without holding legal title to the home. If the buyer defaults at any time during the term of years, the contract purports to allow the seller to cancel (or "forfeit") the purchase contract, keep all payments made by the buyer, and evict the buyer summarily like a tenant.

16.     Contract for deed transactions are as old as racially disparate access to mortgage credit. From the 1930s to the 1960s, when federal homeownership programs prevented most African-American borrowers from accessing a traditional mortgage loan, land contracts were marketed in credit-starved communities of color as a means of attaining homeownership. In tightly segregated urban neighborhoods, land contracts were often the primary way to purchase a home. One leading advocate estimated that in 1950s Chicago, 85% of the properties purchased by African-Americans were sold through land contracts. Beryl Satter, *Family Properties: Race, Real Estate, and the Exploitation of Black Urban America* (Metropolitan Books, 2009), 4.

17.     When access to mortgage lending expanded in the 1970s through the subprime boom of the 1990s and early 2000s, contract for deed lending became less prevalent.

7

18.    With the constriction in mortgage lending that followed the subprime

foreclosure crisis, land contracts are experiencing a resurgence. Wall Street-

backed investors, Harbour Portfolio chief among them, have been buying up

foreclosed houses at bargain basement prices and selling them on land contract to

buyers who are eager to pursue the American dream.

### C. Harbour Portfolio's abusive contract for deed business model

19.    Harbour Portfolio has purchased more than 6,700 single family homes to be

sold on land contracts, predominantly in Ohio, Michigan, Illinois, Florida, Georgia,

and Pennsylvania.[3]

20.    Harbour began purchasing properties for its contract for deed business in

2010. Harbour made a deliberate decision to purchase all, or nearly all, of its

properties from mortgage finance giant Fannie Mae's portfolio of "real estate

owned," or REO, properties – all of which are homes that went through foreclosure

and were transferred to Fannie Mae because Fannie Mae owned or insured the

mortgage loan that was foreclosed.

21.    Because of its decision to buy exclusively, or almost exclusively, from

Fannie Mae's REO portfolio, Harbour's business model involves buying properties

---

[3] Matthew Goldstein & Alexandra Stevenson, *High-Risk Deals on Shabby Homes Ensnare Buyers*, N.Y. Times, Feb. 20, 2016, at A1.

that are located in areas that have experienced the largest number of foreclosures. The vast majority of the houses Harbour has purchased for resale through its contract for deed program are in the same communities targeted most aggressively by subprime mortgage lenders and hit hardest by the foreclosure crisis – communities of color.

22. Harbour's business model involves purchasing homes from Fannie Mae's REO portfolio at low prices that are often in extremely poor, even uninhabitable, condition. Nearly all of the properties Harbour buys have been vacant for a period of time after foreclosure and are marked by conditions typical of vacancy – including utilities shut off, poor weatherization, and damaged and leaking pipes. Many of the properties Harbour buys are marked by torn-out electrical wiring, lack of appliances, non-functioning appliances, missing plumbing, missing toilets or other fixtures, leaking roofs, water-damaged and deteriorating wood siding, other water damage, and mold damage. Many of Harbour's properties contain hidden defects, such as nonfunctioning hot water heaters, furnaces, or HVAC systems, which cannot be detected because utility service is not turned on at the time the purchaser views the property.

23. Harbour spends nothing and makes no repairs to its properties before selling them through its contract for deed program. Within a few weeks of its own

purchase, Harbour enters into a land contract reselling the property for roughly four to five times its own purchase price.

24.    In addition to grossly marking up the sale price of the home, Harbour charges interest rates of 9.9% or 10% and finances the sale over a thirty-year period.

25.    All of Harbour's land contracts put the burden of home repairs, maintenance, property taxes, and homeowner's insurance onto the buyer. All, or almost all, of Harbour's contracts state that the buyer must bring the property up to code "within a reasonable period of time not exceeding four months." Nonetheless, all of Harbour's land contracts include a forfeiture clause that purports to give Harbour the right, upon a default, to elect to cancel the contract, keep all monies paid, and evict the buyer as if the buyer were a tenant.

26.    Moreover, Harbour knows that the purchasers it targets for its contract for deed transactions cannot afford to bring the property up to code within four months. Thus, Harbour knows that most purchasers will be in default on the contract almost immediately upon signing.

27.    Harbour also drafts its contract such that the purchaser has the obligation to obtain homeowner's insurance and keep the property insured. However, Harbour knows that many of the homes it sells through its contract for deed program are not

insurable because of the significant defects described in paragraph 22, and knows

that the purchasers it is targeting for its contract for deed program cannot afford to

address those defects quickly in order to obtain homeowner's insurance. Thus,

Harbour knows that most purchasers will be in default on the contract almost

immediately upon signing.

28.     According to one study by researchers at the University of Texas-Austin,

over the 21-year period for which they reviewed the data, 45% of contract for deed

purchasers had defaulted, 37% were still in active contracts, and fewer than 20% of

contract purchasers had obtained a deed to the property.[4]  Upon information and

belief, Harbour's default rate is far greater than 45% due to the uniquely predatory

way that Harbour has structured its contract for deed transactions.  A significant

number of contract for deed purchasers in Harbour's transactions have already

defaulted and been dispossessed of their homes.

29.     By pushing the burden of home repairs onto the contract buyer, Harbour's

business model allows it to draw a stream of income from properties it could not

legally rent out without making costly improvements.  This is true because

---

[4] Peter M. Ward, Heather K. Way, and Lucille Wood, *Executive Summary: Contract for Deed Prevalence Project: A Final Report to the Texas Department of Housing and Community Affairs* (Aug. 2012), available at https://law.utexas.edu/faculty/hway/stand-alone-executive-summary.pdf.

11

landlords have a non-delegable duty under state law to maintain properties in "habitable" condition – the condition deemed safe for residential occupancy by local government units. Typically, landlords must obtain a "certificate of occupancy" showing that the property is habitable from the local government before renting the home out. Upon information and belief, most of Harbour's properties would not be deemed habitable under local housing codes at the time Harbour sells them through land contracts.

30.    By including a provision permitting Harbour to forfeit the contract and keep all amounts paid along with all amounts the buyer has spent improving the property and bringing it into habitable condition, Harbour's business model seeks to reap a significant windfall upon the buyer's default, which as described above, is extremely likely due to the predatory terms built into the contracts.

31.    By charging interest rates of 9.9% and 10% while prevailing interest rates for mortgage loans have hovered around 4%, Harbour's business model allows it to reap a substantial profit even if a buyer does not default. On a $50,000 loan over 30 years, going from a 4% interest rate to a 10% interest rate increases the total of

payments from approximately $86,000 to $158,00B0, resulting in $72,000 in additional interest the buyer will be required to pay over the life of the loan.[5]

32.     By selling homes at a 400 to 500% markup, Harbour's business model allows it to reap a substantial profit even if a buyer does not default.  Over thirty years at 10% interest, increasing the purchase price from $15,000 to $60,000 increases the total of payments from $47,520 to $189,720 (an increase of $142,200, or nearly 300%).

33.     Harbour's land contracts are also predatory because while taking on the obligation to make significant repairs, to pay property taxes, to maintain homeowner's insurance, and to pay a grossly inflated purchase price, the contract buyer does not have the rights of a homeowner to procedural protections through a foreclosure process, the right of a homeowner to obtain a homestead exemption reducing the property tax bill, the right of a homeowner to sell the property if they fall on hard times, or the right of a homeowner to easily refinance their loan in

[5] The Fannie Mae Foundation has likewise documented how modest interest rate disparities can cause dramatic financial consequences for borrowers steered into higher-cost loans. James H. Carr and Jenny Schuetz, Fannie Mae Foundation, Financial Services in Distressed Communities: Framing the Issue, Finding Solutions (2001) at 12-13 (available at https://www.innovations. harvard.edu/financial-services-distressed-communities-framing-issue-finding-solutions) (1% increase in interest rate on 30-year $81,000 mortgage translates into loss of over $78,000 in wealth due to increased payments and lost investment opportunity).

order to qualify for a better interest rate or borrow against the equity. Harbour's buyers do not have these rights, as they do not have a deed.

### D. Harbour's marketing scheme, targeting African-American communities

34.    Harbour purchases all or virtually all of its properties from Fannie Mae's REO portfolio, knowing that such properties are located almost exclusively in communities that are majority African-American.

35.    Harbour intentionally engages in a marketing scheme that predictably and actually draws primarily African-American purchasers. Specifically, it advertises properties by putting a sign in front of each house indicating it is for sale, quoting a low down payment and low monthly payment, and listing a phone number to call.

36.    This primary mode of advertising its contract for deed transactions reaches, and was designed to reach, the primarily African-American residents of these communities. The people likely to see these signs and call were the ones walking or driving through the neighborhood.

37.    Harbour's other primary method of soliciting purchasers to enter into its abusive land contract transactions also reaches, and was designed to reach, an almost entirely African-American pool of purchasers. This method was to encourage any person who contacted Harbour about buying a home to refer friends and family to Harbour as well. Harbour offered referral incentives equal to one

14

month's payment to buyers who referred another potential buyer to Harbour's selling agents.

38.     Harbour did not market its contract for deed transactions through broader outlets, such as advertisements in general-audience television channels, radio stations, newspapers, magazines, or social media sites, that would have reached a broader, less racially-skewed audience.

39.     Harbour marketed its contract for deed transactions exclusively, or almost exclusively, in African-American neighborhoods, because it knew that such communities had been denied access to traditional forms of mortgage credit and believed that African-American residents of these communities could be induced to purchase properties that were in very bad condition, and to pay inflated purchase prices and very high interest rates, because they believed they would not have any other way to purchase a home.

40.     Harbour's business model involves reverse redlining – intentionally targeting credit-starved communities of color for its predatory and abusive contract for deed transactions.  Harbour's targeting of these areas has been effective precisely because access to traditional mortgage lending has been extremely tight over this time period.

15

41.    Harbour has taken advantage of market conditions to sell its extremely toxic

contract for deed product.  Far from being a responsible provider of much-needed

home lending credit, Harbour's practices have exacerbated economic stagnation

and blight in the communities it has targeted.  Many of Harbour's properties now

sit vacant and boarded up, after Harbour dispossessed unsuccessful would-be

homeowners.

42.    This practice of reverse redlining, targeting a protected class for a predatory

home loan product, has repeatedly been held to violate the federal Fair Housing

Act.  *See, e.g., Barkley v. Olympia Mortgage Co.*, No. 04-cv- 875, 2007 WL

2437810 (E.D.N.Y. Aug. 22, 2007); *Hargraves v. Capital City Mortgage Corp.*,

140 F. Supp. 2d 7 (D.D.C. 2000).

### *Mr. Horne's transaction with Harbour*

43.    DeMarkus Horne is a 37-year-old, married African-American man who lives

in Lithonia, DeKalb County, Georgia.

44.    Mr. Horne learned about the opportunity to buy a house through Harbour

Portfolio from a friend of his, also an African-American first-time homebuyer, who

was also in the process of buying a home from Harbour.  His friend learned about

Harbour when he saw a sign in front of a house: "Sale, $800 down, $400/month."

16

Mr. Horne's friend had been told that he would receive a credit of one month's payment for referring Mr. Horne.

45.     In or around March 2012, Mr. Horne called the phone number given to him by his friend and asked about opportunities to buy a home.

46.     Mr. Horne had never owned a home before.

47.     At that time, Mr. Horne was 32 years old and was making about $11.50 per hour working at a car wash. He had some experience doing home repairs and maintenance from previous jobs.

48.     Harbour's agent told Mr. Horne that there were several houses he could look at to consider buying. Mr. Horne's wife viewed at least two houses. For each house, Harbour's agent provided a lock box combination to enter the house. When Mrs. Horne identified the house she thought they should buy, Mr. Horne also went to look at the property. He then told Harbour's agent that they would like to buy this house.

49.     Mr. Horne applied to purchase the property at 6395 Laurel Post Court, Lithonia, DeKalb County, Georgia.

50.     Mr. Horne provided all requested information for the application to purchase the home with a loan from Harbour Portfolio.

17

51.    Mr. Horne was approved to purchase the home with a loan from Harbour Portfolio.

52.    Mr. Horne and his wife were excited about the purchase of this home as a place to raise their three daughters. They knew the home would need some work, but since Mr. Horne was capable of doing some of the work himself, they were willing to take it on. Mr. Horne and his wife saw this as their opportunity to become homeowners.

53.    Harbour required Mr. Horne to sign a promissory note ("note") and agreement for deed ("contract") to memorialize the transaction.

54.    The note and contract, dated March 16, 2012, said Mr. Horne was buying the property for $52,425. Mr. Horne made a down payment of $1,165 and signed a promissory note for the remaining $51,260, to be repaid at 10% interest over 30 years. He was obligated to make payments of $449.84 per month (principal and interest) in addition to paying the property taxes and obtaining homeowner's insurance. Unbeknownst to Mr. Horne, Harbour had purchased the property from Fannie Mae for $15,543 less than three weeks before.

55.    Harbour did not obtain an independent appraisal of the home in the course of this transaction.

18

56.     Mr. Horne never met with any Harbour representative or agent in person. The closing of the transaction was conducted by mail; Mr. Horne was asked to sign the papers in front a notary and return them in a FedEx envelope.

57.     Mr. Horne believed he was becoming a homeowner at the time he signed the papers. He had no idea that he was not obtaining a deed in his name or that this transaction was any different from a traditional mortgage loan.

58.     Mr. Horne's highest level of education was eleventh grade, after which he obtained his G.E.D. He has no experience or expertise in mortgage lending, real estate transactions, or real estate law.

59.     Every aspect of the transaction was designed to make Mr. Horne believe he was becoming a homeowner. Mr. Horne was given a "Lead Based Paint Rider" to the contract that specifies that the seller was required to give certain disclosures and stating that he, the "purchaser," had received these disclosures.

60.     He was given a "Mold Disclosure" stating that as buyer, he "make[s] the decision to purchase the Property independent of any representation" related to mold.

61.     He was given a "Truth in Lending Disclosure Statement" that said that he was giving a security interest in "the goods or property being purchased."

19

62.     He was given a HUD 1 Settlement Statement that included a summary of the

"Purchaser's transaction" and a summary of the "Seller's transaction." This

statement showed that Mr. Horne, the purchaser, was required to bring $1500 cash

and that the remainder of the purchase price was coming from "Owner financed

mortgage" of $51,260.

63.     He was required to sign a "Purchaser's Certification and Authorization" that

states, "I/we have applied to purchase a house with financing from Harbour

Portfolio VII, LP."

64.     Mr. Horne was required to sign a disclosure related to the Equal Credit

Opportunity Act, stating that the Equal Credit Opportunity Act prohibited

discrimination by creditors on certain bases and that Harbour was required to

disclose that Mr. Horne need not disclose any income from alimony, child support,

or separate maintenance.

65.     Mr. Horne was required to sign a disclosure related to the Fair Credit

Reporting Act, stating in part, "An investigation will be made as to the credit

standing of all individuals seeking credit in this application."

66.     Mr. Horne was required to sign an "Owner Occupant Certification" stating

in part, "This is to certify that I am purchasing the above-referenced property as

my primary residence."

67.     The cover letter sent along with a copy of his signed contract stated,

"Congratulations on the purchase of your new home!" It also reminded him to get

homeowner's insurance as soon as possible.

68.     Mr. Horne was encouraged to refer other potential buyers and was told he

would obtain a credit equal to one month's payment for each person he referred.

He referred a friend, who was also African-American.

69.     The contract stated that Mr. Horne was responsible for maintaining the

property in good repair during the term of the agreement as well as bringing the

property into habitable condition within a reasonable period of time not to exceed

four months.

70.     Almost immediately after Mr. Horne moved into the property, DeKalb

County code enforcement placed signs on the door and notices on the windows,

threatening fines if certain repairs were not made.

71.     Due to the threat of fines, Mr. Horne was required to replace and paint wood

siding on the house that was rotting and dilapidated, replace wood trim around the

gutters that was rotting due to water damage, replace wood trim and siding and

paint the chimney that was rotting and dilapidated, purchase and install a new

mailbox, and replace a wood privacy fence that was falling apart.

21

72.     Mr. Horne also had to make a number of other repairs in order to bring the

house into habitable condition. He had to repair a plumbing leak in the main water

line coming into the house. This alone cost thousands of dollars to repair. He

repaired a toilet plumbing leak that was causing water to drip through the ceiling

from an upstairs bathroom and replaced ceiling drywall damaged by the leak. He

replaced flooring in the bathroom and kitchen and painted throughout the house.

He installed a vanity and tile in the master bathroom. He installed ceiling fans. He

put grass down in the yard. He removed a rotting bannister on the porch as

required by the homeowner's insurance company. He replaced the stove,

refrigerator, furnace, and hot water heater. All of the work he did on the house

cost him at least $15,000 in materials and labor, and would have cost much more

but for the fact he did a lot of the work himself with help from friends.

73.     Mr. Horne has paid the property taxes for the house as part of his monthly

payment to National Asset Advisors, the company servicing the contract for

Harbour Portfolio.

74.     Mr. Horne obtained homeowner's insurance, as required by Harbour, and

maintained it for years, paying approximately $800 per year ($65-70 per month).

75.     Mr. Horne has made his house payment for years. At one point he fell

behind due to a loss of employment, but was able to get caught up. Recently, he

has again fallen behind on his payments due to interruptions in employment, and is currently in default.

76. Mr. Horne now faces the risk of forfeiture and eviction due to Harbour's abusive contract terms, which state that upon a default, Harbour may declare a forfeiture, keep all amounts paid or expended on repairs, and evict the buyer like a tenant.

### *Racial Targeting and Disparate Impact*

77. Upon information and belief, over the time period from 2010 to the present, Harbour has purchased at least 250-300 properties in metropolitan Atlanta to sell through contracts for deed. Harbour has since sold many of these properties, either after a default by a contract purchaser or while a contract purchaser was still attempting to buy the home, to third party investors.

78. As of June 2016, at one moment in time, property tax records showed that Harbour Porfolio held 94 properties in six metro Atlanta counties - Clayton, Cobb, DeKalb, Fulton, Gwinnett, and Rockdale counties.

79. The Atlanta Metropolitan Statistical Area (MSA) is 32% African American. Yet 84% of these 94 Harbour properties were located in Census blocks that were at least 50% African-American, and 66% of these Harbour properties were in Census blocks that were at least 75% African-American.

80.   The following is a map of these 94 properties, overlaid with the percent of

African-American residents by Census block.



81.   Harbour Portfolio was actively purchasing properties from Fannie Mae's

REO portfolio in Atlanta from 2011 to 2015. Fannie Mae sold 4,306 properties in

Fulton County over this time period, and Harbour Portfolio was the purchaser in 85

of those sales. Within this time period, all of the 85 properties Harbour purchased

in Fulton County, it purchased from Fannie Mae.

24

82.    Harbour's decision to purchase its properties exclusively, or almost

exclusively, from Fannie Mae's REO portfolio, rather than from any other sellers,

had the predictable and actual effect of disparately impacting high-minority areas.

After merging this data with data on census tracts from the 2014 American

Community Survey (drawn from U.S. Census Bureau surveys from 2010 through

2014), it is possible to show the mean racial concentration (percent African-

American residents) of the Census tracts in which Fannie Mae sales occurred.  As

shown in Table 1 below, Fannie Mae sales were located in Census tracts that had a

mean percentage of African-American residents of 57.7%.  Fulton County as a

whole is only 44.3% African-American.  Thus, the practice of only buying from

Fannie Mae's REO portfolio resulted in purchases being located in areas that were

13.4% more densely African-American than the county average.

83.    But Harbour's purchases were even more racially concentrated than the

broader universe of Fannie Mae REO sales.  If one compares the locations of

Harbour REO purchases to those of other buyers of Fannie Mae REO properties,

the average racial composition of census tracts where Harbour purchased Fannie

Mae REO was 86.9% Black, compared to 57.7% Black for Fannie REO purchased

by other buyers. This almost 30 percentage-point difference is highly statistically significant, with a p-value of 0.000.[6]

### Table 1. Purchases of Fannie Mae REO properties vs. Other Purchases of Fannie Mae REO Properties, 2011-2015

|  | Harbour Purchases of Fannie REO | Other Purchases of Fannie REO | Mean Difference | Standard Error of Mean Difference | Signif* |
|---|---|---|---|---|---|
| Mean of Percent African-American of Census Tract | 86.9% | 57.7% | 29.2% | 1.5% | .000 |
| Standard Deviation | 13.3% | 35.4% | | | |
| Number of purchases | 85 | 4,217 | | | |
| | | | | | |
| Mean of Median Family Income of Tract | $35,267 | $69,016 | -$33,749 | $1,538 | .000 |
| Standard Deviation | $12,923 | $41,091 | | | |
| Number of purchases | 85 | 4,217 | | | |

* Equal variances not assumed

84.    This tremendous gap between the average racial concentration of neighborhoods where Fannie Mae REO properties were sold and the neighborhoods where Harbour purchased Fannie Mae REO is not the product of chance. Such stark disparities are consistent with--and reflect--intentional targeting of high-minority areas.

---

[6] P-value is a term statisticians use to refer to the probability of obtaining a result equal to or "more extreme" than when the "null hypothesis" – that there is no relationship between the two variables – is true. A p-value below 0.05 (5%) is considered to be statistically significant, showing that two variables are not unrelated. Thus a p-value of 0.000 is extremely statistically significant.

85.     Because the income level and racial characteristics of neighborhoods are somewhat correlated, it is useful to examine whether, controlling for income, the racial composition of a neighborhood is a significant predictor of whether Harbour is likely to have purchased a given Fannie Mae REO property as compared to other buyers of Fannie Mae REO.  In a bivariate regression which includes percentage of African-American residents in a Census tract and the median income of the Census tract, the percentage of African-Americans in a Census tract is a significant predictor of a Harbour purchase, even *after* controlling for the median income of the tract.

86.     In a multivariate analysis, controlling for income, age, and owner-occupancy rate, neighborhood racial concentration still had a statistically significant effect on the likelihood of Harbour being the purchaser of a given Fannie Mae REO property.

87.     This analysis shows that the location of Harbour's contract for deed transactions is significantly predicted by racial concentration of the area, even holding constant other factors, like income and owner-occupancy rate.  This fact gives rise to a reasonable inference of intentional targeting of high-minority neighborhoods for Harbour's abusive contract for deed transactions.

### *Injury to plaintiff*

88.    Mr. Horne has been injured by Harbour's abusive contract terms.

Specifically, he has suffered the following damages.  He has spent more than

$15,000 in repairs and hundreds of hours of his own labor on a home that is not

legally titled in his name. He has paid over $4,000 in property taxes on a property

not legally titled in his name, and because of Harbour's structuring of the

transaction, he has been unable to obtain a homestead exemption.  He has paid

thousands of dollars for homeowner's insurance for a home not legally titled in his

name. He has paid a down payment of $1,165 and over $23,000 in monthly

principal and interest payments to see his principal balance go down from $51,260

to only $49,780, according to Harbour's servicer.  Moreover, Harbour charged him

a purchase price of $52,425 on March 16, 2012 for a property it purchased from

Fannie Mae for $15,543 less than three weeks before.

89.    Harbour's illegal discrimination has caused Mr. Horne to suffer irreparable

loss and injury, including, but not limited to, humiliation, embarrassment,

emotional distress, financial loss, and deprivation of his civil rights.

90.    Mr. Horne did not discover the discrimination underlying Harbour's contract

for deed transaction before he consulted with an attorney in March 2017.  He could

not have reasonably discovered the discrimination independently because the

information about Harbour's discrimination was not known to him until explained to him by his counsel.

## V. COUNT ONE: VIOLATION OF THE FAIR HOUSING ACT, 42 U.S.C. §§ 3604, 3605, AGAINST HARBOUR PORTFOLIO

91.   Plaintiff hereby realleges and incorporates the facts and allegations contained in all preceding paragraphs, as if set forth fully herein.

92.   Mr. Horne is a member of a protected class on the basis of race, color, or national origin because he is African-American.

93.   The Fair Housing Act makes it unlawful to "make unavailable… a dwelling to any person because of race, color… or national origin." 42 U.S.C. § 3604(a).

94.   The Fair Housing Act makes it unlawful to discriminate on the basis of race, color, or national origin against any person in a residential real estate transaction such as the making or purchasing of loans or providing other financial assistance. 42 U.S.C. § 3605(a).

95.   Harbour engaged in residential real estate transactions with respect to Mr. Horne by making him a loan for the purchase of residential real estate.

96.   Harbour's actions violated the Fair Housing Act and constitute actionable discrimination on the basis of race, color, or national origin.

29

97.     Mr. Horne is an aggrieved person as defined by Section 3602(i) of the Fair

Housing Act by virtue of having been subject to Harbour's discriminatory, abusive

contract for deed program. 42 U.S.C. § 3602(i).

98.     Based on the racially-targeted marketing strategy it utilized and the

statistically-significant predictive power of racial demographics in the location of

properties purchased by Harbour, even controlling for income, age, and owner-

occupancy rate, Harbour engaged in a pattern and practice of intentionally

targeting African-American consumers and residents of predominantly African-

American neighborhoods for its predatory and abusive contract for deed

transactions.

99.     Harbour engaged in a facially-neutral practice of purchasing homes

exclusively, or almost exclusively, from Fannie Mae's REO portfolio for its

predatory and abusive contract for deed program.  This practice had a predictable

and actual harmful disparate impact on African-American communities and

African-American borrowers, including Mr. Horne.

100.    As a proximate result of such discriminatory housing practices, Mr. Horne

has suffered economic loss, mental anguish, deprivation of civil rights, and the

prospective loss of his home.

101.   Harbour's actions were intentional, wanton, malicious, and taken in reckless disregard of Mr. Horne's civil rights.

102.   As a result of these violations of the Fair Housing Act, Harbour is liable to Mr. Horne for:

    a.   Compensatory and punitive damages in an amount to be determined at trial;

    b.   Injunctive relief;

    c.   Costs and disbursements; and

    d.   Attorney's fees.

## VI. COUNT TWO: VIOLATION OF THE EQUAL CREDIT OPPORTUNITY ACT, 15 U.S.C. § 1691 ET SEQ., AGAINST HARBOUR PORFOLIO

103.   Plaintiff hereby realleges and incorporates the facts and allegations contained in all preceding paragraphs, as if set forth fully herein.

104.   Mr. Horne is a member of a protected class on the basis of race, color, or national origin because he is African-American.

105.   Harbour is a creditor as set forth in the Equal Credit Opportunity Act because in the ordinary course of its business Harbour extended credit to Plaintiff.

106.   Plaintiff is an applicant as defined by the Equal Credit Opportunity Act because he applied to a creditor directly for an extension of credit.

107.   Based on the racially targeted marketing strategy it utilized and the

statistically significant predictive power of racial demographics in the location of

properties purchased by Harbour, even controlling for income, age, and owner-

occupancy rate, Harbour engaged in a pattern and practice of intentionally

targeting African-American consumers and residents of African-American

neighborhoods for its predatory and abusive contract for deed transactions.

108.   Harbour engaged in a facially-neutral practice of purchasing exclusively, or

almost exclusively, from Fannie Mae's REO portfolio, which had a predictable and

actual disparate and harmful impact on African-American communities, and

African-American borrowers, including Mr. Horne.

109.   Harbour's acts, policies, and practices are intentionally discriminatory

against African Americans with respect to aspects of credit transactions, constitute

reverse redlining, and violate 15 U.S.C. §1691(a)(1).

110.   Harbour's acts, policies, and practices disparately impact African Americans

with respect to aspects of credit transactions in violation of 15 U.S.C. § 1691(a)(1).

111.   Mr. Horne is an aggrieved person as defined by the Equal Credit

Opportunity Act by virtue of having been a party to one of Harbour's predatory

and abusive contract for deed transactions.

112. As a result of these violations of the Equal Credit Opportunity Act, Harbour is liable to Mr. Horne for:

    a. Compensatory and punitive damages in an amount to be determined at trial;

    b. Injunctive relief;

    c. Costs and disbursements; and

    d. Attorney's fees.

## VII. COUNT THREE: EQUITABLE MORTGAGE
## AGAINST ALL DEFENDANTS

113. Plaintiff hereby realleges and incorporates the facts and allegations contained in all preceding paragraphs, as if set forth fully herein.

114. The agreement Mr. Horne entered into with Harbour Portfolio should be reformed in equity into a deed and mortgage. Mr. Horne is the equitable owner of the home, and Harbour has not properly foreclosed his right of redemption.

115. The Restatement of Property (Mortgages) takes the position that a contract for deed creates an equitable mortgage. Georgia authorities also support the position that Mr. Horne is the equitable owner of the property, and that a forfeiture clause constitutes an unenforceable penalty.

116. Therefore, Mr. Horne seeks an order declaring that he is the owner of the home subject to an equitable mortgage loan for an amount certain. The amount

33

owed on such equitable mortgage should be offset by Mr. Horne's damages for his additional claims.

## VIII. COUNT FOUR: DECLARATORY JUDGMENT AGAINST ALL DEFENDANTS

117.   Plaintiff hereby realleges and incorporates the facts and allegations contained in all preceding paragraphs, as if set forth fully herein.

118.    The transaction creates an actual controversy that places the parties in a position of uncertainty as to their respective rights in the property.

119.    Mr. Horne has no remedy other than declaratory judgment that could adequately protect his legal right to the property.  A declaratory judgment is necessary to declare that the property is titled in his name and to relieve any uncertainty as to the status of the transaction.

## IX. COUNT FIVE: UNJUST ENRICHMENT AGAINST ALL DEFENDANTS

120.   Plaintiff hereby realleges and incorporates the facts and allegations contained in all preceding paragraphs, as if set forth fully herein.

121.   As described above, Plaintiff has spent a significant amount on repairs to the home, payment of property taxes, and keeping the home insured.

122.   If the contract is not reformed into an equitable mortgage and Mr. Horne is not recognized as the equitable owner of the property, then Defendants should not

be allowed to reap a windfall based on the substantial amount Mr. Horne has spent on repairs to the home, property taxes, and homeowner's insurance. Defendants have been unjustly enriched by these payments, and should be ordered to return them to Mr. Horne.

## X. CONCLUSION AND PRAYER FOR RELIEF

**WHEREFORE,** Mr. Horne respectfully prays that the Court grant the following relief:

(1) Enter a declaratory judgment that the foregoing acts, policies, and practices of Defendant Harbour Portfolio violate the Equal Credit Opportunity Act, 15 U.S.C. § 1691(a) et seq., and violate the Fair Housing Act;

(2) Enter an injunction, temporarily during the pendency of this action, preventing Defendants, their employees, agents, or assigns, from taking any action to dispossess Plaintiff from the property;

(3) Enter a permanent injunction enjoining Defendant Harbour Portfolio from engaging in the conduct described herein and directing Defendant to take all affirmative steps necessary to remedy the effects of the conduct described herein and to prevent additional instances of such conduct or similar conduct from occurring in the future, including but not limited to

35

requiring Defendant to pay off the balance of Plaintiff's loan now owed
to CWAM II, LLC;

(4) Award compensatory damages to Plaintiff in an amount to be
determined by a jury that would fully compensate Plaintiff for his injuries
caused by the conduct of Defendant Harbour Portfolio, including but not
limited to compensation for the funds Plaintiff has paid out of pocket
towards purchase and repair of the home;

(5) Award punitive damages to Plaintiff in an amount to be amount to be
determined by a jury that would punish Defendant Harbour Portfolio for
the willfull, wanton, and reckless conduct alleged herein and that would
effectively deter such conduct in the future;

(6) Award Plaintiff reasonable attorneys' fees and costs;

(7) Enter an order declaring that Plaintiff is the equitable owner of the
property;

(8) Enter an order directing Defendants to return to Plaintiff the amounts by
which they have been unjustly enriched;

(9) Award such other and further relief as the Court deems just and proper.

TRIAL BY JURY DEMANDED.

36

This 15th day of March, 2016,

Sarah Bolling Mancini
Georgia Bar No. 319930
Kristen E. Tullos
Georgia Bar No. 941093
Sarah I. Stein
Georgia Bar No. 598889
Counsel for Plaintiff DeMarkus Horne
Atlanta Legal Aid Society, Inc.
246 Sycamore Street, Suite 120
Decatur, GA 30030
(770) 817-7517 (SBM)
(770) 817-7540 (KET)
(770) 817-7515 (SIS)
(770) 817-7534 (Fax)
ktullos@atlantalegalaid.org
sbmancini@atlantalegalaid.org
sstein@atlantalegalaid.org