IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

DEMARKUS R. HORNE, NINA HORNE, )
JACKIE BROWN, DONNA BROWN, OLA )
ELDER JOHNSON, MICHAEL T. )
JOHNSON, ANITA JORDAN, LAUNDRA )   CIVIL ACTION
MARTIN, AL LEE BUTTS, VERONICA R. )
PITTS, LISA ELLIS-BLADES, RITA )   FILE NO. 1:17-CV-954-RWS
HENIGAN, ROHAN POWELL, )
LAQUINTA HUTCHINS, TABITHA )
HUNTER, JAMES HUNTER, and GERRY )
WHITE, )
 )
      Plaintiffs, )
 )
  vs. )
 )
HARBOUR PORTFOLIO VI, LP, )
HARBOUR PORTFOLIO VII, LP, )
NATIONAL ASSET ADVISORS, LLC, )
CWAM II, LLC, INVESTMENT TRADING )
& DEVELOPMENT, SG CAPITAL )
PARTNERS, JCT CAPITAL, LLC, )
HAMILTON GREEN CREST, and )
ORANGE CAPITAL FUNDING LLC, )
 )
     Defendants.

**PLAINTIFFS' RESPONSE IN OPPOSITION TO HARBOUR DEFENDANTS'
MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT**

# I.   Factual Background

This case is about the racially discriminatory targeting of a predatory financial product – Harbour Portfolio's contract for deed program.[1]

DeMarkus Horne had never owned a home before.[2] He heard about Harbour from his friend, who had seen a for-sale sign in front of a house and called the number, and was promised a credit for referring someone else. After he decided to buy one of Harbour's houses, Harbour congratulated him on the purchase of his new home. The house was in terrible shape, but Mr. Horne was handy and willing to do the work to make it his home. Mr. Horne spent a significant amount of money and devoted countless hours of his own labor to repair the home he believed he had bought for his family.

Harbour's business model involves buying homes from Fannie Mae that it knows are in extremely poor condition and concentrated in African-American neighborhoods. (Second Am. Compl. ¶¶ 48, 67, 68.) Many of the properties are uninhabitable, lacking functioning heat, water, and electricity. (*Id.* ¶ 48.) Harbour buys the properties extremely cheap, makes no repairs to the homes, and immediately sells them to prospective buyers like Mr. Horne at four to five times Harbour's purchase price, charging 10% interest. (*Id.*

---

[1] This case is not about contracts for deed being inherently unlawful, and no such claim is made in the Complaint. If Harbour's business model bore any resemblance to the Bridge to Success program outlined in the 2013 article Defendants cite, we would not be here. *See* Alexandra Stevenson, Matthew Goldstein, "Market for Fixer-Uppers Traps Low-Income Buyers," *The New York Times*, Feb. 21, 2016, http://www.nytimes.com/2016/02/21/business/dealbook/market-for-fixer-uppers-traps-low-income-buyers.html (comparing these two contract for deed programs).

[2] The facts in this paragraph are drawn from the Second Amended Complaint, or SAC, pages 39-48.

¶ 49, 50.) No appraisals are conducted in connection with the sales. (*E.g., id*. ¶ 99.) Many of the homes have hidden defects that could not be observed during the walk-through because the utilities were disconnected. (*Id*. ¶ 48.)

Buyers were told that they were becoming homeowners and were given Truth in Lending and HUD 1 disclosures and letters, like the one Mr. Horne received, that read, "Congratulations on the purchase of your new home!" (*E.g., id*. ¶¶ 102-110.) The contract required them to bring the home up to habitable condition, compliant with local health and safety codes, within four months. (*Id*. ¶ 51.) Plaintiffs believed they owned their homes and spent countless hours and significant amounts of money to repair and improve them. (*E.g., id*. ¶¶ 114-115, 139, 373.) But upon a single missed payment, they face the risk of losing all of the benefit and being evicted like a tenant. (*Id*. ¶ 51.)

Harbour's contracts are designed to fail, and Harbour reaps a significant windfall upon a buyer's default. (*Id*. ¶¶ 51-53.) Rather than having to foreclose and pass along any accumulated equity to the homeowner, Harbour takes back the property, along with the value of any repairs or improvements made by the buyer. (*Id*. ¶¶ 57, 60.) In Fulton County, Harbour has filed 34 evictions (out of 85 homes it purchased) and in DeKalb County, 21 (out of 42 homes). (*Id*. ¶ 55.)

The impact of Harbour's predatory contract for deed scheme has not been felt by all communities equally. The mean racial concentration of census tracts where Harbour

obtained properties and resold them through its contract for deed program from 2011 to 2015 is 86.25% African American, while the locations of other single family home sales during the same time period were in tracts with a mean concentration of 48.37% African American, and the Atlanta MSA overall is 34% African American. (SAC ¶¶ 72, 76, 77.) The racial skew of the locations where Harbour sold its contracts is highly statistically significant. Even controlling for median income of the census tract, age, and owner-occupancy rate, neighborhood racial concentration is still a highly statistically significant predictor of where Harbour homes are located. (*Id.* ¶¶ 77-80.)

Plaintiffs allege that Harbour knew exactly what it was doing; that it engaged in reverse redlining, taking advantage of patterns of residential segregation to sell a predatory product in communities of color. (*Id.* ¶ 67.) Harbour knowingly purchased properties in densely African-American neighborhoods and employed a racially targeted marketing strategy. (*Id.* ¶¶ 384-85.) Specifically, Harbour advertises properties through two methods: putting a for-sale sign in front of its houses (in black neighborhoods) and encouraging customers to refer friends and family. (*Id.* ¶¶ 61-64.) Harbour did not advertise through other, racially neutral, marketing options. (*Id.* ¶ 65.)

The Plaintiffs in this case are victims of Harbour's predatory and racially targeted

scheme.[3] Harbour has moved to dismiss all claims raised against them in this action. For the reasons that follow, this motion should be denied in its entirety.

## II.    Discussion

### A.    Harbour disregards Rules 12(b)(6) and 8.

Harbour fails to satisfy the standards for a motion to dismiss. Harbour routinely contradicts fact pled in the complaint and inserts its own factual allegations that are neither in the complaint nor subject to judicial notice, and that may not be presumed true at this stage. Harbour's attempts to challenge the facts pled in the complaint are improper. The SAC must be construed broadly and its allegations viewed in the light most favorable to Plaintiffs. *Watts v. Fla. Int'l Univ.*, 495 F.3d 1289, 1295 (11th Cir. 2007).

Further, Harbour can hardly argue that the SAC is a shotgun pleading. Each count in the SAC begins with a heading that states the cause of action, the respective Plaintiffs, and the respective Defendants. Each count includes the facts relevant to that claim and a separate demand for relief.[4] To "ascertain which alleged facts support each count," Harbour and this Court need only look to the allegations within the counts themselves.

### B.    Plaintiffs have properly alleged a violation of the Fair Housing Act based on intentional targeting.

Harbour intentionally targeted African-American aspiring homebuyers for its

---

[3] In the chart attached as Exhibit A, Plaintiffs have identified the paragraphs that contain each of the material allegations about the transaction with regard to each Plaintiff.

[4] If directed, Plaintiffs will amend the SAC to incorporate by reference in each count only certain factual allegations. But Plaintiffs do not believe restating paragraphs makes a shotgun complaint.

predatory contracts for deed by purchasing properties in predominately African-American census tracts, to an even greater extent than its facially-neutral policy of buying from Fannie Mae would predict, and employing marketing strategies likely to reach African Americans. (SAC ¶¶ 46-69.) Targeting a protected class for a predatory product, or reverse redlining, violates the Fair Housing Act. *Steed v. EverHome Mortg. Co.*, 308 F. App'x 364, 369 (11th Cir. 2009); *Hargraves v. Capital City Mortg. Corp.*, 140 F. Supp. 2d 7, 20 (D.D.C. 2000). In *Hargraves*, as in the instant case, the plaintiff provided statistical evidence that a company made a disproportionate number of loans in African-American census tracts and engaged in racially-targeted marketing practices. 140 F. Supp. 2d at 20-22 (denying defendants' motion for summary judgment).

Plaintiffs have alleged that Harbour targeted African-American neighborhoods for its predatory contract for deed transactions; therefore, Plaintiffs are not also required to show that Harbour offered contracts on more favorable terms to white applicants. *Steed*, 308 F. App'x at 369 (agreeing with *Hargraves* that plaintiffs can prove reverse redlining without showing that defendants made loans on preferable terms to white applicants, but granting summary judgment for Everhome because the Plaintiff provided "*no* evidence of where Everhome advertised or that Everhome made an unusual number of loans in majority black areas or targeted those debtors for foreclosure"); *Matthews v. New Century Mortg. Corp.*, 185 F. Supp. 2d 874, 886-87 (S.D. Ohio 2002) (allowing

plaintiffs' Fair Housing Act claims to move forward without proof of differential treatment); *Barkley v. Olympia Mortg. Co.*, Nos. 04 CV 875, 2007 U.S. Dist. LEXIS 61940, at *46-47 (E.D.N.Y. Aug. 22, 2007) (denying defendant's motion to dismiss where plaintiffs to provided evidence of targeting in lieu of differential treatment).

If Plaintiffs had to prove that Harbour treated white applicants differently, the Fair Housing Act would permit predatory contracts for deed so long as they are made exclusively to African Americans – an outcome that would be antithetical to its goal of eliminating discrimination in housing. *Hargraves*, 140 F. Supp. 2d at 20 (citing *Contract Buyers League v. F & F Inv.*, 300 F. Supp. 210, 216 (N.D. Ill. 1969); *M&T Mortg. Corp. v. White*, 736 F. Supp. 2d 538, 575 (E.D.N.Y. 2010). Where a defendant intentionally targets minorities for a predatory product, the fact that one or two non-minorities slip through is not determinative. *See Hargraves,* 140 F. Supp. 2d at 20.

In a footnote, Harbour claims that Plaintiffs cannot point to Harbour's policies as evidence of both discriminatory intent and discriminatory impact. It is not disfavored or even unusual for Plaintiffs to plead both types of violations, and the facts that support them are interrelated. *E.g., DeKalb Cty. v. HSBC N. Am. Holdings*, No. 1:12-CV-03640-SCJ, 2013 U.S. Dist. LEXIS 185976, at *49-50 (N.D. Ga. Sep. 24, 2013); *Hargraves*, 140 F.Supp.2d at 21. Because racial animus is often concealed or disguised, discriminatory intent can be established through circumstantial evidence, including

evidence of discriminatory effect. *Hallmark Developers, Inc. v. Fulton Cty.*, 466 F.3d 1276, 1283-84 (11th Cir. 2006) (citing *United States v. Hous. Authority of the City of Chickasaw*, 504 F. Supp. 716, 727 (S.D. Ala. 1980); *see also Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 335-340 (1977) (statistical evidence plays an important role in proving racially-motivated discrimination).

The extreme statistical racial skew of Harbour's predatory contracts combined with marketing practices that target African-American communities is sufficient to allege intentional targeting. *Teamsters,* 431 U.S. at 335-340; *Hargraves,* 140 F.Supp.2d at 20-21.

**C.     Plaintiffs have properly pled a violation of the Fair Housing Act based on a disparate impact.**

Contrary to Harbour's position, Plaintiffs have properly pled all elements of a Fair Housing Act claim based on disparate impact. To plead a discriminatory effects violation of the Fair Housing Act, a complaint must allege "(i) a specific and clearly delineated practice or policy adopted by the defendant, (ii) a disparate impact on a protected group, and (iii) facts demonstrating a causal connection between the specifically challenged practice or policy and the alleged disparate impact." *DeKalb County v. HSBC N. Am. Holdings*, 2013 U.S. Dist. LEXIS 185976, at *50 (N.D. Ga. Sept. 25, 2013).[5]

---

[5] *See also Hargraves*, 140 F.Supp.2d at 21 (plaintiffs met their prima facie burden by providing statistical evidence that defendant's  practices led to loans disproportionately concentrated in majority black census tracts); *Steed*, 308 Fed. Appx. at 368-69 (following *Hargraves*).

### *(1) Plaintiffs have identified a specific, facially neutral policy.*

Unlike the plaintiffs in the cases Harbour relies upon, Plaintiffs here have identified a specific, facially neutral practice causing the disparate impact: Harbour's decision to source its contract for deed sales exclusively from Fannie Mae REO properties. (SAC ¶¶ 74, 385.)[6] Harbour knew these properties were located in high-minority areas, yet they chose to advertise their predatory contracts only through yard signs and referrals. (*Id*. ¶¶ 61-64.) Harbour opted not to advertise its program on the radio, in the newspaper, on TV, or through any non-racially-targeted means. (*Id*. ¶ 65.) As Harbour points out, courts have dismissed disparate impact claims where plaintiffs failed to identify a specific, neutral practice. *See Cobb County v. Bank of America*, 183 F.Supp.3d 1332, 1346 (N.D. Ga. 2016); *City of Miami*, 171 F.Supp.3d 1314, 1320 (S.D. Fla. 2016). In contrast, Plaintiffs have identified a specific, facially neutral practice.

### *(2) Plaintiffs have pled a statistical disparity.*

Plaintiffs allege that this neutral practice caused a disproportionate concentration of Harbour transactions in high-minority census tracts. (SAC ¶ 76.) Harbour wrongly asserts that the racial demographics of a geographic area where loans are made cannot support a disparate impact claim. In fact, alleging this kind of impact on segregated areas

---

[6] Plaintiffs allege that 126 out of 127 Harbour properties in Fulton and DeKalb County were purchased from Fannie Mae. Plaintiffs further allege that the one errant property might also have been from Fannie Mae and mis-coded in error. (SAC ¶ 74, n.12.) Regardless, one outlier does not call into question a policy.

is squarely in the norm for redlining and reverse redlining cases. In *Hargraves*, a seminal reverse redlining case that has been followed by the Eleventh Circuit, the court concluded that plaintiffs had met their prima facie burden of showing a disparate impact by providing statistical evidence that the defendant had made a disproportionate number of its loans in census tracts that were majority black and more than 90% black. 140 F.Supp.2d at 21. By contrast, in *Steed v. EverHome Mortgage*, the Eleventh Circuit upheld summary judgment dismissing an FHA claim on the basis that the plaintiff had provided no evidence that the defendant made an unusual number of loans in majority black areas. 308 Fed. Appx. at 369 (following *Hargraves*).

As these courts acknowledge, redlining is the practice of denying credit "to specific geographic areas due to the income, race, or ethnicity of its residents." *Hargraves* at 20. Reverse redlining, by extension, means lending on unfair or predatory terms to these same communities, either intentionally or through a neutral practice with a discriminatory effect. *See Steed,* 308 Fed. Appx. at 368; *Hargraves,* 140 F.Supp.2d at 20. As the Plaintiffs' claims here involve reverse redlining, pleading geographic racial concentration is an appropriate measure of impact.

Naturally, the fact that loans were made in predominantly African-American census tracts means that the victims of these loans were likely to be mostly African American. Harbour's racially targeted advertising scheme, putting up yard signs in black

neighborhoods and offering to pay its customers for referrals of other customers, predictably and actually led to almost all borrowers being African American. (SAC ¶¶ 61-68). *See Hargraves,* 140 F.Supp.2d at 21 (noting that while evidence of intent is not necessary for a disparate impact claim, geographically targeted advertising can support such a claim). Harbour's targeting of neighborhoods of color meant targeting borrowers of color.

### (3) Plaintiffs have pled facts showing a robust causal link between the neutral practice and the disparate impact.

Without question, Plaintiffs have alleged a statistically significant racial skew to the location of Harbour Properties that was caused by the decision to purchase its properties from Fannie Mae. The statistical analysis showed that Fannie Mae sales were located in census tracts with a median racial concentration of 71.37% African American, while non-Fannie Mae sales during the same time period were located in census tracts with a median racial concentration of 48.37% African American. (SAC ¶ 76, Table 1.) This 23% spread, caused by the practice of buying from Fannie Mae, is highly statistically significant.[7] Harbour **chose** to buy its properties from Fannie Mae, and making that choice led to concentrating Harbour contracts in census tracts that were significantly higher percent minority. Had Harbour not purchased them, these Fannie

---

[7] Plaintiffs could amend the complaint, if directed, to allege that even when controlling for median income of the census tract, percent owner-occupied, and median housing unit age, race and ethnicity of the census tract still have a large and statistically significant effect on the odds of a property being sold by Fannie Mae versus another seller.

properties could have been offered for some other purpose, rather than the extremely abusive loan terms Harbour fashioned. Harbour attempts to impermissibly insert facts that are not pled in the SAC related to its purchase arrangements from Fannie Mae. How these purchases were made and what alternatives existed for Harbour are proper subjects for discovery. Regardless, Harbour exercised free will in its decision to source its predatory contract for deed sales exclusively from Fannie Mae and advertise only through yard signs and referrals. These decisions caused a statistically significant racial impact in the location of its properties and demographics of its borrowers.

Defendants make much of the fact that Plaintiffs went on to plead that Harbour's locations are even more racially concentrated than the average of all Fannie Mae sales, suggesting that this further racial skew defeats causality. This argument makes no sense. Even if Harbour's purchases are more intensely segregated than the universe of all Fannie REO properties, that does not negate the fact that buying exclusively from Fannie Mae itself created a racial impact. Plaintiffs alleged that this additional racial concentration is evidence of Harbour's intentional targeting of communities of color, because the sub-set of the properties Harbour purchased is even more clustered in communities of color. Regardless, Plaintiffs have more than met their burden of pleading a neutral practice and showing that this practice caused a significant discriminatory effect.

At this stage, Plaintiffs need only plead facts giving rise to an inference of

11

causation of the racially disparate impact; the ultimate question of proving what caused the disparity must be held for another day. *See DeKalb County*, 2013 U.S. Dist. LEXIS 185976, at *58-59 (the ultimate question of causation was premature on a motion to dismiss); *Miller v. Countrywide Bank, N.A.*, 571 F.Supp.2d 251, 259 (D. Mass. 2008) (proof of causation, as compared to adequacy of pleadings, must be held for a later stage of the proceeding).

### *(4) Plaintiffs are not required to show that a practice is arbitrary or unnecessary at the pleading stage, but in any event, they have done so.*

Plaintiffs allege that Harbour did not have to purchase properties from Fannie Mae; that it could have purchased from a broader array of sellers, that Fannie Mae properties constituted roughly one fourth of foreclosures over the relevant time period, and that non-Fannie sales were less racially concentrated. (*Id.* at ¶¶ 46, 76.) These facts support an inference that Harbour had an alternative source of homes to sell through its contract for deed program which would have been less racially concentrated, and thus Harbour's policy of buying exclusively from Fannie was arbitrary and unnecessary.

Although these allegations are more than sufficient, Plaintiffs are not required to show that the neutral practice was arbitrary at this stage. The Supreme Court in *Texas Dep't of Housing & Community Affairs v. Inclusive Communities Project* did not add an element to the pleading of a disparate impact claim. 135 S.Ct. 2507, 2523 (2015) (hereinafter *ICP*). Rather than imposing a fourth element at the pleading stage, the Court

in *ICP* stated that in order to impose disparate impact "**liability**," the neutral policy at issue must be "artificial, arbitrary, and unnecessary." *Id.* at 2524. This discussion of what it takes to ultimately prevail on a disparate impact claim was not related to pleading a prima facie claim.[8]

In *ICP*, the Supreme Court acknowledged and approved of HUD's recent regulation outlining the means of pleading and proving a disparate impact claim. *Id.* at 2514-15. The HUD regulations memorialized the burden shifting framework that had already been adopted by the courts. Under this framework, the plaintiff's prima facie claim does not require refuting the defendant's neutral justification. A plaintiff is not required to show that a practice was unnecessary until the defendant has proven that the challenged practice in fact serves a substantial, legitimate, nondiscriminatory interest. 24 CFR § 100.500. *See also Implementation of the Fair Housing Act's Discriminatory Effects Standard*, 78 Fed. Reg. 11460, 11473-74 (2013) (explaining that under the three-step burden shifting process, plaintiffs will have the benefit of discovery before having to show a less discriminatory alternative). Showing that a practice was arbitrary or unnecessary involves refuting the defendant's legitimate reason for adopting it. It would make no sense to require a plaintiff to refute an alleged legitimate justification before any legitimate justification has been offered.

---

[8] The *ICP* appeal followed a ruling on the Defendant's ultimate liability under a disparate impact theory, after both an order on summary judgment and a bench trial. *See ICP v. Texas Dep't of Hous. & Cmty Affairs*, No. 3:08-CV-0546 (N.D. Tex. Mar. 20, 2012) (entering judgment on liability).

The D.C. District Court recently discussed the requirements to plead a viable disparate impact claim after *ICP*. *Nat'l Fair Hous. Alliance v. Travelers Indem. Co*., 2017 U.S. Dist. LEXIS 132899 (D.D.C. Aug. 21, 2017) (hereinafter *NFHA*). The Court explained, "[b]ecause this case is at the motion to dismiss stage, the limitations at the prima facie stage are relevant here," and acknowledged that other limitations on disparate impact liability "take effect at different stages." *Id*. at *20-21 ("for example, defendants must have 'leeway to state and explain the valid interest served by [the challenged] policies' at the rebuttal stage"). The D.C. Court went on to discuss the handful of cases that have closely examined *ICP*'s causality standard, and concluded that the plaintiff had sufficiently alleged a disparate impact caused by defendant's policy of refusing to insure properties that accepted Section 8 vouchers by pleading facts showing that "voucher recipients are significantly more likely to be members of a protected class than is true for the D.C. population as a whole" and including statistical analysis that focused on the relevant geographic area. *Id*. at *33.

A post-*ICP* case from a Georgia trial court is instructive. In *Sams v. GA West Gate, LLC*, the court discussed *ICP*'s pleading standard of robust causality and concluded that plaintiffs had adequately pled their claim related to a criminal history ban imposed by an apartment complex, based on allegations that African Americans are twice as likely as caucasians to have criminal convictions and make up a disproportionate share of the

prison population. 2017 U.S. Dist. LEXIS 13168, at *12-13 (S.D. Ga. Jan. 30, 2017). The court did not impose an arbitrariness prong at the pleading stage. *Id.*

The two district court decisions relied upon by Defendants to impose an arbitrariness prong at the pleading stage involved plaintiffs who had properly pled neither a facially neutral practice nor causation, so the discussion of arbitrariness was not necessary to the courts' decisions to require better pleading.[9]

Here, Plaintiffs have alleged the disproportionate representation of African Americans in neighborhoods where Fannie Mae properties are located, showing that Harbour's practice of only buying properties from Fannie Mae for its contract for deed program caused a disparate impact. This is analogous to the pleading deemed sufficient in *Sams*, where disproportionate prevalence of criminal backgrounds caused a disparate impact, and *NHFA*, where disproportionate representation of African Americans among Section 8 voucher holders sufficed to allege causation. *Sams*, 2017 U.S. Dist. LEXIS at 9-11; *NFHA*, 2017 U.S. Dist. LEXIS at 26-34. Plaintiffs' allegations about Harbour's racially targeted marketing scheme further support a solid disparate impact claim. *See Hargraves,* 140 F.Supp.2d at 21.

**D.    Plaintiffs' ECOA claim should proceed.**

Plaintiff's ECOA claims are supported by the same facts as their FHA claims, and

---

[9] The Eleventh Circuit never suggested that the arbitrariness of the neutral practice needed to be alleged at the pleading stage, focusing instead on causality. *See City of Miami v. Bank of America*, 800 F.3d 1262, 1286-87 (11th Cir. 2015).

should move forward for the same reasons.

Courts have overwhelmingly held that reverse redlining – here, Harbour's practice of targeting its contracts for deed on the basis of race – violates both the FHA and ECOA. *E.g. Brook v. Sistema Universitario Ana G. Mendez, Inc.*, No. 8:17-cv-171-T-30AAS, 2017 U.S. Dist. LEXIS 67940, at *5-6 (M.D. Fla. May 4, 2017) ("A plaintiff could establish a cause of action under ECOA under the theory of reverse redlining if he can establish that he was given credit under less favorable terms because of his membership in a certain class," but dismissing the claim because plaintiffs failed to show causation); *United States v. Auto Fare, Inc.*, No. 3:14-cv-0008-RJC-DSC, 2014 U.S. Dist. LEXIS 86382, at *7-8 (W.D.N.C. June 25, 2014); *U.S. ex rel. Cooper v. Auto Fare, Inc.*, No. 3:14-CV-0008-RJC, 2014 U.S. Dist. LEXIS 86382, 2014 WL 2889993, at *1-3 (W.D.N.C. June 25, 2014); *M & T Mortg. Corp.*, 736 F. Supp. 2d at 574-76; *Jackson v. Novastar Mortg. Inc.*, 645 F. Supp. 2d 636, 647 (W.D. Tenn. 2007); *Hargraves*, 140 F.Supp.2d at 20-23.

To adequately plead a disparate treatment claim under ECOA, Plaintiffs are not required to allege that Harbour treated white applicants differently. While that is one way to show intentional discrimination under ECOA, in reverse redlining cases, courts have consistently looked at evidence of targeting instead of comparative treatment of

16

minorities and non-minorities.[10] *E.g. Matthews*, 185 F.Supp.2d at 885-888 ("If the plaintiff presents direct evidence that the lender intentionally targeted her for unfair loans on the basis of [membership in a protected class], the plaintiff need not also show that the lender makes loans on more favorable terms to others."); *Hargraves,* 140 F.Supp.2d at 23. The policy reason is the same as in the FHA context: lenders cannot escape liability by targeting a predatory product at a protected class and then giving the same bad deal to non-protected class members who inadvertently get trapped in their net. Plaintiffs have adequately alleged that Harbour targeted its predatory contracts for deed in African-American neighborhoods using statistical analysis of the locations of the homes Harbour purchased for its contract for deed business as well as Harbour's marketing practices intended to reach African Americans. (SAC ¶¶ 46-69.)

Based on the same three-pronged test described above with respect to the FHA, Plaintiffs have properly pled a disparate impact claim under ECOA. Numerous courts have held that disparate impact claims can be brought under ECOA, and Harbour cited no case holding otherwise in its single footnote addressing the issue. *E.g., M&T Mortg. Corp.*, 736 F. Supp. 2d at 574 ("FHA and ECOA claims may be prosecuted on the basis of…disparate impact, i.e., that the defendant's practices have a proportionally greater negative impact on minority populations."); *Ramirez v. GreenPoint Mortg. Funding, Inc.*,

---

[10] The only case cited by defendants in support of their assertion that white applicants must be treated differently was a case that did not involve targeting. *Powell v. Am. Gen. Fin., Inc.*, 310 F. Supp. 2d 481, 489 (N.D.N.Y. 2004).

633 F. Supp. 2d 922, 926-27 (N.D. Cal. 2008) (disparate impact claims are cognizable under ECOA); *Williams v. First Fed. Sav. & Loan Asso.*, 554 F. Supp. 447, 448 (N.D.N.Y. 1981) (finding that ECOA claims may be proven by disparate impact, but granting summary judgment for defendant bank because plaintiff's bare allegations that she was in a protected class and the bank did not fund her loan were insufficient).

In addition, the legislative history makes it clear that Congress intended for ECOA to address discriminatory effects. Senate Comm. on Banking, Housing and Urban Affairs, Equal Credit Opportunity Act Amendments of 1976, S. Rep. No. 94-589, at 4 (1976) ("In determining the existence of discrimination…courts or agencies are free to look at the effects of a creditor's practices as well as the creditor's motives or conduct in individual transactions."). Moreover, the Federal Reserve Board and the Consumer Financial Protection Bureau, the agencies tasked with implementing ECOA since its enactment in 1968, have interpreted the statute to allow for a disparate impact claim.[11] 12 C.F.R. Part 202, § 202.4, ¶ 4(a) ("Disparate treatment on a prohibited basis is illegal whether or not it results from a conscious intent to discriminate."); 12 C.F.R. § 1002, Supp. 1 to Part 1002, § 1002.4, ¶ 4(a) (restating the same). Agency interpretations of this kind are generally entitled to great deference, and they are specifically incorporated into ECOA. 15 U.S.C.S. § 1691a(g) (any reference to any requirement or provision of ECOA also includes

---

[11] Initially, this interpretation was put forward by the Federal Reserve Board and the CFPB has maintained the same view since obtaining regulatory authority for ECOA under Dodd-Frank.

reference to the implementing regulations); *Griggs v. Duke Power Co.*, 401 U.S. 424, 434 (1971).

**E.     Plaintiffs' FHA and ECOA claims are timely.**

"[D]ismissal on statute of limitations grounds is appropriate only if it is apparent from the face of the complaint that the claim is time-barred." *Lindley v. Birmingham*, 515 F. App'x 813, 815 (11th Cir. 2013) (citations omitted). A complaint may be dismissed on the basis of a statute of limitations defense "only if it appears beyond a doubt that Plaintiffs can prove no set of facts that toll the statute." *Id.*; *see also County of Cook v. Bank of America Corp.*, 181 F.Supp.3d 513, 520 (N.D. Ill. 2015).

Although the limitations bar might seem on its face to affect several Plaintiffs' claims, three independent arguments (any single one sufficient) preserve the claims. First, these claims are preserved by the continuing violation doctrine. Second, the FHA limitations period begins to run only upon discovery of alleged violation. Third, the statute was equitably tolled due to concealment.

Plaintiffs' FHA and ECOA claims are timely under the continuing violations doctrine because they allege that Defendants engaged in a pattern of discriminatory lending that continued into the limitation period. "[W]here a plaintiff, pursuant to the Fair Housing Act, challenges not just one incident of conduct violative of the Act, but an unlawful practice that continues into the limitations period, the complaint is timely when

it is filed within" that period. *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 380-81 (1982). In *Havens*, the Supreme Court explained that a "wooden application" of the statute of limitations would undermine the "broad remedial intent of Congress" in enacting the Fair Housing Act. *Id.* Statutes of limitations "are intended to keep stale claims out of the courts," but that when a violation is continuing, "the staleness concern disappears." *Id.*

These Plaintiffs allege precisely the kind of extended and integrated discriminatory practice contemplated in *Havens*. Plaintiffs have alleged a continuous pattern of discriminatory lending, with all transactions bearing the same key features. (*See* Exhibit A.)[12] They also allege at least one anchoring transaction that was consummated within the statutory period: Mr. Jackie Brown's loan was originated on April 15, 2015, and his claims were raised on April 14, 2017. (SAC ¶ 134; First Am. Compl., April 14, 2017.)

The application of the continuing violations theory to a pattern of discriminatory lending like that pled in the SAC is well established in the Eleventh Circuit. *See Miami v. Bank of America Corp.*, 800 F.3d 1262, 1283-86 (11th Cir. 2015), *vacated and remanded on other grds.*, 137 S. Ct. 1296 (2017) (under continuing violations theory, if the City can identify FHA violations within the limitations period, the case would be "on all fours with *Havens*"); *Cobb County v. Bank of Am. Corp.,* 183 F. Supp. 3d 1332, 1342-43 (N.D.

---

[12] The chart attached as Exhibit A references the key features of each transaction and in what paragraph those elements are pled.

Ga. 2016) (statute of limitations tolled with respect to earlier violations if plaintiff alleges at least one FHA violation within the statutory period); *DeKalb County v. HSBC N. Am. Holdings*, 2013 WL 7874104, at *9-12 (N.D. Ga. Sept. 25, 2013) (discussing and following *Havens*); *Cherry v. D.B. Zwirn Special Opportunities Fund*, 2010 WL 415313 (M.D. Fla. Jan. 27, 2010) (applying the doctrine to a "loan to own" scheme that "extended over a long period of time") *aff'd*, 433 Fed. Appx. 870 (11th Cir. 2011). *See also Ramirez*, 633 F. Supp. 2d 922, 930 (explaining that pattern of housing discrimination cases are similar to hostile work environment claims, where an accumulation of violations brings an "over-arching" pattern to light; explaining that "although each loan origination could be seen as a separate violation… this does not mean that the continuing violations doctrine does not apply"); *Barkley*, 2007 WL 2437810, at *16 (allegation that the last asserted occurrence of predatory home sales to minority buyers occurred in the limitations period was sufficient to survive a motion to dismiss).

Although Harbour's conduct may not have been perfectly identical in every loan, it adds up nevertheless to a unified scheme of discrimination, manifested in various actions. As the Eleventh Circuit noted in *Miami v. Bank of America Corp.*:

> The predatory qualities of the loans have taken slightly different forms over time (e.g., higher interest rates, undisclosed back-end premiums, higher fees, etc.). … The fact that the burdensome terms have not remained perfectly uniform does not make the allegedly unlawful practice any less "continuing."  The various instances of discriminatory lending comprise the practice, which continues into the

21

limitations period.  At least at the pleading stage, this is enough to plausibly invoke the continuing violation doctrine.

800 F.3d 1262, 1285.

Moreover, Plaintiffs allege numerous acts enforcing the predatory contracts within the limitations period. They allege that Harbour threatened evictions and actually carried out evictions on seven occasions within the statutory period. (*See* Ex. A.) This conduct within the limitations period, although unnecessary to anchor Plaintiffs' claims, provides additional reasoning to allow the complaint to proceed. *See DeKalb Cnty. v. HSBC*, 2013 WL 7874104, at *11-12 (noting that a split of authority exists regarding such ongoing enforcement; holding a decision until summary judgment or trial); *DeKalb Cnty. v. HSBC*, No. 1:12-cv-3640-AT, at 9 (N.D. Ga. June 29, 2016) (recent order in the same case, stating, "the Court needs to see if Plaintiffs can produce any evidence of discriminatory acts and [their] 'character' … before reaching any determination on the statute of limitations issues."). *See also Hargraves*, 140 F. Supp. 2d at 18-19 (because the loans themselves were discriminatory, actions to enforce them were violations in themselves); *Contract Buyers League*, 300 F. Supp.at 220-21 (ongoing enforcement of exploitative land contracts rendered the claims "present and vital").[13]

Second, the FHA and ECOA statutes of limitations are subject to the discovery

---

[13] The *Contract Buyers League* case alleged a very similar scheme of racial targeting of contract for deed transactions, some fifty years ago. Harbour's lending program harkens back to a different era.

rule.  The limitation period "begins to run [when] 'facts supportive of the cause of action are or should be apparent to a reasonably prudent person similarly situated.'" *Telesca v. Village of Kings Creek Condo. Ass'n, Inc.,* 390 F. App'x  877, 882 (11th Cir. 2010) (citation omitted). *See also Jones v. Dillard's, Inc*., 331 F.3d 1259, 1264 (11th Cir. 2003) (in age discrimination case, holding that the limitations period should begin to run as of the date a reasonable plaintiff should have discovered the discriminatory conduct) (citations omitted); *Sturniolo v. Sheaffer, Eaton, Inc*., 15 F.3d 1023, 1025 (11th Cir. 1994) (same). "The discovery rule is both a commitment to fundamental fairness and a safeguard against sophisticated schemes that use parameters of the law to facilitate injustices." *Saint-Jean v. Emigrant Mtg. Co.*, 50 F. Supp.3d 300, 314 (E.D.N.Y. 2014). Plaintiffs allege that they were unaware of Defendants' racially discriminatory lending pattern until they consulted a lawyer, well within the statutory limitation period before suit. (SAC ¶ 376.) Because that consultation defined their date of discovery, see *Saint-Jean*, 50 F. Supp.3d at 315-17, the statute did not accrue until that date.

Finally, Plaintiffs' FHA and ECOA claims should be preserved based on equitable tolling. Although Defendants may object that they engaged in no intentional concealment, equitable tolling is appropriate nonetheless because "FHA, ECOA, and other claims similar to those advanced by Plaintiffs in the context of discriminatory [home purchase] lending, are inherently self-concealing." *Saint-Jean*, 50 F. Supp.3d at

23

316 (citations omitted). *See also Osterneck v. E.T. Barwick Inds., Inc.*, 825 F.2d 1521,

1535 n.28 (11th Cir. 1987) (equitable tolling may apply based on affirmative

concealment or where "concealment is inherent in the nature of the wrong done");

*DeKalb Cnty. v. HSBC*, 2013 WL 7874104, at *12, n.22 (question of due diligence in

discovering a claim should be reserved until evidence can be submitted); *Thompson v.

Metro. Life Ins. Co*., 149 F. Supp. 2d 38, 49 (S.D.N.Y. 2011) (whether plaintiffs

exercised reasonable diligence is a question of fact). Plaintiffs have alleged an inherently

self-concealing wrong, the targeting of racial minorities for an abusive loan product, and

that they sued within two years of their discovery of the violation. (SAC ¶ 376.)

Defendants have not satisfied the stringent test for Rule 12(b)(6) dismissal of

Plaintiffs' FHA and ECOA claims on timeliness grounds.

**F.     Plaintiffs have alleged a claim under the Georgia Fair Housing Act.**

The Georgia Fair Housing Act and the federal Fair Housing Act are "nearly

identical," and the same factual allegations that support Plaintiffs' claims under the Fair

Housing Act also support their claim under the state corollary. *See Stewart v. McDonald*,

334 Ga. App. 461, 465-66 (2015); *Steed*, 477 F. App'x at 726 (courts rely on federal

court interpretations of the FHA in construing the GFHA). Thus, for the same reasons

cited above, this claim should proceed.

### G.  Plaintiffs Brown and Hutchins have alleged proper TILA claims.

Only Jackie Brown and LaQuinta Hutchins bring claims under TILA because their loans were originated within three years, the limitations period applicable to the kind of TILA claims they bring.[14] *See* 15 U.S.C. 1640(e) (three year limitations period applies to claims under 15 U.S.C. §§ 1639, 1639b, 1639c). However, Plaintiffs now realize that certain claims applicable to higher priced mortgage loans do in fact carry a one-year statute of limitations.[15] Plaintiffs will amend the SAC to remove those particular TILA claims that are time-barred.

### H.  The Georgia Residential Mortgage Act is privately enforceable.

Defendants argue that Plaintiffs' claims under the Georgia Residential Mortgage Act (GRMA), O.C.G.A. § 7-1-1000 *et seq*., should be dismissed because the GRMA does not provide a private right of action. Decisions by this court find the existence of a private right of action under the GRMA. *Scott v. Bank of Am., N.A.*, 2011 U.S. Dist. LEXIS 161613, *7-10 (N.D. Ga. Sept. 16, 2011); *Jordan v. Novastar Mortg., Inc.*, 2009 U.S. Dist. LEXIS 134878, at *2-4 (N.D. Ga. Nov. 18, 2009) (private right of action for claims post-dating 2005 statutory amendment). In upholding a private action under the GRMA, *Scott v. Bank of America* notes that federal courts must follow state courts'

---

[14] The one-year statute of limitations cited by Defendants applies to non-disclosure claims, and not to most of the substantive rules added to TILA by Dodd-Frank which these Plaintiffs raise.

[15] This was an error of Plaintiffs' counsel and will be rectified by amending the TILA count to remove any claims that are governed by a one-year statute of limitations.

interpretations of state statutes and that Georgia courts have not viewed the GRMA as lacking a private right of action. *See* 2011 U.S. Dist. LEXIS at *8 (reviewing Georgia cases).

*Scott* and *Jordan* also follow the many Georgia cases finding similar statutes enforceable by private citizens when they do not contain a specific cause of action within the statute. *See Norris v. Sigler Daisy Corp.*, 260 Ga. 271 (1990) (criminal usury statute could give rise to a civil cause of action); *Borison v. Christian*, 257 Ga. App. 257, 258 (2002) (violation of criminal statute limiting bail bond compensation can give rise to civil cause of action); *Val D'Aosta Co. v. Cross*, 241 Ga. App. 583, 585 (1999) (statute is privately enforceable under a theory of negligence where the statute had criminal and administrative enforcing mechanisms); *Central Anesthesia Associates P.C. v. Worthy*, 173 Ga. App. 150, 152-153 (1984) *aff'd*, 254 Ga. 728 (1985) (negligence per se claim for violation of a nurse licensing statute containing no explicit civil remedies; statute contained criminal sanctions).

Under Georgia law, persons injured by the breach of a statutory duty may recover if (1) the statute breached was enacted for the benefit of a class of persons to which they belong, and (2) the harm caused was the harm that the statute was intended to guard against. *Amick v. BM & KM, Inc.*, 275 F. Supp. 2d 1378, 1382 (N.D. Ga. 2003) (analyzing Georgia case law). O.C.G.A. § 51-1-6 codifies this principle, stating:

> When the law requires a person to perform an act for the benefit of another or to refrain from doing an act which may injure another, <u>although no cause of action is given in express terms</u>, the injured party may recover for the breach of such legal duty if he suffers damage thereby.

O.C.G.A. § 51-1-6 (emphasis added). Georgia law allows the adoption of a statute or regulation as a standard of conduct so that its violation becomes negligence per se. *Pulte Home Corp. v. Simerly*, 322 Ga. App. 699, 705 (2013).

The language of the GRMA demonstrates that the Georgia legislature planned for the statute to be enforced by private citizens. The legislature intended that citizens would sue under the GRMA when it (1) required lenders to post a bond and provided borrowers a remedy against the bond and (2) required that lenders give notice to the Department when they were sued by borrowers or if borrowers obtained a judgment against them. Section 7-1-1003.2(d) requires that mortgage brokers and mortgage originators maintain a bond for the benefit of "any person" damaged by noncompliance with the GRMA. Section 7-1-1003.2(e) further provides: "<u>Any person, including the department</u>, who may be <u>damaged by noncompliance</u> of a licensee with any condition of a bond <u>or this article</u>, the "Georgia Residential Mortgage Act," may proceed on such bond against the principal or surety thereon, or both, to <u>recover damages</u>." (emphasis added). Thus, the plain language of the statute allows recovery by "any person," including borrowers. The legislature would not have assured that borrowers would be able to collect judgments from the bond unless it intended borrowers to be able to privately enforce the statute.

*Jordan,* 2009 U.S. Dist. LEXIS at *2-4 (finding that the GRMA's bond provisions support a private right of action, but refusing to apply it retroactively to conduct that occurred prior to their enactment).

Furthermore, several notice provisions make clear the legislature's understanding and intent that borrowers will file private actions under this statute. When a corporate surety pays a judgment from the bond covering noncompliance with the GRMA, it must notify the department. O.C.G.A. § 7-1-1007(b). Obviously persons other than the department are intended to collect on judgments from the bond or there would be no need for notice. Not only did the legislature include a guaranteed bond remedy for consumers, it also made clear that consumers could recover damages under the article itself, independent of the bond. Section 7-1-1007(a) provides that:

> A licensee shall give notice to the department by registered or certified mail or statutory overnight delivery of <u>any action</u> which may be brought against it by any creditor <u>or borrower</u> where such action <u>is brought under this article</u>, involves a claim against the bond filed with the department for the purposes of compliance with Code Section 7-1-1003.2 or 7-1-1004, <u>or</u> . . . <u>of any judgment which may be entered against it by any creditor or any borrower or prospective borrower</u>. . . .

The text of this statute shows that the legislature envisioned that borrowers would file lawsuits under the GRMA and prevail. <u>None</u> of the cases cited by Defendants or any other case holding that there can be no private enforcement of the GRMA discuss these explicit statutory provisions that presume and intend private enforcement by borrowers. While the other cases cited above rely on statutory intent and O.C.G.A. § 51-1-6, the

28

statutory language of the GRMA makes a private civil remedy even clearer.

In addition to the bond and notice provisions of the GRMA, the substance of the GRMA makes it clear that the legislature intended to create a private right of action for borrowers.[16] The statute creates a standard of conduct to protect individuals, not just for licensing and inspection purposes. *See Doe v. Fulton-DeKalb Hosp. Auth.*, 628 F.3d 1325, 1339 (11th Cir. Ga. 2010).

The explicit statutory language of the GRMA, applicable state cases interpreting the GRMA, and better reasoned federal authority all support Plaintiffs' claims that the GRMA is privately enforceable.

Further, the Plaintiffs' GRMA claims are timely. When a Georgia statute contains no limitations period, the general statute of limitations governs. In general, actions to enforce a right accruing to an individual under a state statute must be brought within twenty years. O.C.G.A. § 9-3-22; *Hornsby v. Phillips*, 190 Ga. App. 335, 875 S.E.2d 870 (1989) (Georgia Sale of Business Opportunities Act). Under the 20-year statute, all of Plaintiffs' claims are timely.[17]

---

[16] The conduct barred by the GRMA also makes clear that a private remedy was envisioned. Borrowers cannot receive effective relief merely from state enforcement actions if they lose a home because of a loan made "with the intent to foreclose," are harmed by misrepresentation of material facts or the use of false statements or documents, or are harmed by a lender's failure to "disburse funds in accordance with a written commitment…to make or a mortgage loan." O.C.G.A. § 7-1-1013(9), (1), and (3).

[17] Alternatively, actions for injuries to personalty must be brought within four years. O.C.G.A. § 9-3-31; *Currie v. Cayman Res. Corp.*, 595 F.Supp. 1364, 1378 (N.D. Ga. 1984), rev'd in part on other grds., 835 F.2d 780 (11th Cir. 1988) (Georgia UDTPA); *Kason Indus., Inc. v. Component Hardware Group, Inc.*,

The GRMA claims should survive a motion to dismiss and be heard on the merits.

## I.      The FBPA and the UDPTEA apply to the alleged conduct.

Harbour attempts to avoid liability under the FBPA and the UDPTEA based on an exemption that does not help them.[18] The exemption bars FBPA claims based on "[a]ctions or transactions specifically authorized under laws administered by or rules and regulations promulgated by any regulatory agency of this state or the United States." O.C.G.A. § 10-1-396(1) (emphasis added). In support of its argument, Harbour cites to cases dealing with mortgages. But a contract for deed is not a mortgage. Mortgage lending is heavily regulated; contracts for deed are the Wild West. Not a single Georgia or federal statute or regulation specifically regulates contracts for deed or the exercise of a forfeiture remedy contained in such a contract.[19]

For conduct to be exempted from the FBPA, there must be a law, rule, or regulation that "specifically" addresses that conduct.[20] The Georgia legislature's choice of the word "specifically" must be respected. A statute cannot be construed in a manner

---

120 F. 3d 1199, 1204 (11th Cir. 1997) (borrowing same limitations period, by analogy, for federal Lanham Act purposes). Even under the 4-year statute, virtually all of Plaintffs' claims would be timely.

[18] Contrary to Harbour's claims, the FBPA exemption at OCGA 10-1-396(1) nowhere refers to the UDPTEA. Neither does the UDPTEA reference or incorporate the FBPA exemption.

[19] *Cf.* Ohio Rev. Code Ann. § 5313.07 (restricting forfeiture); Tex. Prop. Code Ann. § 5.079 (converting contract for deed to a deed and mortgage upon recordation).

[20] "The [exemption] excludes from the FBPA's coverage conduct which is 'specifically authorized' by other state or federal laws." William Rothschild, *A Guide to Georgia's Fair Business Practices Act of 1975*, 10 Ga. L. Rev. 917, 920 (1976) (emphasis added). The article also points out that "conduct which might be 'permitted' by other state or federal agencies but is not 'specifically authorized' by them is not exempted from the FBPA." 10 Ga. L. Rev. at 921 (emphasis added).

that would render one of its words meaningless. *See Wellborn v. Estes*, 70 Ga. 390, 397

(1883) ("[Courts] must lean in favor of a construction which will render every word

operative, rather than one which makes some idle and nugatory").[21] Further, the

legislature requires that the FBPA be "liberally construed" so that "unfair or deceptive

practices in the conduct of any trade or commerce" shall be "swiftly stopped." O.C.G.A.

§ 10-1-391(a). The statute demands that only conduct "specifically authorized" by

another statute or regulation be exempted from the FBPA's reach. Nothing the Plaintiffs

allege as the basis for their FBPA claim is authorized by any other law.

The unfair and deceptive conduct Plaintiffs allege is not even "specifically

regulated," much less specifically authorized. The only source of regulation that Harbour

points to, O.C.G.A. § 44-14-60, has nothing to do with contracts for deed.[22] It is true that

some consumer laws apply to contracts for deed, but only because they apply to

consumer or home-secured lending in general. They do not "specifically regulate" either

contracts for deed or the conduct supporting the FBPA count. (*See* SAC ¶¶ 436-451.)

Harbour urges, contrary to the wording and the policy of the FBPA, that the Court

exclude from the FBPA all "real estate and lending transactions," rather than particular

---

[21] *See also* O.C.G.A. § 1-3-1(b) ("In all interpretations of statutes, the ordinary signification shall be applied to all words, . . ."); *Reiter v. Sonotone Corp.*, 442 U.S. 330, 338-39 (1979) ("In construing a statute we are obliged to give effect, if possible, to every word Congress used.") (citation omitted).
[22] This statute discusses deeds to secure debt (the typical Georgia security instrument since the late 1800's). *See* Frank S. Alexander, Sara J. Toering & Sarah Bolling Mancini, *Georgia Real Estate Finance and Foreclosure Law* § 1.5, n.2 (West 2016-17 Ed.).

actions that are specifically regulated. This conflicts with the FBPA itself, which specifically applies to real estate settlements. O.C.G.A. §§ 10-1-393(b)(25).[23]

Harbour cites a number of cases saying that mortgages, because heavily regulated, are not covered by the FBPA. Because contracts for deed are neither mortgages nor heavily regulated, these cases do not control.[24] This Court should follow the long line of precedent looking at whether the actual conduct complained of in the FBPA claim is specifically authorized, and it is Defendants' burden to identify any statute that does so. *See, e.g., 1st Nationwide Collection Agency, Inc. v. Werner*, 288 Ga. App. 457, 458-59, (2007) (applying FBPA to debt collection agencies despite Fair Debt Collection Practices Act); *Stroman v. Bank of Am.*, 852 F.Supp.2d 1366, 1381 (N.D. Ga. 2012) (conduct complained of was not specifically authorized); *White v. Wachovia Bank, N.A.*, 563 F. Supp. 2d 1358, 1366-70 (N.D. Ga. 2008) (FBPA applied to claim regarding overdraft fees despite presence of National Bank Act and implementing regulations); *Kitchen v.*

---

[23] Indeed, the FBPA applies to heavily regulated businesses, including settlements, credit reporting, credit cards, and home health agencies. *See* O.C.G.A. §§ 10-1-393(b)(25) (29), (29.1), and (30).

[24] In the only Georgia court case cited by Harbour on this issue, the party arguing for application of the exemption showed that the specific conduct complained of under the FBPA was specifically regulated by another statute. *Chancellor v. Gateway Lincoln-Mercury, Inc.*, 233 Ga. App. 38, 45, 502 S.E.2d 799, 805 (Ct. App. 1998) (alleged nondisclosure of a finance charge was specifically regulated by TILA). Another case, *Stewart v. Suntrust Mortg. Inc.*, 331 Ga. App. 635 (2015), also turned on the fact that the "specific conduct at issue" was regulated by the GRMA. (Unfortunately, the *Stewart* court failed to consider the GRMA's savings clause, "[N]othing in this article shall be construed as limiting in any manner the application of Part 2 of Article 15 of Chapter 1 of Title 10, the 'Fair Business Practices Act of 1975.'" O.C.G.A. § 7-1-1020.) Moreover, in *Sheppard v. Bank of Am.*, 542 Fed. Appx. 789, 793 (11th Cir. 2013), the court ruled based on a different issue, finding that the FBPA did not apply because the acts complained of impacted only the plaintiff and not the broader consuming public.

*Ameriquest Mortgage Co.*, 2005 U.S. Dist LEXIS 43937, at *19-27 (N.D. Ga. Apr. 29, 2005) (Martin, J.) (no blanket exemption for mortgage lending; lender failed to show that the <u>challenged</u> <u>conduct</u> was specifically regulated).

Harbour further asserts that FBPA claims cannot arise out of unfairness related to a contract. But the case it cites merely found a lack of reasonable reliance barring an FBPA claim based solely on a misrepresentation. *Rivergate v. McIntosh*, 205 Ga. App. 189, 191 (1992). Unfairness and deception are two different, freestanding violations of the statute.[25] Further, Plaintiffs are not basing their claims on misrepresentations about the contract at the time they entered into it. Rather, they allege unfairness and deception by Harbour in pursuing evictions when it had not lawfully terminated the purchase contract and misrepresenting in servicing letters that Plaintiffs were "homeowners" with a "mortgage." (SAC ¶¶ 442-445.) Plaintiffs more than adequately allege reasonable reliance. (*Id.* ¶¶ 436, 447.) Plaintiffs have alleged wrongful conduct that post-dated loan consummation and occurred within the FBPA's two year statute of limitations. (*Id.* ¶¶ 436-451.) Plaintiffs have alleged that Ola Johnson, Al Butts, and Veronica Pitts are disabled under the meaning of the UDPTEA.[26] (*Id.* ¶¶ 145, 450.) The Court need only read the FBPA and UDPTEA count to see that it alleges facts supporting a plausible

---

[25] Due diligence, or reasonable reliance, is an element of a misrepresentation claim but not an unfairness claim. *Tiismann v. Linda Martin Homes*, 281 Ga. 137, 141, 637 S.E.2d 14 (2006) ("<u>When the alleged</u> <u>FBPA violation is a misrepresentation</u>, the consumer must show that he exercised due diligence to ascertain the falsity of the statement.") (emphasis added).
[26] In the event the Court deems these allegations insufficient, Plaintiffs seek leave to amend.

claim. (*Id*. pp. 129-135.)

**J.     Plaintiffs' malicious eviction claims are not barred by *res judicata*.**

Evicting Plaintiffs Gerry White and Tabitha Hunter under writs of possession does not insulate Harbour from liability for malicious evictions.[27] *See e.g. Cannon v. Laing*, 153 Ga. 88, 88-91 (1922) (allowing Plaintiff to maintain a suit for damages despite being evicted following a default judgment in a dispossessory case); *Stringer v. Bugg*, 254 Ga. App. 745, 745, 748-49 (2002) (res judicata did not bar Plaintiff's claims because the cause of action in the dispossessory in magistrate court was a failure to pay rent, while the cause of action in the affirmative suit was fraud and the injuries caused by the eviction); *Smith v. Republic Realty Servs., Inc*., 216 Ga. App. 736, 737 (1995) (allowing former tenant who was evicted under a writ of possession to sue for wrongful eviction if landlord's actions were willful and malicious, but finding no evidence of maliciousness). For a prior action to bar a subsequent action under *res judicata,* the prior court must have had jurisdiction to hear the action. O.C.G.A. § 9-12-42. Georgia courts have regularly held that *res judicata* does not bar a defendant in a dispossessory action from bringing claims in a separate suit concerning the same subject matter so long as those claims seek

---

[27] *Vereen v. Everett*, the only case cited by Harbour on this issue, a dispossessed *pro se* plaintiff filed four previous lawsuits and four appeals all raising identical claims against identical parties – an archetypal case where *res judicata* ought to apply. Even assuming the *Vereen* plaintiff alleged a colorable claim to ownership that would not have been barred by *res judicata* after the state court dispossessory, it was unquestionably barred at the point it came before the Court. *Vereen v. Everett*, No. 1:08-CV-1969-RWS, 2009 WL 901007, at *4 (N.D. Ga. Mar. 31, 2009).

relief that a magistrate court could not grant. *West v. DJ Mortg.*, LLC, 164 F. Supp. 3d 1393, 1402 (N.D. Ga. 2016); *see also Myers v. N. Ga. Title & Tax Free Exch.*, 241 Ga. App. 379, 380-81, (1999).

Mr. White and Ms. Hunter's claims for malicious eviction are not barred by *res judicata* because the magistrate court hearing their dispossessory cases did not have jurisdiction to rule on issues related to title to land. The contracts for deed gave Mr. White and Ms. Hunter ownership interests in their homes. Before initiating the dispossessory cases against them, Harbour did not obtain foreclosure judgments or even terminate the contracts under their express terms. (SAC ¶¶ 343, 367, 493.) As a result, these Plaintiffs had ownership interests in their homes that had not been terminated at the time Harbour filed and prosecuted eviction cases against them in magistrate courts. Magistrate courts do not have jurisdiction to hear arguments related to ownership interests because the Georgia Constitution vests exclusive jurisdiction to hear cases respecting title to land in Superior Courts. Ga. Const. 1983, Art. VI, Sec. IV, Par. I.; O.C.G.A. § 44-2-60; O.C.G.A. § 23-1-1; *Myers*, 241 Ga. App. 379 at 380-81 (magistrate court has jurisdiction over dispossessory actions, but not ejectment suits)*; Brown Realty Assoc. v. Thomas*, 193 Ga. App. 847, 848 (1989) ("all of the claims, which centered around the question of title to real property, could not properly have been determined in the state court dispossessory action"). Mr. White and Ms. Hunter's claims for malicious

eviction are not barred by *res judicata* because their dispossessory proceedings did not present an opportunity for their malicious eviction claims based on their ownership interests to be heard by a court of competent jurisdiction.

Plaintiffs allege that Harbour maliciously filed evictions against Plaintiffs despite the fact that Plaintiffs had an equitable ownership interest in the real property.[28] (SAC ¶ 341-345, 365-369.) Without actually knowing what was in Harbour's mind, it can be inferred from facts Plaintiffs allege that Harbour knew it had no right to summarily evict them like tenants. Harbour neither recorded declarations of its election to terminate their contracts, which is the sole method provided in the contract for converting the agreement to a tenancy, nor transferred their ownership interests by obtaining foreclosure judgments. (SAC ¶¶ 343, 367, 493.)  Harbour knew that it had taken neither of these actions when it submitted false sworn statements to the magistrate courts that Plaintiffs were then tenants who failed to "pay rent now due."

Mr. White and Ms. Hunter's claims for malicious eviction should proceed.

K.     **The SAC states a claim for unjust enrichment.**

Harbour cites several cases for the proposition that the SAC's unjust enrichment

---

[28] Contrary to Harbour's assertion, tenants who are current on rental payments are not the only individuals who can bring a claim for wrongful or malicious eviction. A claim for malicious eviction can lie where a defendant alleges that he is the rightful owner of the property and not subject to eviction proceedings. *Crusselle v. Pugh*, 71 Ga. 744, 747 (Ga. 1883) (holding that "the ejection is a tort for which [the plaintiff] may recover").

claim should be dismissed as inconsistent with a breach of contract allegation. The cases that Harbour cites are no barrier to Plaintiffs' claim.[29]

Courts have permitted plaintiffs to plead breach of contract and unjust enrichment in the alternative so long as the unjust enrichment claim does not incorporate the breach of contract claim. *Clark*, 914 F. Supp. 2d at 1309-10; *see also Graybill v. Attaway Constr. & Assocs., LLC*, 341 Ga. App. 805, 811 (2017) (upholding pleading in the alternative). Furthermore, while courts have held that the existence of a legal contract precludes an unjust enrichment claim, the key word is "legal."

In *Clark*, the court denied a motion to dismiss an unjust enrichment count because the plaintiff "pled her breach of contract claim in a separate count" and "disputed the validity of the contracts at issue by alleging that they are void as unconscionable and in violation of statutory law." *Id*. In this case, Plaintiffs pled unjust enrichment in a separate count and alleged that Harbour's conduct was "unfair, deceptive, and unconscionable" and in violation of the FBPA.[30] Further, Harbour purported to terminate many of the contracts at issue upon default.

---

[29] *Clark v. Aaron's, Inc.*, 914 F. Supp. 2d 1301 (N.D. Ga. 2012); *Wachovia Ins. Servs. v. Fallon*, 682 S.E.2d 657 (Ga. App. 2009) (dismissing an unjust enrichment claim that was pled as a tort); *Am. Casual Dining, Ltd. P'ship v. Moe's Sw. Grill*, L.L.C., 426 F. Supp. 2d 1356 (N.D. Ga. 2006) (dismissing a UE claim that incorporated by reference a breach of contract claim, which Plaintiffs here have not done).
[30] SAC ¶ 445, *incorporated by reference* ¶ 467.

**L.      Plaintiffs' other claims are properly pled.**

Harbour's agent's[31] mismanagement of Plaintiffs'[32] escrow funds give rise to

claims for breach of contract, breach of the duty of good faith and fair dealing, and

negligence. Contract formation requires the following elements: parties able to contract,

consideration, assent of the parties to the terms, and "a subject matter upon which the

contract can operate." O.C.G.A. § 13-3-1. Harbour offered to pay Plaintiffs' property

taxes, and also Ms. Hutchins' HOA dues, in exchange for Plaintiffs' sending a monthly

escrow payment to Harbour. (SAC ¶¶ 164-65, 199, 211, 241-42, 258, 307, Exhibit 1.)

Plaintiffs accepted Harbour's offer to pay escrowed items by signing and returning the

form and performing by sending Harbour escrow payments.

Harbour (through its agent) breached this agreement by failing to pay escrowed

items with collected funds, overcollecting for escrowed items, and paying the escrowed

items late while passing the late fees on to Plaintiffs. (SAC ¶¶ 165, 242, 265, 314-15,

479.) In addition, Harbour's actions violate the duty of good faith and fair dealing that is

inherent in the contract. *Sw. Composite Tech. Corp. v. Americus-Sumter Payroll Dev.*

*Auth.*, 239 Ga. App. 342, 344 (1999). In *Composite Tech.*, a landlord asked a commercial

tenant to reimburse it for repairs that were more expensive than the landlord initially

---

[31] The Second Amended Complaint is clear that the Plaintiffs bringing these claims are asserting it against Harbour because it is responsible for the acts of its servicing agent, National Asset Advisors.
[32] In this section only, the term "Plaintiffs" refers to this subgroup: Ms. Blades, Ms. Jordan, Ms. Martin, Ms. Hutchins, Mr. and Mrs. Johnson, Mr. Butts, and Ms. Pitts.

claimed, which raised a question of fact as to whether the landlord acted unreasonably and violated its duty of good faith and fair dealing. *Id*. Plaintiffs have alleged a breach of contract and raised a question of fact as to whether Harbour violated its duty of good faith and fair dealing in its mismanagement of Plaintiffs' escrow accounts.

The same facts also give rise to negligence claims. Despite Defendants' purported confusion, it is clear from the SAC that specific Plaintiffs are bringing a negligence claim against Harbour for violating a duty of care that springs from RESPA. (SAC ¶ 485-88.) NAA negligently serviced the contracts, and Harbour is liable for the actions of its servicing agent. O.C.G.A. § 10-6-51 ("The principal shall be bound by all the acts of his agent within the scope of his authority…). Plaintiffs' claims for negligence are clearly pled and should be allowed to proceed.

Finally, Plaintiffs have properly pled claims for equitable mortgage and declaratory relief.[33] Plaintiffs seek equitable and declaratory relief to establish them as the equitable owners of their homes subject to a mortgage loan. Georgia courts have recognized these principles in refusing to enforce contract for deed forfeiture clauses. *See Watkins v. Maddox Medical Associates, Inc*., 270 Ga. 404 (1998); *Chilivis v. Tumlin Woods Realty Associates, Inc*., 250 Ga. 179 (1982); *see also Restatement Third, Property: Mortgages* § 3.4 cmt. a (1997). It would be premature on a motion to dismiss to consider whether

---

[33] Harbour has repurchased several Plaintiffs' loans upon demand, and should remain subject to this claim for all loans until case conclusion, since the ownership of other loans may change.

tender should be required for the relief Plaintiffs seek. Tender is an equitable principle, and should be applied when the equities so require, within the Court's discretion. It arises from the equitable maxim, "He who would have equity must do equity and must <u>give effect to all equitable rights of the other party</u> respecting the subject matter of the action." O.C.G.A. § 23-1-10 (emphasis added). Converting a contract for deed to a mortgage would adequately protect Harbour's rights; the obligation and the security interest would remain. "Tender is not an absolute rule," especially where the adverse party is accused of improper conduct. *Metro Atlanta Task Force for the Homeless, Inc. v. Ichthus Cmty. Tr.*, 298 Ga. 221, 236 (2015). These issues should be held for factual development.

### III. Conclusion

For the reasons set forth above, Plaintiffs respectfully request that the Court deny Harbour's Motion to Dismiss in its entirety.

Respectfully submitted this 11th day of September, 2017,

/s/ Sarah B. Mancini
Sarah B. Mancini
Georgia Bar No. 319930
Kristen E. Tullos
Georgia Bar No. 941093
*Attorneys for Plaintiffs*

ATLANTA LEGAL AID SOCIETY, INC.
246 Sycamore Street, Suite 120
Decatur, GA 30030
(770) 817-7517 (SBM)
(770) 817-7540 (KET)

(770) 817-7534 (Fax)
sbmancini@atlantalegalaid.org
ktullos@atlantalegalaid.org

## CERTIFICATION PURSUANT TO LOCAL RULE 7.1(D)

I hereby certify that the foregoing brief was prepared using Times New Roman 14

point font, in accordance with Local Rule 5.1(C).

/s/ Sarah B. Mancini
Sarah B. Mancini

## CERTIFICATE OF SERVICE

I certify that on this date I electronically filed the foregoing Response in

Opposition to Harbour Defendants' Motion to Dismiss Plaintiffs' Second Amended

Complaint using this Court's ECF System, which will automatically send email

notification to the following attorneys of record:

Mark Rooney                         Valerie Hletko
mrooney@buckleysandler.com          vhletko@buckleysandler.com

Sharmin Arefin                      Heather Lynn Stevenson
sarefin@arefinlaw.com               h.stevenson@kimfirm.com

David L. Rusnak
davidr@wncwlaw.com

Respectfully submitted this 11th day of September, 2017.

/s/ Sarah B. Mancini
Sarah B. Mancini