IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

DEMARKUS R. HORNE, NINA HORNE, JACKIE ) 
BROWN, DONNA BROWN, OLA ELDER )
JOHNSON, MICHAEL T. JOHNSON, ANITA )
JORDAN, LAUNDRA MARTIN, AL LEE )   CIVIL ACTION
BUTTS, VERONICA R. PITTS, LISA ELLIS- )
BLADES, RITA HENIGAN, ROHAN POWELL, )   FILE NO. 1:17-CV-954-RWS
LAQUINTA HUTCHINS, TABITHA HUNTER, )
JAMES HUNTER, GERRY WHITE, ZACHARY )
ANDERSON, JACKIE BARBER, ITHAMAR )
YEHUDAH, TONYA TATE, and DECARLOS )
BUTTS, )
                                                       )
      Plaintiffs, )
                                                         )
  vs. )
                                                         )
HARBOUR PORTFOLIO VI, LP, HARBOUR )
PORTFOLIO VII, LP, NATIONAL ASSET )
ADVISORS, LLC, CWAM II, LLC, )
INVESTMENT TRADING & DEVELOPMENT, )
THE BRADY IMPACT TRUST, C/O )
WILMINGTON SAVINGS FUND SOCIETY FSB, )
AS TRUSTEE; JCT CAPITAL, LLC, HAMILTON )
GREEN CREST FUND I, L.P., BAWLD GUY )
NOTE INVESTMENT GROUP I, LLC, )
ROCKTOP PARTNERS I, LP, REDSTICK )
ACQUISITIONS LLC, BLUE INVESTMENT )
GROUP, LLC, and ORANGE CAPITAL )
FUNDING LLC, )
                                                         )
      Defendants.

## **THIRD AMENDED COMPLAINT**

# I. Introduction and Summary

1.      Plaintiffs are African-American citizens of the United States and residents of Fulton, DeKalb, Clayton, Rockdale, and Henry County, Georgia and Jefferson County, Alabama.  This action arises out of the discriminatory targeting for abusive credit terms in home purchase "contract for deed" transactions extended by Harbour Portfolio VII, LP and Harbour Portfolio VI, LP (collectively, "Harbour Portfolio" or "Harbour").  Defendant Harbour Portfolio, through both intentional targeting of African-American consumers and practices that have a foreseeable disparate impact on African-American consumers, has violated the Fair Housing Act of 1968, as amended, 42 U.S.C. § 3601, *et seq*., the Equal Credit Opportunity Act, 15 U.S.C. § 1691, *et seq*., and the Georgia Fair Housing Act, O.C.G.A. § 8-3-200 *et seq*.

2.      Harbour's contract for deed transactions require consumers to take on all of the obligations of homeownership with none of the rights.  Properties in extremely poor condition are sold to would-be homeowners, who invest many thousands (and

tens of thousands) of dollars making the home habitable, only to lose all of that investment and all of the money paid in the event of a default. Unlike a homeowner with a mortgage, who gets to keep the benefit of their labors and financial investment in a home, Harbour's purchasers do not accrue that benefit nor build any equity. However, they are subjected to repeated misrepresentations that they are a "homeowner." Plaintiffs have been injured by the discriminatory targeting of Harbour's abusive and deceptive contracts.

3.      Plaintiffs also raise claims for violation of duties imposed by the Georgia Residential Mortgage Act, violation of the Georgia Fair Business Practices Act, equitable mortgage, unjust enrichment, and declaratory judgment against Harbour and its assignees. Mr. Brown and Ms. Hutchins raise claims under the Truth in Lending Act, 15 U.S.C. § 1601, *et seq.* Certain Plaintiffs raise claims for violation of the Real Estate Settlement Procedures Act, 12 U.S.C. § 2601, *et seq.*, breach of contract, and negligence based on improper handling of their escrow accounts. Three Plaintiffs raise a claim for malicious eviction from their homes.

## II. JURISDICTION AND VENUE

4.     Jurisdiction is conferred on this Court by 42 U.S.C. § 3613(a), 15 U.S.C. § 1691e(f), and 28 U.S.C. §§ 1331 and 1367.

5.     Venue is proper in this District and Division pursuant to 28 U.S.C. § 1391 because the claims arose in this District, the Defendants do business and/or reside in this District, and the events giving rise to this action occurred in this District.

## III. PARTIES

6.     DeMarkus Horne is a United States citizen and resident of DeKalb County, Georgia.

7.     Nina Horne is a United States citizen and resident of DeKalb County, Georgia.

8.     Jackie Brown is a United States citizen and resident of Henry County, Georgia.

9.     Donna Brown is a United States citizen and resident of Henry County, Georgia.

10.     Ola Johnson is a United States citizen and resident of DeKalb County, Georgia.

11.     Michael Johnson is a United States citizen and resident of DeKalb County, Georgia.

12.     Anita Jordan is a United States citizen and resident of Fulton County, Georgia.

13.     Laundra Martin is a United States citizen and resident of DeKalb County, Georgia.

14.     Al Lee Butts is a United States citizen and resident of DeKalb County, Georgia.

15.     Veronica R. Pitts is a United States citizen and resident of DeKalb County, Georgia.

16.     Lisa Ellis-Blades is a United States citizen and resident of Fulton County, Georgia.

17.     Rita Henigan is a United States citizen and resident of DeKalb County,

Georgia.

18.     Rohan Powell is a United States citizen and resident of DeKalb County,

Georgia.

19.     LaQuinta Hutchins is a United States citizen and resident of Clayton County,

Georgia.

20.     Tabitha Hunter is a United States citizen and resident of Birmingham,

Jefferson County, Alabama.

21.     James Hunter a United States citizen and resident of Birmingham, Jefferson

County, Alabama.

22.     Gerry White is a United States citizen and resident of DeKalb County,

Georgia.

23.      Zachary Anderson is a United States citizen and resident of Fulton County,

Georgia.

24.      Jackie Barber is a United States citizen and resident of Fulton County,

Georgia.

25.     Ithamar Yehudah is a United States citizen and resident of DeKalb County, Georgia.

26.     Tonya Tate is a United States citizen and resident of DeKalb County, Georgia.

27.     Decarlos Butts  is a United States citizen and resident of Fulton County, Georgia.

28.     Defendant Harbour Portfolio VII, LP is a Texas limited partnership that regularly engages in the business of contract for deed lending and does substantial contract for deed business in the state of Georgia.  Harbour Portfolio VII's principal address is 8214 Westchester Drive, Suite 635, Dallas, Texas 75225.

29.     Defendant Harbour Portfolio VI, LP is a Texas limited partnership that regularly engages in the business of contract for deed lending and does substantial contract for deed business in the state of Georgia.  Harbour Portfolio VI's principal address is 8214 Westchester Drive, Suite 635, Dallas, Texas 75225.

30.     Defendant National Asset Advisors, LLC is a South Carolina Limited

Liability Company that regularly engages in the business of servicing contract for deed agreements on behalf of other companies, and has done substantial business servicing contract for deed agreements in the state of Georgia. National Asset Advisors principal address is 4350 St. Andrews Road, Suite F, Columbia, SC, 29210.

31.     Defendant CWAM II, LLC is a California limited liability company that regularly engages in the business of purchasing non-performing notes, including contract for deed notes, and has done substantial business purchasing contract for deed notes in the state of Georgia. CWAM II, LLC's principal office address is 964 5th Ave. Suite 518, San Diego, California, 92101.

32.     Defendant Investment Trading & Development, LLC is a Georgia limited liability company that regularly engages in the business of purchasing non-performing notes, including contract for deed notes, and has done substantial business purchasing contract for deed notes in the state of Georgia. Investment Trading & Development's principal office address is P.O. Box 491821, Atlanta,

GA, 30349.

33.     Defendant The Brady Impact Trust, care of the Wilmington Savings Fund Society FSB, as Trustee, is a Delaware trust with principal address of 500 Delaware Avenue, 11th Floor, Wilmington, DE, 19801, that regularly engages in the business of purchasing non-performing notes, and has done substantial business purchasing non-performing notes in the state of Georgia.

34.     Defendant JCT Capital is a Georgia limited liability company that regularly engages in the business of purchasing non-performing notes, including contract for deed notes, and has done substantial business purchasing contract for deed notes in the state of Georgia.  JCT Capital's principal address is 515 Bellemont Court, Fulton, Duluth, GA, 30097.

35.     Defendant Hamilton Green Crest Fund I, LLC is a Delaware limited liability company that regularly engages in the business of purchasing non-performing notes, including contract for deed notes, and has done substantial business purchasing contract for deed notes in the state of Georgia.  Hamilton Green Crest's

principal address is 100 Partrick Road, Westport, CT 06880.

36.    Defendant Orange Capital Funding LLC is a Florida limited liability company that regularly engages in the business of purchasing non-performing notes, including contract for deed notes, and has done substantial business purchasing contract for deed notes in the state of Georgia.  Orange Capital's principal address is 295 East Highway 50, Suite 5, Clermont, FL 34711.

37.    Defendant Bawld Guy Note Investment Group I, LLC is a California limited liability company that regularly engages in the business of purchasing non-performing notes, including contract for deed notes, and has done substantial business purchasing contract for deed notes in the state of Georgia. Bawld Guy's principal address is 8384 Loren Dr., La Mesa, CA 91942.

38.    Defendant Rocktop Partners I, LP is a Texas limited partnership company that regularly engages in the business of purchasing non-performing notes, including contract for deed notes, and has done substantial business purchasing contract for deed notes in the state of Georgia. Rocktop's principal address is

701Highlander, Ste. 200, Arlington, TX 76015.

39.     Defendant Red Stick Acquisitions LLC is a Florida limited liability company that regularly engages in the business of purchasing non-performing notes, including contract for deed notes, and has done substantial business purchasing contract for deed notes in the state of Georgia.  Red Stick's principal address is 1081 Singer Dr., Riviera Beach, FL 33404.

40.     Defendant Blue Investment Group, LLC is a Florida limited liability company that regularly engages in the business of purchasing non-performing notes, including contract for deed notes, and has done substantial business purchasing contract for deed in the state of Georgia. Blue Investment's principal address is 295 E. Highway 50, Ste. 5, Clermont, FL 34711.

## IV.  FACTUAL BACKGROUND

### *Historical background of redlining and reverse redlining*

41.     In a not too distant chapter of American history, government-backed home lending programs carried out the explicit, intentional exclusion of African-

American borrowers and communities with a certain percent of African-American residents from access to mortgage loans. This practice, known as redlining, involved banks (following the lead of the federal Home Owners Loan Corporation in the 1930s) literally drawing a red line around particular neighborhoods deemed too racially "inharmonious" and excluding borrowers in these neighborhoods from access to mortgage loans. The Secretary of the United States Department of Housing and Urban Development admitted in 1970 that the federal government had "refus[ed] to provide insurance in integrated neighborhoods, promot[ed] the use of racially restrictive covenants," and engaged in other methods of redlining. *Thompson v. U.S. H.U.D.*, 348 F. Supp. 2d 398, 466 (D. Md. 2005).

42.     With passage of the federal Fair Housing Act in 1968, the practice of redlining became illegal and was curtailed to some extent. However, communities of color have never enjoyed equal access to prime rate home lending.[1]

---

[1] Richard Rothstein, *The Color of Law: A Forgotten History of How Our Government Segregated America* (2017); Bill Dedman, "The Color of Money,"

43.     Soon enough, lenders began to pump subprime loans—high rate, high cost loans issued without regard to the borrower's ability to repay—into communities of color.  This practice grew with the advent of mortgage securitization, a financial technique of repackaging large groups of loans for sale that allows lenders to decrease their risk without actually improving the quality of individual loans.

44.     The disproportionate targeting of communities of color for subprime loans came to be known as "reverse redlining."  Communities and borrowers that had been unable to access prime rate loans were explicitly targeted for home mortgages with predatory terms.  Studies have shown that African-American borrowers were often steered into subprime loans when they could have qualified for prime rate loans.[2]  The targeting of subprime loans to communities of color through reverse

---

*Atlanta Journal Constitution* (1989) (Pulitzer Prize winning series examining racial disparities in lending).

[2] *See* National Community Reinvestment Coalition, *The Broken Credit System: Discrimination and Unequal Access to Affordable Loans by Race and Age – Subprime Lending in Ten Large Metropolitan Areas* (2003), at 6 (available at http://www.ncrc.org/images /stories/pdf/research/ncrcdiscrimstudy.pdf) (finding

redlining has been well documented in empirical research.[3]

45.     The practice of reverse redlining, targeting a protected class for a predatory

home loan product, has repeatedly been held to violate the federal Fair Housing

Act.  *See, e.g., Barkley v. Olympia Mortgage Co*., No. 04-cv- 875, 2007 WL

---

that African-American neighborhoods, regardless of their creditworthiness, receive a disproportionate share of high cost subprime loans.); Emily Badger, "The Divided American Dream," *Washington Post* (May 2, 2016) (documenting that well-off African Americans, like those in South DeKalb County, were more likely to be given subprime loans when they should have qualified for better ones).

[3] *See* Abt Associates, *Using Credit Scores to Analyze High-Cost Lending in Central City Neighborhoods* (2008); Calvin Bradford, Center for Community Change, *Risk or Race? Racial Disparities and the Subprime Refinance Market* (2002), at vii-ix; Center for Responsible Lending, *Unfair Lending: The Effect of Race and Ethnicity on the Price of Subprime Mortgages* (2006), at 16-17 (available at http://www.responsiblelending.org/mortgage-lending/research-analysis/rr011-Unfair_Lending-0506.pdf); HUD & Dept. of the Treasury, *Curbing Predatory Home Mortgage Lending* (2000), at 72 (available at http://www.huduser.org/Publications/ pdf/treasrpt.pdf); HUD, *Unequal Burden: Income and Racial Disparities in Subprime Lending in America* (2000), at 4-5 (available at https://www.huduser.gov/portal/publications/fairhsg/ unequal.html); National Community Reinvestment Coalition, *The Broken Credit System: Discrimination and Unequal Access to Affordable Loans by Race and Age – Subprime Lending in Ten Large Metropolitan Areas* (2003), at 31-34 (available at http://www.ncrc.org/images /stories/pdf/research/ncrcdiscrimstudy.pdf).

2437810 (E.D.N.Y. Aug. 22, 2007); *Hargraves v. Capital City Mortgage Corp.*,

140 F. Supp. 2d 7 (D.D.C. 2000).

46.     Reverse redlining is most effective in cities where two basic conditions

exist: racial minorities have been denied equal access to credit and racially

segregated residential living patterns persist.  Both of these conditions exist in

Atlanta.[4]  Atlanta's housing conditions favored reverse redlining during the

subprime lending boom, and those same conditions exist today.

47.     The same communities of color that were targeted for subprime lending

through reverse redlining were then disproportionately eviscerated by the

foreclosure crisis that flowed from the abuses of subprime lending.  The practice of

lending without regard to borrowers' ability to pay and masking unaffordability

---

[4] See Chris Joyner, "Is Atlanta a Segregated Community?", *Atlanta Journal Constitution* (April 4, 2017); *Moving Beyond the Sprawl: The Challenge for Metropolitan Atlanta*, The Brookings Institution (2000) (concluding that race is an important factor contributing to unbalanced growth in Atlanta); "Mapping Segregation," *The New York Times* (July 8, 2015) (map based on 2010 census data showing geographic divide between white and black residents in Atlanta).

with features like interest-only periods and initial low teaser rates followed by a much higher adjustable interest rate led directly to the subprime foreclosure crisis. The rate of African-American homeownership fell from 49.7% in 2004 (at its peak) to 41.7% in 2016. The homeownership rate for white households in 2016 was 72.2%.

48.    The foreclosure crisis was followed by a tightening of access to credit that has impacted low-income communities, but especially communities of color.[5] One study by the National Community Reinvestment Coalition released in July 2016 found that in St. Louis and Milwaukee, racial makeup of a neighborhood was a significant predictor of access to mortgage lending. In Milwaukee, white people make up 70% of the population but were getting 81% of the mortgage loans; African-Americans make up 16% of the population but were getting only 4% of

_____

[5] James H. Carr, Katrin B. Anacker & Michelle L. Mulcahy, *The Foreclosure Crisis and Its Impact on Communities of Color: Research and Solutions*, National Community Reinvestment Coalition (Sept. 2011) ("While the foreclosure crisis has had vast consequences throughout the United States, it has had a disproportionate impact on persons of color".)

the mortgage loans.  Similarly, in St. Louis, African-Americans make up 18% of

the population, but were receiving 4% of the mortgage loans.[6]

### *Contract for deed – the instrument*

49.     A contract for deed, also referred to as a land installment contract or land

contract, is a method of seller financing used to purchase a home.  However, in

these contracts, while the buyer becomes obligated to pay a certain purchase price,

at a certain interest rate, over a term of years (often 20 or 30 years), he or she does

not obtain the deed to the property until the full purchase price has been paid.

Immediately upon signing the contract the buyer takes on the obligation to pay the

property taxes, obtain homeowner's insurance, and make any needed repairs to the

property – all without holding legal title to the home.  If the buyer defaults at any

time during the term of years, the contract purports to allow the seller to cancel (or

"forfeit") the purchase contract, keep all payments made by the buyer, and evict

---

[6] NCRC, *Home Mortgage Lending in St. Louis, Milwaukee, Minneapolis, and Surrounding Areas* (July 2016).

the buyer summarily like a tenant.

50.     Contract for deed transactions are as old as racially disparate access to mortgage credit.  From the 1930s to the 1960s, when federal homeownership programs prevented most African-American borrowers from accessing a traditional mortgage loan, land contracts were marketed in credit-starved communities of color as a means of attaining homeownership.  In tightly segregated urban neighborhoods, land contracts were often the primary way for African Americans to purchase a home.  One leading advocate estimated that in 1950s Chicago, 85% of the properties purchased by African Americans were sold through land contracts.[7]

51.     When access to mortgage lending expanded in the 1970s through the subprime boom of the 1990s and early 2000s, contract for deed lending became less prevalent.

---

[7]  Beryl Satter, *Family Properties: Race, Real Estate, and the Exploitation of Black Urban America* (Metropolitan Books, 2009), 4.

52.    With the constriction in mortgage lending that followed the subprime

foreclosure crisis, land contracts are experiencing a resurgence.  Wall Street-

backed investors, Harbour Portfolio chief among them, have been buying up

foreclosed houses in poor condition at bargain-basement prices and reselling them

on land contracts to buyers who are eager to pursue the American dream.

### *Harbour Portfolio's abusive contract for deed business model*

53.    Harbour Portfolio has purchased more than 6,700 single family homes to be

sold on land contracts, predominantly in Ohio, Michigan, Illinois, Florida, Georgia,

and Pennsylvania.[8]

54.    Harbour began purchasing properties for its contract for deed business in

2010.  Harbour made a deliberate decision to purchase all, or nearly all, of its

properties from mortgage finance giant Fannie Mae's portfolio of "real estate

owned," or REO, properties.  Fannie Mae REO properties are homes that went

---

[8] Matthew Goldstein & Alexandra Stevenson, *High-Risk Deals on Shabby Homes Ensnare Buyers*, N.Y. Times, Feb. 20, 2016, at A1.

through foreclosure but were not purchased by a third party at the foreclosure auction. As a result, they were bought by the mortgagee and transferred to Fannie Mae because Fannie Mae owned or insured the mortgage loan that had been foreclosed.

55.     Harbour made a deliberate decision to purchase homes for its contract for deed business exclusively, or almost exclusively, from Fannie Mae.  According to estimates from CoreLogic and *The New York Times*, Fannie Mae REO represented less than a quarter of the properties that went through foreclosure during the 2010-2016 time period.  Harbour easily could have structured its business to buy from a broader array of sellers of single-family homes.

56.     Because of its decision to buy exclusively, or almost exclusively, from Fannie Mae's REO portfolio, Harbour's business model involves buying properties that are located in areas that have experienced the largest number of foreclosures. The vast majority of the houses Harbour has purchased for resale through its contract for deed program are in the same communities targeted most aggressively

by subprime mortgage lenders and hit hardest by the foreclosure crisis –
communities of color.

57.     Harbour's business model involves purchasing homes from Fannie Mae's
REO portfolio at low prices that are often in extremely poor, even uninhabitable,
condition.  Nearly all of the properties Harbour buys have been vacant for a period
of time after foreclosure and are marked by conditions typical of vacancy –
including disconnected utility service, poor weatherization, and damaged and
leaking pipes.  Many of the properties Harbour sells have torn-out electrical
wiring, missing or non-functioning appliances, missing or damaged plumbing,
missing toilets or other fixtures, leaking roofs, water-damaged and deteriorating
wood siding, other water damage, and mold damage.  Many of Harbour's
properties contain hidden defects, such as nonfunctioning hot water heaters,
furnaces, or HVAC systems, which cannot be detected in advance because utility
service is not turned on at the time the potential purchaser views the property.

58.     Upon information and belief, Harbour makes no repairs to its properties

before selling them through its contract for deed program. Within a few weeks or months of purchasing a property, Harbour enters into a land contract reselling the property for roughly four to five times its own purchase price.

59.     In addition to grossly marking up the sale price of the home, Harbour charges interest rates of 9.9% or 10% and finances the sale over a 30-year period.

60.     All of Harbour's land contracts put the burden of home repairs, maintenance, property taxes, and homeowner's insurance onto the buyer. All, or almost all, of Harbour's contracts state that the buyer must bring the property up to code "within a reasonable period of time not exceeding four months." Nonetheless, all of Harbour's land contracts include a forfeiture clause that purports to give Harbour the right, upon a default, to elect to cancel the contract, keep all monies paid, and evict the buyer like a tenant.

61.     Moreover, Harbour knows that the purchasers it targets for its contract for deed transactions cannot afford to bring the property up to code within four months. Thus, Harbour knows that most purchasers will be in default on the

contract four months after signing.

62.     Harbour also drafts its contract such that the purchaser has the obligation to obtain homeowner's insurance and keep the property insured.  However, Harbour knows that many of the homes it sells through its contract for deed program are not insurable because of the significant defects described above, and knows that the purchasers it is targeting for its contract for deed program cannot afford to address those defects quickly in order to obtain homeowner's insurance.  Thus, Harbour knows that most purchasers will be in default on the contract almost immediately upon signing.

63.     According to one study by researchers at the University of Texas-Austin, over the 21-year period for which they reviewed the data, 45% of contract for deed purchasers had defaulted, 37% were still in active contracts, and fewer than 20% of contract purchasers had obtained a deed to the property.[9]  Upon information and

---

[9] Peter M. Ward, Heather K. Way, and Lucille Wood, *Executive Summary: Contract for Deed Prevalence Project: A Final Report to the Texas Department of*

belief, Harbour's default rate is far greater than 45% due to the uniquely predatory way that Harbour has structured its contract for deed transactions. A significant number of contract for deed purchasers in Harbour's transactions have already defaulted and been dispossessed of their homes.

64. Since 2012, Harbour Portfolio has filed at least 71 eviction cases in Fulton, DeKalb, and Clayton County. Harbour purchased 85 properties in Fulton County for resale through its contract for deed business over the period 2011 to 2015, and has filed at least 34 eviction lawsuits in Fulton County. Harbour purchased 42 properties in DeKalb County over this same time period, and has filed 21 evictions in DeKalb County. Upon information and belief, other Harbour purchasers have vacated their homes after Harbour threatened to file an eviction against them.

65. By pushing the burden of home repairs onto the contract buyer, Harbour's business model allows it to draw a stream of income from properties it could not

---

*Housing and Community Affairs* (Aug. 2012), available at
https://law.utexas.edu/faculty/hway/stand-alone-executive-summary.pdf.

legally rent out without making costly improvements. This is true because landlords have a non-delegable duty under state law to maintain properties in "habitable" condition – the condition deemed safe for residential occupancy by local government units. Typically, landlords must obtain a "certificate of occupancy" showing that the property is habitable from the local government before renting the home out. Upon information and belief, most of Harbour's properties would not be deemed habitable under local housing codes at the time Harbour sells them through land contracts.

66.     By including a provision permitting Harbour to forfeit the contract and keep all amounts paid along with all amounts the buyer has spent improving the property and bringing it into habitable condition, Harbour's business model seeks to reap a significant windfall upon the buyer's default, which as described above, is extremely likely due to the predatory terms built into the contracts.

67.     By charging interest rates of 9.9% and 10% while prevailing interest rates for mortgage loans have hovered around 4%, Harbour's business model allows it to

reap a substantial profit even if a buyer does not default. On a $50,000 loan over 30 years, going from a 4% interest rate to a 10% interest rate increases the total of payments from approximately $86,000 to $158,000, resulting in $72,000 in additional interest the buyer will be required to pay over the life of the loan.[10]

68.     By selling homes at a 400 to 500% markup, Harbour's business model allows it to reap a substantial profit even if a buyer does not default. Over 30 years at 10% interest, increasing the purchase price from $15,000 to $60,000 increases the total of payments from $47,520 to $189,720 (an increase of $142,200, or nearly 300%).

69.     Harbour's land contracts are also predatory because while taking on the

---

[10] The Fannie Mae Foundation has likewise documented how modest interest rate disparities can cause dramatic financial consequences for borrowers steered into higher-cost loans. James H. Carr and Jenny Schuetz, Fannie Mae Foundation, *Financial Services in Distressed Communities: Framing the Issue, Finding Solutions* (2001) at 12-13 (available at https://www.innovations. harvard.edu/financial-services-distressed-communities-framing-issue-finding-solutions) (1% increase in interest rate on 30-year $81,000 mortgage translates into loss of over $78,000 in wealth due to increased payments and lost investment opportunity).

obligation to make significant repairs, pay property taxes, maintain homeowner's insurance, and pay a grossly inflated purchase price, the contract buyer does not have the rights of a homeowner to the procedural protections involved in the foreclosure process, the right of a homeowner to receive any excess proceeds in a foreclosure sale (to the return of their equity), the ability to obtain a homestead exemption reducing the property tax bill,[11] the ability to sell the property if they fall on hard times, or the ability to easily refinance a mortgage loan in order to qualify for a better interest rate or borrow against their equity. Harbour's buyers do not have these rights and options, as they do not have a deed.

### *Harbour's marketing scheme, targeting African-American communities*

70. Harbour purchases all or virtually all of its properties from Fannie Mae's REO portfolio, knowing that such properties are located almost exclusively in communities that are majority African American.

---

[11] Upon information and belief, Harbour purchasers were not advised to apply for the homestead exemption. Several purchasers who applied for the exemption were told they were not eligible without a recorded deed.

71.    Harbour intentionally engages in a marketing scheme that predictably and actually draws primarily African-American purchasers.  Specifically, it advertises properties by putting a sign in front of each house indicating it is for sale, quoting a low downpayment and low monthly payment, and listing a phone number to call.

72.    This primary mode of advertising its contract for deed transactions reaches, and was designed to reach, the primarily African-American residents of these communities.  The people likely to see these signs and call Habour were the ones walking or driving through the neighborhood.

73.    Harbour's other primary method of soliciting purchasers to enter into its abusive land contract transactions also reaches, and was designed to reach, an almost entirely African-American pool of purchasers.  This method was to encourage any person who contacted Harbour about buying a home to refer friends and family to Harbour.  Harbour offered referral incentives to buyers who referred another buyer to Harbour's selling agents.

74.    Upon information and belief, Harbour did not market its contract for deed

transactions through broader outlets, such as advertisements in general-audience television channels, radio stations, newspapers, magazines, or social media sites that would have reached a broader, less racially-skewed audience.

75.     Upon information and belief, Harbour marketed its contract for deed transactions exclusively, or almost exclusively, in African-American neighborhoods, because it knew that such communities had been denied access to traditional forms of mortgage credit and believed that African-American residents of these communities could be induced to purchase properties that were in very bad condition, and to pay inflated purchase prices and very high interest rates, because they believed they would not have any other way to purchase a home.

76.     Harbour's business model involves reverse redlining – intentionally targeting credit-starved communities of color for its predatory and abusive contract for deed transactions.  Harbour's targeting of these areas has been effective precisely because access to traditional mortgage lending has been extremely tight over this time period.

77.     Harbour has taken advantage of market conditions to sell its extremely toxic contract for deed product.  Far from being a responsible provider of much-needed home lending credit, Harbour's practices have exacerbated economic stagnation and blight in the communities it has targeted.  Many of Harbour's properties now sit vacant and boarded up, after Harbour dispossessed unsuccessful would-be homeowners (and sometimes multiple would-be homeowners in succession) who had invested significant amounts of time and money in the homes.

78.     This practice of reverse redlining, targeting a protected class for a predatory home loan product, has repeatedly been held to violate the federal Fair Housing Act.  *See, e.g., Barkley v. Olympia Mortgage Co*., No. 04-cv- 875, 2007 WL 2437810 (E.D.N.Y. Aug. 22, 2007); *Hargraves v. Capital City Mortgage Corp*., 140 F. Supp. 2d 7 (D.D.C. 2000).

### *Racial Targeting and Disparate Impact*

79.     Upon information and belief, over the time period from 2010 to the present, Harbour has purchased at least 250 properties in metropolitan Atlanta to sell

through contracts for deed.  Harbour has since sold many of these properties, either after a default by a contract purchaser or while a contract purchaser was still attempting to buy the home, to third party investors.

80.　　As of June 2016, at one moment in time, property tax records showed that Harbour Porfolio held 94 properties in six metro Atlanta counties - Clayton, Cobb, DeKalb, Fulton, Gwinnett, and Rockdale counties.  Upon information and belief, all of these 94 properties were purchased by Harbour Portfolio with the intent to market them for its predatory contract for deed transactions.

81.　　The Atlanta Metropolitan Statistical Area (MSA) is 34% African American. Yet 84% of these 94 Harbour properties were located in census blocks that were at least 50% African American, and 62% of these Harbour properties were in Census blocks that were at least 80% African American.

82.　　The following is a map of these 94 properties, overlaid with the percent of African-American residents by census tract.

Figure 1. Harbour Properties as of June 2016 in Six-County Atlanta Metro Area and Percent African American by Census Tract





Legend
○ Property Location
**Atlanta Population Demographics**
**Percent Minority**
  0 - 20%
  20% - 50%
  50% - 80%
  80% - 100%



0  4.25  8.5    17    25.5    34
━━━━━━━━━━━━━━━━━━━━━━━━ Miles

Sources: Esri, HERE, DeLorme, USGS, Intermap, increment P Corp., NRCAN, Esri Japan, METI, Esri China (Hong Kong), Esri (Thailand), MapmyIndia, © OpenStreetMap contributors, and the GIS User Community

83.     Harbour Portfolio was actively purchasing properties from Fannie Mae's

REO portfolio in Atlanta from 2011 to 2015.  Fannie Mae sold 5,473 properties in

Fulton and DeKalb County over this time period, and Harbour Portfolio was the

purchaser in 126 of those sales.  Within this time period, all but one of the 127

properties Harbour Portfolio purchased in Fulton or DeKalb County, Georgia, were

purchased from Fannie Mae.[12]

84.     Fulton and DeKalb County comprise roughly half of the five-county Atlanta

metro area by population, and a significant majority of Harbour's purchases were

located in Fulton and DeKalb County.

85.     Harbour's decision to purchase its properties exclusively, or almost

exclusively, from Fannie Mae's REO portfolio, rather than from any other sellers,

had the predictable and actual effect of disparately impacting high-minority areas.

_____

[12] The one remaining property is shown by the DeKalb County tax assessor to have
been purchased by Harbour from Freddie Mac.  This could be a data entry mistake,
as the two entities are described in a variety of ways in the tax assessor's sales
records.

After merging this data with data on census tracts from the 2014 American Community Survey (drawn from U.S. Census Bureau surveys from 2010 through 2014), it is possible to show the mean racial concentration (percent African-American residents) of the census tracts in which Fannie Mae sales occurred. As shown in Table 1 below, Fannie Mae sales in Fulton and DeKalb County from 2011-2015 were located in census tracts that had a mean percentage of African-American residents of 71.37%. By contrast, the mean racial makeup of the census tracts where other (non-Fannie Mae) single family home sales occurred in Fulton and DeKalb County over the same time period was 48.37% African American. Thus, the practice of only buying from Fannie Mae's REO portfolio results in purchases being located in areas that were 23% more densely African American than the locations of other single family home sales in these counties over this time period. This information is summarized in Table 1 below.

**Table 1. Sales by Fannie Mae in Fulton and DeKalb County vs. Other Regular Sales of Single-Family Properties, 2011-2015**

| | Sales of Fannie REO | Other Sales of Single-Family Properties | Mean Difference | Signif. |
|---|---|---|---|---|
| Mean of Percent African American of Census Tract | 71.37% | 48.37% | 23% | <.001 |
| Standard Deviation | 30.09% | 37.70% | | |
| Number of Purchases | 5,473 | 116,083 | | |
| | | | | |
| Mean of Median Family Income of Tract | $59,284 | $84,435 | $25,151 | <.001 |
| Standard Deviation | $29,577 | $47,197 | | |
| Number of Purchases | 5,473 | 116,083 | | |

86.     But Harbour's purchases were even more racially concentrated than Fannie Mae REO sales. If one compares the locations of Harbour's Fannie Mae REO purchases in Fulton and DeKalb County to those of other buyers over the 2011-2015 time period, the average racial composition of census tracts where Harbour purchased properties was 86.25% African-American, compared to 71.02% African

American for Fannie REO purchased by other buyers. This almost 30 percentage-point difference is highly statistically significant, with a p-value of 0.000.[13] This information is summarized in Table 2 below.

**Table 2. Harbour Portfolio Purchases of Fannie Mae REO properties vs. Other Purchases of Fannie Mae Single-Family Properties, 2011-2015**

| | Harbour Purchases of Fannie REO | Other Purchases of Fannie REO | Mean Difference | Significance |
|---|---|---|---|---|
| Mean of Percent African American of Census Tract | 86.25% | 71.02% | 15.23% | <.001 |
| Standard Deviation | 12.96% | 30.29% | | |
| Number of purchases | 126 | 5,347 | | |
| | | | | |
| Mean of Median Family Income of Tract | $39,557 | $59,749 | $20,192 | <.001 |
| Standard Deviation | $14,464 | $29,684 | | |
| Number of purchases | 126 | 5,347 | | |

---

[13] P-value is a term statisticians use to refer to the probability of obtaining a result equal to or "more extreme" than when the "null hypothesis" – that there is no relationship between the two variables – is true. A p-value below 0.05 (5%) is considered to be statistically significant, showing that two variables are not unrelated. Thus, a p-value of 0.000 is extremely statistically significant.

87.     This large gap between the average racial concentration of neighborhoods where Fannie Mae REO properties were sold and the neighborhoods where Harbour purchased Fannie Mae REO is not the product of chance.  Such stark disparities are consistent with, and reflect, intentional targeting of African-American neighborhoods.

88.     Because the income level and racial characteristics of neighborhoods are somewhat correlated, it is useful to examine whether, controlling for income, the racial composition of a neighborhood is a significant predictor of whether Harbour is likely to have purchased a given Fannie Mae REO property as compared to other buyers of Fannie Mae REO.  In a bivariate regression which includes percentage of African-American residents in a census tract and the median income of the census tract, the percentage of African Americans in a census tract is a significant predictor of a Harbour purchase in Fulton and DeKalb County, even _after_ controlling for the median income of the tract.

89.     In a multivariate analysis, controlling for income, age, and owner-occupancy

rate, neighborhood racial concentration still had a statistically significant effect on the likelihood of Harbour being the purchaser of a given Fannie Mae REO property in Fulton and DeKalb County from 2011 to 2015.

90.    This analysis shows that the location of Harbour's contract for deed transactions is significantly predicted by racial concentration of the area, even holding constant other factors, like income and owner-occupancy rate. This fact gives rise to a reasonable inference of that Harbour is intentionally targeting of African-American neighborhoods for its's abusive contract for deed transactions.

91.    The maps that follow show the locations of the properties Harbour purchased for its contract for deed business in Fulton and DeKalb County over the 2011-2015 time period, overlaid with the racial concentration (percent African American) by census tract.

# Figure 2. Map of Harbour Portfolio Properties in Fulton County, GA



- ● Harbour Portfolio Property
- 0 to 9.9% African-American
- 10 to 29.9% African-American
- 30 to 59.9% African-American
- 60 to 79.9% African-American
- 80 to 100% African-American

Miles

0  2  4      8

**Figure 3. Map of Harbour Portfolio Properties in DeKalb County, GA**



### *DeMarkus and Nina Horne's transaction with Harbour*

92.    DeMarkus Horne is a 37-year-old, married African-American man who lives in Lithonia, DeKalb County, Georgia.

93.    Nina Horne, his wife, is a 32-year-old African-American woman. They live in their home with their three children.

94.    Mr. and Mrs. Horne learned about the opportunity to buy a house through Harbour Portfolio from a friend of Mr. Horne's, also an African-American first-time homebuyer, who was in the process of buying a home from Harbour. His friend learned about Harbour when he saw a sign in front of a house: "Sale, $800 down, $400/month." Mr. Horne's friend had been told that he would receive a credit of one month's payment for referring Mr. Horne.

95.    In or around March 2012, Mr. Horne called the phone number given to him by his friend and asked about opportunities to buy a home.

96.    Mr. Horne had never owned a home before.

97.    At that time, Mr. Horne was 32 years old and was making about $11.50 per

hour working at a car wash.  He had some experience doing home repairs and maintenance from previous jobs.  Mr. Horne's highest level of education was eleventh grade, after which he obtained his General Education Development (GED) Diploma.  He has no experience or expertise in mortgage lending, real estate transactions, or real estate law.

98.     Mrs. Horne graduated from high school and started working towards an Associate's degree, which she has not yet completed.  She has no experience or expertise in mortgage lending, real estate transactions, or real estate law.

99.     Harbour told the Hornes that there were several houses they could look at to consider buying.  Mr. Horne's wife viewed at least two houses.  For each house, Harbour provided a lock box combination to enter the house.  When Mrs. Horne identified the house she thought they should buy, Mr. Horne also went to look at the property.  They then told Harbour that they would like to buy this house.

100.   Mr. and Mrs. Horne applied to purchase the property at 6395 Laurel Post Court, Lithonia, DeKalb County, Georgia.

101.   Mr. and Mrs. Horne provided all requested information for the application to purchase the home with a loan from Harbour Portfolio.

102.   Mr. Horne was approved to purchase the home with a loan from Harbour Portfolio.  Although both Mr. and Mrs. Horne applied, and Mrs. Horne believed her name would also be included on the documents, Harbour drafted the documents in Mr. Horne's name alone.

103.   Mr. and Mrs. Horne were married at the time of the transaction and have remained married since that time.  They manage their collective financial resources together, such that the financial harm caused to Mr. Horne by the transaction has equally harmed Mrs. Horne.  They both live in the home, and both face the risk of loss of their home and the anxiety and stress that comes with this risk.

104.   Mr. Horne and his wife were excited about the purchase of this home as a place to raise their three daughters.  They knew the home needed work, but since Mr. Horne was capable of doing much of the work himself, they were willing to take it on.  They saw it as their opportunity to become homeowners.

105. Harbour required Mr. Horne to sign a promissory note ("note") and agreement for deed ("contract") to memorialize the transaction.

106. The note and contract, dated March 16, 2012, said Mr. Horne was buying the property for $52,425. The Hornes made a downpayment of $1,165 and signed a promissory note for the remaining $51,260, to be repaid at 10% interest over 30 years. The note and contract required payments of $449.84 per month (principal and interest) in addition to paying the property taxes and obtaining homeowner's insurance.

107. Unbeknownst to Mr. Horne, Harbour had purchased the property from Fannie Mae for $15,543 less than three weeks before. Upon information and belief, Harbour did not make any repairs or improvements to the property before selling it to Mr. Horne.

108. Upon information and belief, Harbour did not obtain an independent appraisal of the home in the course of this transaction.

109. Mr. Horne never met with any Harbour representative or agent in person.

The closing of the transaction was conducted by mail; Mr. Horne was asked to sign the papers in front a notary and return them in a FedEx envelope.

110. Mr. Horne believed he was becoming a homeowner at the time he signed the papers. He had no idea that he was not obtaining a deed in his name or that this transaction was any different from a mortgage loan.

111. Every aspect of the transaction was designed to make Mr. Horne believe he was becoming a homeowner. Mr. Horne was given a "Lead Based Paint Rider" to the contract that specifies that the seller was required to give certain disclosures and stating that he, the "purchaser," had received these disclosures.

112. He was given a "Mold Disclosure" stating that as buyer, he "make[s] the decision to purchase the Property independent of any representation" related to mold.

113. He was given a "Truth in Lending Disclosure Statement" that said that he was giving a security interest in "the goods or property being purchased."

114. He was given a HUD 1 Settlement Statement that included a summary of the

"Purchaser's transaction" and a summary of the "Seller's transaction." This statement showed that Mr. Horne, the purchaser, was required to bring $1500 cash and that the remainder of the purchase price was coming from an "Owner financed mortgage" of $51,260.

115.   He was required to sign a "Purchaser's Certification and Authorization" that states, "I/we have applied to purchase a house with financing from Harbour Portfolio VII, LP."

116.   Mr. Horne was required to sign a disclosure related to the Equal Credit Opportunity Act, stating that the Equal Credit Opportunity Act prohibited discrimination by creditors on certain bases and that Harbour was required to disclose that Mr. Horne need not disclose any income from alimony, child support, or separate maintenance.

117.   Mr. Horne was required to sign a disclosure related to the Fair Credit Reporting Act, stating in part, "An investigation will be made as to the credit standing of all individuals seeking credit in this application."

118. Mr. Horne was required to sign an "Owner Occupant Certification" stating in part, "This is to certify that I am purchasing the above-referenced property as my primary residence."

119. The cover letter sent along with a copy of his signed contract stated, "Congratulations on the purchase of your new home!" It also reminded him to get homeowner's insurance as soon as possible.

120. Mr. Horne was encouraged to refer other potential buyers and was told he would obtain a credit equal to one month's payment for each person he referred. He referred a friend, who was also African American.

121. The contract stated that Mr. Horne was responsible for maintaining the property in good repair during the term of the agreement as well as bringing the property into habitable condition within a reasonable period of time not to exceed four months.

122. Almost immediately after the Hornes moved into the property, DeKalb County code enforcement placed signs on the door and notices on the windows,

threatening fines if certain repairs were not made.

123.   Due to the threat of fines, Mr. Horne was required to replace and paint wood siding on the house that was rotting and dilapidated, replace wood trim around the gutters that was rotting due to water damage, replace wood trim and siding and paint the chimney that was rotting and dilapidated, purchase and install a new mailbox, and replace a wood privacy fence that was falling apart.

124.   Mr. Horne also had to make a number of other repairs in order to bring the house into habitable condition, including but not limited to the following examples. He had to repair a plumbing leak in the main water line coming into the house. This alone cost thousands of dollars to repair.  He repaired a plumbing leak that was causing water to drip through the ceiling from an upstairs bathroom and replaced ceiling drywall damaged by the leak.  He replaced flooring in the bathroom and kitchen and painted throughout the house.  He installed a vanity and tile in the master bathroom.  He installed ceiling fans.  He put grass down in the yard.  He removed a rotting bannister on the porch as required by the homeowner's

insurance company.  He replaced the stove, refrigerator, furnace, and hot water heater.

125.   Mr. Horne has paid the property taxes for the house as part of his monthly payment to National Asset Advisors, the company servicing the contract for Harbour Portfolio.

126.   Mr. Horne obtained homeowner's insurance, as required by Harbour, and maintained it for years, paying approximately $800 per year.

127.   Mr. Horne has made his house payment for years.  At one point he fell behind due to a loss of employment, but was able to get caught up.  Recently, he has again fallen behind on his payments due to interruptions in employment, and is currently in default.

128.   The Hornes now face the risk of forfeiture and eviction due to Harbour's abusive contract terms, which state that upon a default, Harbour may declare a forfeiture, keep all amounts paid or expended on repairs, and evict the buyer like a tenant.

129.  Harbour sold Mr. Horne's contract to CWAM II, LLC and executed a deed dated April 24, 2015, transferring the property to CWAM II, LLC.

130.  In or around April, 2017, CWAM II, LLC sent Mr. Horne a "Notice to Vacate," demanding that he and his family immediately give up possession of their home, stating that CWAM II "in no way recognizes your right to temporary or permanent possession of the premises," and threatening to commence an eviction.

### Jackie and Donna Brown's transaction with Harbour

131.  Jackie Brown is a 51-year-old African-American man.

132.  His wife, Donna Brown, is a 50-year-old African-American woman.

133.  Mr. and Mrs. Brown live in their home at 45 Charlotte Boulevard, Stockbridge, Henry County, Georgia, which they believed they owned subject to a mortgage loan.  Mr. Brown signed papers to purchase their home from Harbour Portfolio VI, LP in April 2015.

134.  Mr. Brown works in maintenance for DeKalb County Schools and has for the past 20 years.  Mr. Brown's wife, Donna, had to stop working due to chronic,

severe health problems. Mrs. Brown worked for over 16 years for the United Education Institute, a private university, helping students obtain financial aid. She then worked briefly for DeKalb County Schools before her health deteriorated and she was forced to resign. Due to chronic osteoarthritis and another autoimmune disease which also impacts the joints, she has been in and out of the hospital. The Browns are now living off of just Mr. Brown's income and also shouldering the costs of Mrs. Brown's doctor visits and medications. Mrs. Brown has applied for Social Security disability benefits, but her application has not yet been approved.

135. Mr. Brown completed high school and one semester of college. Mrs. Brown also completed high school and some college. Neither Mr. nor Mrs. Brown has any experience in mortgage lending, real estate transactions, or real property law.

136. The Browns learned about the opportunity to buy a home from Harbour Portfolio from Mrs. Brown's brother, also African-American, who had signed a contract with Harbour some years before.

137. The Browns looked at two houses that Harbour was advertising for sale in

51

the Stockbridge area. The other house was in worse condition, so the Browns decided they wanted to purchase the home at 45 Charlotte Blvd.

138. Mr. Brown applied to purchase the home at 45 Charlotte Blvd, provided all information that Harbour requested, and was approved to purchase the home.

139. Mr. and Mrs. Brown were married at the time of the transaction and have remained married since that time. They manage their collective financial resources together, such that the financial harm caused to Mr. Brown by the transaction has equally harmed Mrs. Brown. They both live in the home, and both face the risk of loss of their home and the anxiety and stress that comes with this risk.

140. Upon information and belief, Harbour Portfolio did not obtain an appraisal by an independent appraiser in connection with the transaction.

141. The purchase price for the home was $34,500.

142. Harbour had bought the property from Fannie Mae on April 7, 2011 for $10,467. Upon information and belief, Harbour did not make any repairs or improvements to the property before selling it to Mr. Brown.

143.   Harbour required Mr. Brown to make a downpayment of $1,500 and to execute a Promissory Note ("note) and Agreement for Deed ("contract") to purchase the home.  The note and contract, dated April 15, 2015, financed the remaining $33,000 at 9.9% interest over a 30-year term, for a principal and interest payment of $287.16. The initial escrow payment was set at $115.85, for a total monthly payment of $403.01.  Mr. Brown was told he had the obligation to obtain his own homeowner's insurance.  He obtained homeowner's insurance, but the insurance company canceled the policy shortly thereafter, stating that it would not provide coverage due to the condition of the home.

144.   Mr. Brown never met with any Harbour representative or agent in person. The closing of the transaction was conducted by mail; Mr. Brown was asked to sign the papers in front a notary and return them in a FedEx envelope.

145.   Mr. Brown believed he was buying the home in the transaction and that after signing the papers, he would own the home.  Every aspect of the transaction was designed to make it appear that he was the owner of the home.  He was given a

"Truth in Lending Disclosure Statement" that said that he was giving a security interest in "the goods or property being purchased." He was given a HUD 1 Settlement Statement that described amounts paid by an "owner financed mortgage." He received a letter from Harbour stating, "Congratulations on your decision to buy a home!" and enclosed the documents he was required to sign and return in order to complete the transaction. Mr. Brown received documents substantially similar to those received by Mr. Horne, containing numerous representations that he was becoming the owner of the home through this transaction.

146.    The contract stated that Mr. Brown was responsible for maintaining the property in good repair during the term of the agreement as well as bringing the property into habitable condition within a reasonable period of time not to exceed four months.

147.    Mr. Brown had experience doing home improvement work, so although the house needed significant repairs, he believed he could do the work himself.

However, the repairs needed to bring the house into habitable condition were much more extensive than what the Browns could observe before signing the contract, because the utilities were turned off when they viewed the house.

148.   Soon after moving in, the Browns discovered extensive problems with the home and began making necessary repairs, including but not limited to the following examples.  They had to tear out the carpets, which were covered with stains from apparent pet soiling.  They discovered that the kitchen had no electrical service, as a number of wires had been torn out of the circuit breaker.  They installed circuit breakers and electrical wiring.  They had to put in an electrical line for the stove, as there was none in place.  They made repairs to the HVAC system, but it still does not function properly, forcing them to rely on space heaters and window air conditioning units.  They installed ceiling fans.  They had to repair leaks in the main water line coming into the house twice, as the line was leaking in two different areas, requiring them to dig up the front yard to repair it.  They had to patch sheet rock where holes had been knocked in the walls and ceiling.  They had

to replace the front door and other doors in the house. They began to convert the garage to a finished space.

149. The Browns have fallen behind on the payments and are currently in default. They are trying to keep paying what they can, but struggling due to Mrs. Brown's health problems and the fact that they are now living on just one income.

150. The Browns received a letter dated June 6, 2017 notifying them that their contract for deed had been sold and transferred to Orange Capital Funding LLC effective May 5, 2017.

### Ola and Michael Johnson's transaction with Harbour

151. Ola Elder Johnson is a 55-year-old African-American woman.

152. Michael T. Johnson, her husband, is a 54-year-old African-American man.

153. Ola Elder Johnson and Michael T. Johnson are a married couple who live with her brother, her son, and her granddaughter in their home at 4076 Chedworth Way, Stone Mountain, GA 30083.

154. Mr. Johnson is employed as a construction worker. Mrs. Johnson was a

Certified Nursing Assistant, but is now disabled and receives Social Security Disability. Her brother who lives in their home also receives Social Security Disability. Neither Mr. nor Mrs. Johnson has any experience or expertise in mortgage lending, real estate transactions, or real property law.

155. Mrs. Johnson received her high school diploma and took some college classes. Mr. Johnson went to school through 11th grade and then received a General Educational Development (GED) Diploma.

156. A friend who purchased a house from Harbour Portfolio recommended that Mrs. Johnson view Harbour's available house online.

157. Around November of 2011, the Johnsons visited approximately six houses owned by Harbour Portfolio around the Decatur/Stone Mountain area. Except for the home they purchased, all needed extensive repairs and appeared to have been vandalized.

158. The sign in front of their home said "Sale" and advertised a $1,000 downpayment and a monthly payment of $400.

159.   Throughout the process, the Johnsons communicated by telephone and email with Harbour.

160.   Mr. Johnson had never owned a home before. Mrs. Johnson previously inherited a property, but lost it to foreclosure.

161.   The Johnsons decided they wanted to purchase the home at 4076 Chedworth Way.  They applied to purchase it, submitted all information that was requested of them, and were approved to purchase the home.

162.    Harbour required the Johnsons to sign a Purchase Money Note ("note") and Agreement for Deed ("contract") to memorialize the transaction.

163.   The note and contract, dated November 30, 2011, stated the Johnsons were buying the property for $69,500.

164.   Harbour had purchased the Johnsons' home from Fannie Mae on September 23, 2011 for $16,193.  Upon information and belief, Harbour did not make any repairs or improvements to the property before selling it to the Johnsons.

165.   Upon information and belief, Harbour did not obtain an independent

appraisal of the home in the course of this transaction.

166. According to the note and contract, the Johnsons were required to make a downpayment of $1,400. The balance of $56,000 was financed at 10% over 30 years. The Johnsons were required to make monthly payments of $597.63 per month (principal and interest) in addition to paying the property taxes and obtaining homeowner's insurance.

167. The Johnsons never met with any Harbour representative or agent in person. The closing of the transaction was done remotely; the Johnsons were asked to sign the papers in front of a notary and return them to Harbour Portfolio.

168. The Johnsons believed they were becoming homeowners at the time they signed the papers. They had no idea that they were not obtaining a deed in their names or that this transaction was any different from a mortgage loan. The Johnsons received documents substantially similar to those received by the other Plaintiffs, containing numerous representations that they were becoming the owners of the home through this transaction.

169.   The contract stated that the Johnsons were responsible for maintaining the property in good repair during the term of the agreement as well as bringing the property into habitable condition within a reasonable period of time not to exceed four months.

170.   After moving in, the Johnsons discovered problems with the condition of the property.  The roof has leaked in the front and the back since they purchased the home, and some of the pipes underneath the house burst after they moved in.  The Johnsons have made necessary repairs and improvements to the home, including but not limited to the following examples.  They replaced the damaged pipes, installed an air conditioning unit, and installed and a fuse box.

171.   The Johnsons are current on their payments on the contract for deed.

172.   When the Johnsons fell behind on the payments in 2013 because Mrs. Johnson was sick, Harbour Portfolio sent them a letter threatening to evict them. The letter, dated May 14, 2013, was titled "10 DAY NOTICE TO PAY OR MOVE!" and stated that they must contact someone at National Asset Advisors

"**_NOW_** in order to avoid being removed from these premises by local authorities."
The Johnsons were able to bring the payments current and Harbour never filed an
eviction action against them.

173.    The Johnsons have paid the property taxes for the house as part of their
monthly payment.

174.    Over time, Harbour and its servicing agent NAA have repeatedly over-
collected for the Johnsons' property tax bill.  The Johnsons received a Tax and
Insurance Account Disclosure Statement dated January 20, 2016 showing that their
escrow balance was $3,662.15.  Harbour and NAA collected these funds from the
Johnsons although their projected 2016 property tax obligation was only
$1,392.16.

175.    The Johnsons have continuously maintained a homeowner's insurance
policy on the home.  It is not included in their monthly payment to Harbour
Portfolio or its successors.

176.    The Johnsons' contract for deed was sold from Harbour Portfolio to SG

Capital on or about December 8, 2015.

177.    A quitclaim deed dated December 8, 2015 from Harbour Portfolio to SG Capital was recorded in the DeKalb County deed records on April 8, 2016.

178.    The property was apparently transferred from SG Capital to Brady Impact Trust in February 2017.  A special warranty deed dated February 1, 2017 and executed on February 27, 2017 from SG Capital to Brady Impact Trust was recorded in the DeKalb County deed records on July 13, 2017.

179.    National Asset Advisors is still servicing the Johnsons' contract for deed.

180.    Once SG Capital took over ownership of the property and contract, the Johnsons stopped receiving monthly statements.

181.    As of December 2015, the Johnsons allegedly still owed $66,205.68 to Harbour Portfolio.

### *Anita Jordan's transaction with Harbour*

182.    Anita Jordan is a 39 year-old African-American woman.

183.    In late August 2012, Anita Jordan saw a sign in the window of one of

Harbour's homes in Pittsburgh, the Atlanta neighborhood where she had grown up and lived in as an adult.

184. To the best of her recollection, the sign advertised that the home was for sale for a $1,000 downpayment and $300 per month.

185. Ms. Jordan wanted to buy a home in the Pittsburgh neighborhood and saw this as the opportunity to do so. She did not look at other homes.

186. Ms. Jordan had never owned a home before.

187. Ms. Jordan called the number on the sign and she expressed interest in the home at 1163 Garibaldi Street SW Atlanta, GA. She was given the code to the lock box so she could enter the property.

188. At that time, Ms. Jordan was making about $46,000 annually working two jobs as a nurse's assistant. Ms. Jordan is currently seeking her GED Diploma and is a board-certified licensed nursing assistant. She has never worked in real estate. She has no experience or expertise in mortgage lending, real estate transactions, or real property law.

189.   Harbour initially offered to sell Ms. Jordan the home for $60,000.

190.   On June 25, 2012, roughly two months before Ms. Jordan's inquiry, Harbour had purchased 1163 Garibaldi Street from Fannie Mae for $16,493. Upon information and belief, Harbour did not make any repairs or improvements to the property before selling it to Ms. Jordan.

191.   The house was basically a shell. It needed substantial work to make it livable. Electrical wiring had been stripped from the walls. New drywall was needed throughout the entire home. Toilets and sinks were missing; the kitchen had no cabinets, counters, appliances, or fixtures. The master bedroom was completely unfinished. Carpets and padding needed to be replaced. Heating ducts and two furnaces also needed to be replaced.

192.   In light of the substantial expected cost of repairs to the home, Harbour and Ms. Jordan agreed to a purchase price of $40,000.

193.   Soon after establishing the purchase price, Harbour called Ms. Jordan and said that if she wanted to buy the home she would need to send a cashier's check

for the $1,886 downpayment by the end of the day.

194.   On or about August 28, 2012, Ms. Jordan sent a cashier's check for $1,886 via express mail to an address provided by Harbour.  She called Harbour to report the tracking number, at which time she was told that the property would be taken off of the market.

195.   Ms. Jordan applied to purchase the home, provided all information that was requested of her, and was approved to purchase the home.

196.   On or about September 7, 2012, Harbour sent Ms. Jordan a packet of paperwork with instructions for her to fill out, sign, and return.

197.   Harbour required Ms. Jordan to sign a promissory note ("note") and agreement for deed ("contract") to memorialize the transaction.

198.   The note and contract, dated September 4, 2012, stated that Ms. Jordan was buying the property for $41,000 at 10% interest over 30 years.  She was obligated to make payments of $351.03 per month (principal and interest) in addition to paying the property taxes and obtaining homeowner's insurance.

199. Upon information and belief, Harbour did not obtain an independent appraisal in the course of this transaction.

200. Ms. Jordan never met with any Harbour representative or agent in person. The closing of the transaction was conducted by mail; Ms. Jordan was asked to sign the papers in front of a notary and return them in a FedEx envelope.

201. Ms. Jordan believed she was becoming a homeowner at the time she signed the papers. She had no idea that she was not obtaining a deed in her name or that this transaction was any different from a mortgage loan.

202. Every aspect of the transaction was designed to make Ms. Jordan believe she was becoming a homeowner. Ms. Jordan received documents substantially similar to those received by the other Plaintiffs, containing numerous representations that she was becoming the owner of the home through this transaction.

203. The contract stated that Ms. Jordan was responsible for maintaining the property in good repair during the term of the agreement as well as bringing the property into habitable condition within a reasonable period of time, not to exceed

four months.

204.   Ms. Jordan had to make significant repairs to the home in order to bring the house into habitable condition, including but not limited to the following examples. The home contained no electric wiring at all, as it had been stripped from the walls. She replaced all wiring and purchased a new electrical meter.  She had to add or replace drywall in almost the entire home.  She installed toilets in all three of the bathrooms and sinks in two bathrooms, as there were none in the home when she purchased it.  She had to completely build out the kitchen, which had no cabinets, counters, appliances, or fixtures.  She finished the master bedroom, which had been completely unfinished.  She had to tear out all of the carpet and padding and replace it. She also had to replace heating ducts and two furnaces.

205.   In addition to making repairs necessary for habitability, Ms. Jordan made improvements to the home, including but not limited to the following examples. She bought and installed new light fixtures, appliances, electrical sockets, and flooring.  She replaced the front and back doors and installed security doors and

added an alarm system to the home. Ms. Jordan fenced in her yard, extended her driveway, filled in the yard with soil and laid turf.

206. Ms. Jordan has invested in extensive repairs and improvements to the home because she believed she owned it.

207. In 2013 Ms. Jordan lost one of her jobs and fell behind on her payments. She continued to make payments as she was able and attempted to catch up at various points, sometimes sending more money than a regular monthly payment.

208. In fall of 2016, Ms. Jordan received notice that her house had been sold to Hamilton Green Crest Fund I, LLC ("Green Crest"). Confused by this information, she stopped making house payments in September 2016. Unsure where to make payments and whether the money would be applied to her loan, Ms. Jordan had been saving her house payments since September. She has recently resumed sending payments to NAA, despite her concerns about the transaction.

209. Upon information and belief, over the course of her loan, Harbour and its servicing agent NAA required Ms. Jordan to make monthly escrow payments of

approximately $199, totaling $10,348 through December 2016. However, the property tax liability on her home from September 2012 through December 2016 only totals around $3,798.

210. Ms. Jordan does not recall ever having received an escrow analysis or any information indicating that she had accrued a surplus in her escrow account.

211. Ms. Jordan has continuously maintained insurance coverage on her home since she acquired it in 2012.

### Laundra Martin's transaction with Harbour

212. Laundra Martin is a 55-year old African-American woman.

213. Ms. Martin graduated from college and works for the Department of Human Services, doing online chat support for people dealing with child support issues. She has worked for DHS for the past seven years. She also works part-time as a contractor transcribing audio recordings for court reporters. She has no experience or expertise in mortgage lending, real estate transactions, or real estate law.

214. Ms. Martin lives in her home at 1550 Spruce Ridge Court, Stone Mountain,

Georgia with her two children, who are 18 and 21 years old.  Ms. Martin believed she was the owner of this home subject to a mortgage, and has invested a substantial amount of time and money making repairs to the home.

215.   Ms. Martin found out about the opportunity to buy a home from Harbour Portfolio from a member of her church, also African-American, who had bought a home from Harbour Portfolio and referred others to Harbour Portfolio.

216.   Ms. Martin called Harbour Portfolio and inquired about homes available for purchase in the Stone Mountain area.

217.   Ms. Martin looked at two houses that Harbour was offering for sale.  One house had a basement that was sinking.  Ms. Martin decided she wanted to buy the home at 1550 Spruce Ridge Court.  Although she could see that it needed some work, she was interested in buying a home and believed she could make this into a good home for her family.

218.   Ms. Martin applied to purchase the home at 1550 Spruce Ridge Court, Stone Mountain, Georgia.  She provided all information requested by Harbour and was

approved to purchase the home. At the time, Ms. Martin was working in customer service and making approximately $25,000 a year.

219. Ms. Martin never met with any Harbour representative or agent in person. The closing of the transaction was conducted by mail; Ms. Martin was asked to sign the papers in front of a notary and return them in a FedEx envelope.

220. The purchase price for the home was $43,400. Ms. Martin was required to pay a $1,200 non-refundable deposit before she was able to see the documents memorializing the transaction. Harbour also demanded that she send a processing fee of $335 and the first month's payment of $554.34, for a total initial payment of $2,089.34, before they would take the house off the market and send her the documents to sign.

221. The documents Ms. Martin was asked to sign were dated March 8, 2012. Harbour required her to sign a Promissory Note ("note") and Agreement for Deed ("contract") securing the remaining purchase price of $42,200, at 10% interest, over 30 years. Ms. Martin was horrified when she saw the 10% interest rate. She

had already paid her deposit, so she felt pressure to go forward with the transaction. The principal and interest payment was $370.34, plus an initial monthly escrow payment of $184 for property taxes, for a total monthly payment of $554.34. The contract also required Ms. Martin to obtain homeowner's insurance.

222. Just weeks before selling it to her for $43,400, Harbour had purchased the property from Fannie Mae for $15,543. Upon information and belief, Harbour did not make any repairs or improvements to the property before selling it to Ms. Martin.

223. Upon information and belief, Harbour did not obtain an appraisal before entering into the transaction.

224. Ms. Martin believed she was becoming the owner of the home, and did not understand that she was not obtaining a deed and mortgage loan. She received documents substantially similar to those received by the other Plaintiffs, containing numerous representations that she was becoming the owner of the home through

this transaction.

225. The contract stated that Ms. Martin was responsible for maintaining the property in good repair during the term of the agreement as well as bringing the property into habitable condition within a reasonable period of time not to exceed four months.

226. Ms. Martin knew the house was in need of some repairs before signing the documents, but the problems significantly exceeded what she could detect when she viewed the house, because the utilities were turned off. Upon moving in, she learned that the hot water heater, furnace, and all major appliances were non-functioning.

227. The repairs Ms. Martin made to the home include but are not limited to the following examples. She replaced the stove, refrigerator, dishwasher, and hot water heater. She paid people to come out and service the furnace many times. Each time, it would work for maybe a week before cutting out and forcing her to rely on space heaters. The gas company refused to connect the furnace to the gas

line, saying that it was unsafe.  She finally bought and paid someone to install a replacement furnace.  She has spent a significant amount on repairs and service calls for the poorly functioning air conditioning system.  She replaced the kitchen flooring and installed security lighting outside the house.  She also installed an alarm system and bars on the windows and doors.  She cleaned mold off the walls.  She paid for electrical work on several occasions, but has not been able to get the electrical system to function properly.  She has paid plumbers to repair multiple plumbing issues and replace a toilet.

228.   The house still has significant repair problems.  The electrical wire to the stove is exposed and unsafe.  The roof is in bad condition.  The fence needs to be repaired or replaced.  The gutters and wood flashing need to be replaced.  The attic fan does not work.

229.   Ms. Martin has maintained homeowners insurance on the home for the past five years, at a cost to her of approximately $88 per month.

230.   Ms. Martin has continued to make her monthly payment every month for the

past five years, despite the fact that she now realizes she does not have a deed in her name and that her principal balance has only gone down from $42,200 to roughly $40,000, after paying more than $25,000 in monthly payments.

231. Despite her continuing on-time payments, Harbour has been reporting Ms. Martin as one month past-due to the credit bureaus. She has disputed that reporting to the credit bureaus and also directly with Harbour's servicer. Although the negative credit reporting appears to have been corrected after her complaint, she does not know how long the inaccurate information was reported. Upon information and belief, this inaccurate reporting has impacted her ability to obtain credit and her credit score.

232. Laundra Martin's loan was transferred to CWAM II, LLC.

### *Al Lee Butts and Veronica R. Pitts's transaction with Harbour*

233. Al Lee Butts is a 47-year-old African-American man.

234. Veronica R. Pitts is a 32-year-old African-American woman.

235. Al Lee Butts and Veronica R. Pitts are a married couple who live with their

four children in their home located at 1753 Austin Drive, Decatur, GA 30032.

236.   Their only household income is Social Security Disability received by Mr. Butts and two of their children.

237.   Mr. Butts only went to school through ninth grade.  Ms. Pitts completed high school.  Neither of them has any experience or expertise in mortgage lending, real estate transactions, or real property law.

238.   Mr. Butts and Ms. Pitts learned about the opportunity to purchase their home when they saw a "for sale" sign in the front yard of the home. The sign said "Sale" and advertised a $700 downpayment and a monthly payment of $350.

239.   In or around early September 2011, Mr. Butts and Ms. Pitts called the number on the sign and spoke to a representative about purchasing the home.

240.   They obtained an access code to view the home.  They did not look at any other houses owned by Harbour Portfolio.

241.   Neither Mr. Butts nor Ms. Pitts had ever owned a home before.

242.   Mr. Butts and Ms. Pitts applied to purchase the home and provided all

information that Harbour requested.

243. Harbour approved Mr. Butts and Ms. Pitts for a purchase money loan and agreement for deed.

244. Harbour required Mr. Butts and Ms. Pitts to sign a Purchase Money Note ("note") and Agreement for Deed ("contract") to memorialize the transaction.

245. The note and contract, dated September 21, 2011, stated that Mr. Butts and Ms. Pitts were buying the property for $58,000.

246. Harbour purchased the house from Fannie Mae on July 26, 2011 for $15,777. Upon information and belief, Harbour did not make any repairs or improvements to the property before selling it to Mr. Butts and Ms. Pitts.

247. The note and contract specified that Mr. Butts and Ms. Pitts had to pay a $1,200 downpayment, and the remaining $56,800 would be financed at 10% over a term of 30 years. They had to make payments of $498.46 per month (principal and interest) in addition to paying the property taxes and obtaining homeowner's insurance.

248.	Upon information and belief, Harbour did not obtain an independent appraisal in the course of this transaction.

249.	Mr. Butts and Ms. Pitts never met with any Harbour representative or agent in person. The closing of the transaction was done remotely; Mr. Butts and Ms. Pitts were mailed papers to sign in front a notary and return to Harbour Portfolio.

250.	Mr. Butts and Ms. Pitts believed they were becoming homeowners at the time they signed the papers. They had no idea that they were not obtaining a deed in their names or that this transaction was any different from a mortgage loan. Mr. Butts and Ms. Pitts received documents substantially similar to those received by the other Plaintiffs, containing numerous representations that they were becoming the owners of the home through this transaction.

251.	The contract stated that Mr. Butts and Ms. Pitts were responsible for maintaining the property in good repair during the term of the agreement as well as bringing the property into habitable condition within a reasonable period of time not to exceed four months.

252.   Mr. Butts and Ms. Pitts had to make a number of repairs in order to bring the house into habitable condition, including but not limited to the following examples. The copper wiring had been stripped from the home and the fuse box removed. They had to install new electrical wiring and a fuse box.  They replaced leaking pipes.  They replaced the tub and two toilets.  They purchased a refrigerator and stove.  When they moved in, there were numerous holes in the walls, so they installed sheetrock and painted.  They had to replace three doors.  Mr. Butts and Ms. Pitts have paid the property taxes for the house as part of their monthly payment.

253.   Harbour and its servicing agent NAA paid the DeKalb County property taxes late in 2015 and 2016, and charged Mr. Butts and Ms. Pitts for the late fees.

254.   Mr. Butts and Ms. Pitts obtained homeowner's insurance several times, but their coverage was cancelled in 2014 due to problems with the condition of the property and again in 2015.

255.   On January 23, 2012, when they had fallen behind on their payments, Ms.

Pitts received a letter from National Asset Advisors stating: "Your agreement has been converted to a month-to-month renta[sic] as outlined in your original contract. We may now refer youraccount[sic] to our legal department for eviction. We can start the eviction process without further notice to you!"

256.   According to National Asset Advisor's payment history, as of April 6, 2017, Mr. Butts and Ms. Pitts had paid $34,307.86 to Harbour Portfolio, but their unpaid principal balance had only gone down to $55,634.97.  They have been struggling to keep up with the payments every month, and according to Harbour, they are currently in default.

### Lisa Ellis-Blades's transaction with Harbour

257.   Lisa Ellis-Blades (Ms. Blades) is a 43 year-old Black-Hispanic woman who moved to the United States from Belize when she was fifteen years old.

258.   Ms. Blades has lived in her home at 1426 Hawkins St, NW since February 2014.

259.   Ms. Blades is a taxi driver, and was at the time she purchased her home.  At

that time she was making approximately $27,000 annually.  She has a high school

education.  She has no experience or expertise in mortgage lending, real estate

transactions, or real property law.

260.  Ms. Blades learned about the opportunity to purchase a home with Harbour

Portfolio when she was dropping off a regular client and saw a "for sale" sign in

the yard of a neighboring home in Jonesboro, Georgia.  The sign advertised a very

low downpayment and monthly cost.  Excited about the possibility that

homeownership was within her reach, she contacted the phone number on the sign

and was directed to a website where she found other listings in the Atlanta area.

261.  Ms. Blades had purchased a home before.  However, ever since moving to

the United States as a girl she had always dreamed of owning her own home.

262.  After reviewing the website listings, Ms. Blades selected a couple of homes

to view. Harbour provided her the access codes to enter and view the properties.

263.  Ms. Blades visited two homes but found them both to be in very poor

condition, and certainly not livable without extensive renovations that she could

not afford to make.  She needed to find a home that she could live in while she made repairs.

264.   Ms. Blades called back to ask if Harbour had any unlisted homes in the City of Atlanta.  Harbour told her about a home located at 1426 Hawkins Street and gave her the access code to view the property.

265.   Ms. Blades visited the home at 1426 Hawkins Street.  She entered through the back door because the property was so overgrown that the front door was not accessible.  Once inside, she saw that many of the walls had been destroyed and some were missing drywall.  The kitchen had no appliances, and the toilet in the main bathroom had been destroyed.  However, the master bedroom looked livable, and the necessary repairs seemed manageable for her and her husband.  She believed that her family could live in the home while they worked to make it whole.

266.   Ms. Blades expressed the desire to purchase the home and was told to deposit a sum of money in a Bank of America account to reserve the home for

purchase.

267. Ms. Blades never met with any Harbour representative or agent in person. The closing of the transaction was done remotely; Ms. Blades was mailed papers to sign in front a notary and return to Harbour Portfolio.

268. After she made the deposit, Harbour sent her the documents to complete her purchase of the home. The documents were dated January 20, 2014. These documents were substantially similar to documents received by other Plaintiffs in this action, and led Ms. Blades to believe that she was purchasing the home with a mortgage loan. The documents contained numerous representations that she was becoming the owner of the home through this transaction.

269. The purchase price for the home was $31,500. To finance the remaining purchase price of $30,040, Harbour required that Ms. Blades sign a Promissory Note ("note") and an Agreement for Deed ("contract"). The note and contract were dated January 20, 2014. The note carried a 9.9% interest rate over 30 years. The monthly principal and interest payment was $261.41, plus an initial escrow

amount of $106 for the payment of property taxes, resulting in a monthly payment of $367.41, not including homeowner's insurance.

270.   Harbour purchased Ms. Blades's home from Fannie Mae on September 23, 2011 for $22,790.  Upon information and belief, Harbour did not make any repairs or improvements to the property before selling it to Ms. Blades.

271.   Upon information and belief, Harbour did not obtain an independent appraisal of the home in the course of this transaction.

272.   The contract stated that Ms. Blades was responsible for maintaining the property in good repair during the term of the agreement as well as bringing the property into habitable condition within a reasonable period of time not to exceed four months.

273.   Upon moving into her new home, Ms. Blades discovered that many more repairs needed to be made than she anticipated.  She noticed that the ground floor of the house was wet and that mold and mildew grew on the walls.  Once she had the electricity turned on, she learned that much of the wiring was missing or did

not work at all.  She also discovered that the attic had been destroyed, and the air

conditioning unit had been stolen.  The house contained no heating system or hot

water heater, either.  Additionally, Ms. Blades needed to remove damaged carpet

and replace rotted wood, doors, and windows throughout the home.

274.   The work Ms. Blades did to the home included, but was not limited to, the

repairs described above.  While repairing the home, Ms. Blades also made

substantial improvements because she believed she owned her home.

275.   Ms. Blades has carried homeowner's insurance on her home continuously

since purchasing her home.  She pays roughly $950 annually for her policy.

276.   Ms. Blades has paid the taxes on her home through a monthly escrow

payment collected by Harbour.  Harbour and NAA have mismanaged payment of

Ms. Blades's taxes by charging her for a tax year she did not owe and by paying

the taxes late, resulting in fees, penalties, and interest charges.  Harbour and NAA

passed these amounts on to Ms. Blades by charging her a shortage and raising her

escrow amount far above an amount that would adequately cover the annual cost of

taxes. As a result of this behavior, upon information and belief, Harbour and NAA have charged Ms. Blades over $1,800 more than she should have paid in taxes for the years 2014, 2015, and 2016. Harbour and NAA continue to collect an inflated escrow amount from Ms. Blades.

277. Two car accidents caused Ms. Blades to fall behind on her monthly payments. Her first accident in October of 2015 left her unable to work. She made an arrangement with Harbour to catch up on payments. She later got into a second accident around June of 2015 and again called Harbour to enter into a payment arrangement. Without notifying her in advance, on July 16, 2015 Harbour filed an eviction action in Fulton County Magistrate Court. Harbour dismissed the action on July 17, 2015.

278. In late 2015, Ms. Blades experienced a dramatic drop in taxi calls, and her income dropped significantly, causing her to fall behind on her payment plan. Fortunately, she was able to find a job driving for a new company in late January 2016 and her income began to increase. However, in March 2016, Harbour again

filed a dispossessory action in Fulton County Magistrate Court to evict Ms. Blades. Once she was served with the paperwork, Ms. Blades reached out to the eviction attorney who told her to call Harbour. After she called Harbour and offered to send payment, Harbour eventually dismissed the eviction action.

279. Ms. Blades is currently one month behind on her payments and has entered into an arrangement to get caught up over the next few months.

### Rita Henigan and Rohan Powell's transaction with Harbour

280. Rita Henigan is a 37-year-old African-American woman.

281. Rohan Powell is a 34-year-old African-American man.

282. Rita Henigan and Rohan Powell are a married couple who reside in their home at 1724 Hollyhock Terrace, Decatur, Georgia, DeKalb County with their daughters, ages 10 and 18.

283. Ms. Henigan attended college but did not finish. Mr. Powell has a high school education. Neither Ms. Henigan nor Mr. Powell have ever worked in the field of real estate, real property law, or mortgage lending.

284.   Ms. Henigan and Mr. Powell moved their family to Atlanta from Chicago in 2011 because they wanted to raise their children in a city where they could afford to buy a home.

285.   Neither Ms. Henigan nor Mr. Powell had ever purchased a home before entering into the transaction with Harbour.

286.   In 2012, Ms. Henigan was working cleaning houses and Mr. Powell was working as a temporary employee with a meat packing plant.  Collectively they made less than $40,000 annually.

287.   Ms. Henigan and Mr. Powell learned of the opportunity to buy a home with from Harbour Portfolio through Ms. Henigan's uncle, Jackie Brown, whose friend (also African American) had recently purchased a home through Harbour.  In an effort to find a home to purchase near their daughter's school, Ms. Henigan and Mr. Powell drove around the surrounding neighborhood.  They came across a for sale sign posted at 1724 Hollyhock Terrace advertising a $1,500 downpayment and a monthly payment of $365.  They later learned that the sign was posted on behalf

of Harbour Portfolio.  Ms. Henigan and Mr. Powell were already familiar with Harbour Portfolio through Ms. Henigan's uncle .

288.  They called the number on the sign, and after sending in their pay stubs, were given a code to enter the property.

289.  Once they entered the property, Ms. Henigan and Mr. Powell observed that the kitchen floor was missing and there was a hole in the subfloor caused by a water leak.  They also noted that all kitchen appliances had been removed from the home.  The utilities and water service had been cut off, so they could not test any household systems.

290.  Upon informing Harbour that they wanted to purchase the home, Ms. Henigan and Mr. Powell were told to immediately send $2,250 to Harbour in order to purchase the home.  They sent this amount to Harbour via FedEx.

291.  Ms. Henigan and Mr. Powell never met with any Harbour representative or agent in person.  The closing of the transaction was done remotely; Mr. Henigan and Mr. Powell were mailed papers to sign in front a notary and return to Harbour

Portfolio.

292.   Soon after they sent Harbour the $2,250, Ms. Henigan and Mr. Powell received a packet of documents from Harbour.  These documents included an Agreement for Deed and a Promissory Note.  The documents were substantially similar to those received by other plaintiffs in this action.  Upon reviewing the documents, Ms. Henigan and Mr. Powell believed they were purchasing the home with a mortgage.  Ms. Henigan and Mr. Powell executed the documents on April 16, 2012.

293.   Ms. Henigan and Mr. Powell's Agreement for Deed stipulated a purchase price of $31,725 with a $900 downpayment.  Harbour financed the remaining $30,825 with a 30-year Promissory Note at 10% interest.

294.   Harbour Purchased 1724 Hollyhock Terrace on February 23, 2012 for $5,097 from Fannie Mae.  Upon information and belief, Harbour did not make any repairs or improvements to the property before selling it to Ms. Henigan and Mr. Powell.

295.    Upon information and belief, Harbour did not obtain an independent appraisal of the home in the course of this transaction.

296.    The contract stated that Ms. Henigan and Mr. Powell were responsible for maintaining the property in good repair during the term of the agreement as well as bringing the property into habitable condition within a reasonable period of time not to exceed four months.

297.    After purchasing the home and restoring utility and water service to the property, Ms. Henigan and Mr. Powell learned that the water lines ran brown, the toilet was not functioning properly, neither the furnace nor the hot water were in operable condition, and a window-mounted air conditioner was not functioning.

298.    Ms. Henigan and Mr. Powell have made substantial repairs and improvements to their home, including but not limited to the following examples. They repaired the hole in the kitchen floor and laid new flooring in the kitchen, bathroom, and bedrooms.  They repaired and upgraded the electrical and plumbing systems and installed new toilets and sinks in the house.  They painted and sealed

the foundation, added appliances, replaced and repaired cracking drywall, and upgraded the landscaping around the house. There are further repairs and improvements that they would like to make, but are afraid to after learning that they do not actually own their home.

299. Ms. Henigan and Mr. Powell obtained homeowners insurance on the property.

300. Ms. Henigan and Mr. Powell have paid the property taxes on the property as part of their monthly payment to Harbour.

301. In March 2017, Ms. Henigan and Mr. Powell received a letter from an unknown company offering them $1,500 to vacate their home. Around the same time, they began to notice strange people pulling up in front of their house and taking photographs of their property. Ms. Henigan confronted one woman who was taking pictures, and the woman informed her that her home was listed for sale. Later, Ms. Henigan and Mr. Powell arrived home to find what appeared to be a construction crew in front of their home. The workers said that they had been sent

by the new owner of the property and that they were about to hop the fence and enter the house to begin construction on the home.

302.  Upon information and belief, Harbour sold 1724 Hollyhock Terrace to Vilmart & CIE V, LLC on March 21, 2017 for $20,616.

303.  Upon information and belief, Vilmart & CIE V, LLC sold 1724 Hollyhock Terrace to JCT Capital, LLC on March 21, 2017 for $27,500.

304.  On or about March 22, 2017, Ms. Henigan and Mr. Powell received a "Notice of Transfer" letter identifying Vilmart & CIE V, LLC as the new owner of their "Land Contract, Agreement for Deed, Mortgage, Purchase Money Note, Deed of Trust or other instrument ('Contract')."  The notice stated that the transfer was effective March 3, 2017--19 days prior to the date of the notice and prior to the transfer of the property.  The notice also identified FCI Lending Services as the new servicer of their contract, effective April 5, 2017.

305.  On or about April 17, 2017, NAA sent Ms. Henigan and Mr. Powell a monthly statement soliciting payment.

306.   On or about April 25, 2017, NAA sent Ms. Henigan and Mr. Powell another notice of transfer again identifying Vilmart & CIE V, LLC as the new owner of their "Land Contract, Agreement for Deed, Mortgage, Purchase Money Note, Deed of Trust or other instrument ('Contract')."  The notice stated that the transfer was effective March 15, 2017--over a month prior to the date of the notice.  The notice identified SN Servicing Corporation as the new servicer of their contract, effective May 12, 2017.

307.   On or about May 3, 2017, Ms. Henigan and Mr. Powell received a letter from an attorney claiming to represent JCT Capital, LLC.  The letter offered to "facilitate [their] departure from 1724 Hollyhock Terrace" and threatened a dispossessory action if they did not vacate their property by May 8, 2017.

308.   Ms. Henigan and Mr. Powell are terrified of being evicted from their home. They are unsure of where and to whom they should make their monthly payments. They remain frightened that whatever entity claims to own their property will send another crew to break into their house while they are not home, or while their

daughters are home alone.

## *LaQuinta Hutchins's transaction with Harbour*

309.   LaQuinta Hutchins is a 37-year-old African-American woman.

310.   Ms. Hutchins has worked as a hospice caregiver for a number of years.  Ms.

Hutchins has no experience or expertise in mortgage lending, real estate

transactions, or real property law.

311.   Ms. Hutchins lives in her home at 7684 Bernardo Drive, Riverdale, Georgia,

with her two children, a 9 year old and an infant.

312.   Ms. Hutchins learned about the opportunity to buy a home through Harbour

Portfolio when she saw a sign in front of the property at 7684 Bernardo Drive

stating that it was for sale.

313.   At the time, Ms. Hutchins was living in the house next door with her then

boyfriend.  However, their relationship was not going well, and Ms. Hutchins soon

decided she would separate from her boyfriend and live in 7684 Bernardo Drive

with her children.

314.   She called the number that was listed on the sign and applied to buy the home.  She provided all information that Harbour requested and was approved to purchase the home.

315.   The purchase price for the home was $54,000, and Harbour required her to make a nonrefundable downpayment of $1,744, plus closing costs, for a total initial payment of $1,949.69.

316.   Harbour had purchased the home for $15,543 from Fannie Mae.  Upon information and belief, Harbour did not make any repairs or improvements to the home before selling it to Ms. Hutchins.

317.   Upon information and belief, Harbour did not obtain an independent appraisal of the home in the course of this transaction.

318.   Harbour required Ms. Hutchins to sign a Promissory Note ("note") and Agreement for Deed ("contract") securing the remaining purchase price of $52,256, at 9.9% interest, over 30 years.  The note and contract were dated November 12, 2014.  Her monthly principal and interest payment was $454.73,

with an escrow of $132 for taxes and Homeowner's Association ("HOA") dues, for a total monthly payment of $586.73.

319.   The contract stated that Ms. Hutchins was responsible for maintaining the property in good repair during the term of the agreement as well as bringing the property into habitable condition within a reasonable period of time not to exceed four months.

320.   Ms. Hutchins could see that the house needed some work, but the conditions were in fact significantly worse than what she could detect upon viewing it before signing the documents, because the utilities were turned off at the time.  Upon moving in and turning on utility services, Ms. Hutchins discovered a pipe leak and a non-functioning furnace.

321.   The home had a major pest infestation, so Ms. Hutchins paid for three or four months of pest control treatments before she moved into the home with her family.

322.   Ms. Hutchins has had to make a number of repairs to the home, including

but not limited to the following examples. She had to repair a pipe in the master bathroom that was leaking down into the ceiling of the kitchen below, causing the ceiling to crumble and fall in places. She repaired a pipe leak in front of the house in the main water line. She repaired the heating unit but may still have to replace it. She replaced a broken window. She patched holes in the walls and ceiling. She paid a company to remove piles of junk from the backyard. She tore out carpet throughout the entire house, but has not yet replaced the carpet.

323. Ms. Hutchins has paid to maintain homeowner's insurance coverage on her home.

324. Ms. Hutchins began making her monthly payments. At one point she fell behind due to being out of work after the birth of her second child. In November 2016, she received a letter from a law firm claiming to represent the new owner of her loan, Investment Trading & Development, LLC, stating that if she did not bring the account current by November 15, 2016, the owner would "terminate your right to purchase the property effective November 30, 2016 under the Agreement

and you will become a month-to-month tenant and you must vacate the premises by November 30, 2016." Terrified of being evicted with her children, Ms. Hutchins managed to get caught up and began sending her monthly payments to Investment Trading & Development's attorney.

325.   Although she has been paying a monthly escrow that includes $50 per month for HOA dues, it appears that Harbour, its servicing agent NAA, and now Investment Trading & Development, LLC have not been paying the HOA dues. The HOA has been sending Ms. Hutchins letters claiming that the $50 per month HOA dues have been unpaid all throughout 2016, and that there was a balance of around $5,000 brought forward in October 2015.

326.   Although she has been paying a monthly escrow that should cover her property taxes, it appears that Harbour, its servicing agent NAA, and now Investment Trading & Development have not been paying the property taxes when due.  The Clayton County Tax Commissioner recently recorded a FiFa against Ms. Hutchins' home for unpaid 2016 taxes in the amount of $1,097.65.  Ms. Hutchins

is now at risk of losing her home to tax foreclosure due to Defendants' careless servicing of her loan.

327. Ms. Hutchins has asked Investment Trading & Development to provide her with any proof that it owns the loan, since no transfer, assignment, or deed has yet been recorded in the deed records. She has also requested a payment history, since it appears the HOA dues have not been paid despite the fact that she has been paying that amount as part of her monthly payment. To this date, Investment Trading & Development has provided neither proof of its ownership nor a payment history in response to her written request. Therefore, Ms. Hutchins has stopped sending her monthly payment to Investment Trading & Development and is saving the money until she has documentation of who has the right to receive payments and whether her payments are being properly applied.

### *Tabitha and James Hunter's transaction with Harbour*

328. Tabitha Hunter is a 44-year-old African-American woman.

329. Her husband, James Hunter, is a 46-year-old African-American man.

330.   From 2011 until 2015, the Hunters lived with their five children in their home located at 4738 Cedar Lake Drive, Conyers, GA 30094.  They now reside in Birmingham, Alabama.

331.   Mr. and Ms. Hunter work in video production and are self-employed.  Mr. Hunter is also self-employed as a contractor.  Mrs. Hunter has a high school education.  Mr. Hunter went through 11th grade, and then took some college courses.  Neither Mr. nor Mrs. Hunter has any experience or expertise in mortgage lending, real estate transactions, or real property law.

332.   Mrs. Hunter heard about Harbour while searching on the Internet.  She called the number listed and was told to go on the website to see which home she liked.  She was told she could buy one of the available homes with seller financing.

333.   After viewing the available homes online, Mrs. Hunter called Harbour and received the access codes to view around four to five houses in person.  They were all either in horrible condition or unaffordable.

334.   Mrs. Hunter decided to purchase her home at 4738 Cedar Lake Drive,

Conyers, GA 30094 because it looked like it was in reasonably good condition and she thought it was located in a good neighborhood for her family.

335.   Mrs. Hunter had never owned a home before.  Mr. Hunter's only previous experience buying property was purchasing a parcel of land for $1,500 cash in Ohio in the 1990s with the intention of building a theatre.  He could not obtain the required permits and sold the land.

336.   Mrs. Hunter applied to purchase the property at 4738 Cedar Lake Drive, supplied all information that was requested of her, and was approved to purchase the home.

337.   Mr. and Mrs. Hunter were married at the time of the transaction and have remained married since that time.  They manage their collective financial resources together, such that the financial harm caused to Mrs. Hunter by the transaction has equally harmed Mr. Hunter.  Mr. and Mrs. Hunter both lived in the home and both suffered injury when Harbour evicted them from the home.

338.   Harbour required Mrs. Hunter to sign a Purchase Money Note ("note") and

Agreement for Deed ("contract") to memorialize the transaction.

339.   The note and contract, dated July 14, 2011, stated that Mrs. Hunter was buying the property for $56,000.

340.   Harbour purchased the house from Fannie Mae on May 26, 2011 for $21,588.  Upon information and belief, Harbour did not make any repairs or improvements to the property before selling it to Mrs. Hunter.

341.   Upon information and belief, Harbour did not obtain an independent appraisal of the home in the course of this transaction.

342.   The note and contract specified that Mrs. Hunter had to pay a $1,500 downpayment plus additional costs and fees, and the remaining $53,000 would be financed at 10% over a term of 30 years.  She and her family had to make payments of $465.11 per month (principal and interest) in addition to paying the property taxes and obtaining homeowner's insurance.  Including an initial escrow payment of $116 for property taxes, her initial monthly payment was $581.11.

343.   Mrs. Hunter never met with any Harbour representative or agent in person.

The closing of the transaction was done remotely; Ms. Hunter was mailed papers to sign in front a notary and return to Harbour Portfolio.

344.  Mrs. Hunter believed she was becoming a homeowner at the time she signed the papers.  She had no idea that she was not obtaining a deed in her name or that this transaction was any different from a mortgage loan.  Mrs. Hunter received documents substantially similar to those received by the other Plaintiffs, containing numerous representations that she was becoming the owner of the home through this transaction.

345.  The contract stated that Mrs. Hunter was responsible for maintaining the property in good repair during the term of the agreement as well as bringing the property into habitable condition within a reasonable period of time not to exceed four months.

346.  The Hunters had to make a number of repairs in order to bring the house into habitable condition, including but not limited to the following examples.  Shortly after moving in, they noticed that the bottom floor would get wet when it rained.

When they pulled up the carpet, they found black mold, which they tried to kill with bleach.  The house had a major flooding problem downstairs, and Mr. Hunter had to build a dam to direct water away from the house. In addition, the kitchen floor was warped and buckled,  there was no refrigerator or air conditioning, the furnace was not functional, and there was a leak in the bedroom ceiling.  When Mrs. Hunter told Harbour about the problems, she was told that she was responsible for all the repairs.  The Hunters patched the roof, stabilized the balcony, fixed the plumbing, and put in fixtures and sinks.

347.   Because Mrs. Hunter thought she owned the home, she and Mr. Hunter made improvements to the home, including renovating part of their downstairs from a garage into a two bedroom, one bathroom suite and adding French doors to create an exit in the back of the home.

348.   The Hunters paid the property taxes for the house as part of their monthly payment.

349.   In 2012, Mrs. Hunter learned that the homestead exemption would lower her

taxes.  When she tried to apply for it, she was told that her deed was not recorded.

She called Harbour about recording the deed.  Harbour told her it should have

recorded the deed and would do so.  Harbour recorded the contract on October 2,

2012.  Mrs. Hunter never received the homestead exemption.

350.   Mrs. Hunter referred a friend to Harbour Portfolio.  Harbour told her that she

would receive a referral fee, but she never received any compensation for the

referral.

351.   Mrs. Hunter's father became very sick and passed away on August 2, 2014.

Around the time her father passed away, she learned that the home needed a roof

replacement and major foundation repairs.  She was overwhelmed by her father's

death and financially unable to make the monthly payments and also pay for

necessary repairs.

352.   Harbour filed an eviction lawsuit against Mrs. Hunter and her family in May

2015.

353.   In the eviction lawsuit, Harbour's affiant signed a sworn statement that

Harbour was the owner of the property, that Mrs. Hunter had failed to pay rent then due, and that Harbour had demanded possession of the property and possession had been refused.

354.   Upon information and belief, at the time of Harbour's sworn statement and at the time of the Hunters' forcible eviction from the property, Harbour had not lawfully forfeited or terminated Mrs. Hunter's contract for deed.  Harbour had not recorded a declaration evidencing any election to terminate the contract in the office of the Clerk of Court of Rockdale County, as set forth in the contract. Because the agreement had not been converted to a tenancy and Mrs. Hunter's interest in the property had not been terminated, Harbour had no right to evict the Hunter family from the property.

355.   Harbour's sworn statement that Mrs. Hunter as a "tenant" had failed to "pay rent now due" was false.

356.   Harbour evicted Mrs. Hunter, Mr. Hunter, and their children from the home, kept all payments made by them, and kept all of their investment in the home.

357.   Mrs. Hunter was confused when Harbour filed an eviction action against her because she believed she was the owner of the home with a mortgage.

358.   As a result of Harbour's unlawful eviction, Mrs. Hunter and Mr. Hunter incurred substantial out-of-pocket expenses and experienced extreme emotional distress.  They had to uproot and relocate her family.  They had to shoulder the costs of moving.  At the time of the eviction, Mrs. Hunter, Mr. Hunter, and their children were all made homeless.  Initially, they traveled around visiting relatives to keep a roof over their heads.  They ended up moving in Birmingham, Alabama where they could get help from Mr. Hunter's family.

359.   After unlawfully evicting Mrs. Hunter, Harbour entered into contract for deed on the same property with new buyers in November of 2015, with a purchase price of $40,300.

### *Gerry White's transaction with Harbour*

360.   Gerry White is a 34-year-old African-American man.

361.   Mr. White works for a company that does home improvement and

maintenance work.  Mr. White was in school through eleventh grade.  He started trade school, but had to leave due to a family emergency.  He later obtained his GED Diploma.  Mr. White has no experience or expertise in mortgage lending, real estate transactions, or real property law.

362.    Mr. White heard about the opportunity to buy a home through Harbour Porfolio from his friend, DeMarkus Horne.

363.    Mr. White contacted Harbour Portfolio about properties available for purchase.  He viewed two of them and decided he wanted to purchase the home at 5351 Medena Way, Lithonia, Georgia.

364.    Mr. White never met with any Harbour representative or agent in person. The closing of the transaction was done remotely; Mr. White was mailed papers to sign in front a notary and return to Harbour Portfolio.

365.    Mr. White notified Harbour that he wanted to buy this property and provided any information that Harbour requested of him.  Harbour approved him to purchase the home.  He does not recall Harbour asking him to provide any documentation of

his income.

366.	According to the papers sent to him by Harbour, Mr. White was required to make an initial payment of $935 and to sign the documents in front of a notary. Harbour required him to sign a Promissory Note ("note") and Agreement for Deed ("contract" in order to purchase the home. The note and contract, dated March 31, 2012, showed a purchase price for the home of $40,600. After the $600 downpayment, the remaining $40,000 was financed at 10% interest over 30 years.

367.	Harbour had purchased the home from Fannie Mae for $30,038 roughly one month before reselling it to Mr. White. Upon information and belief, Harbour did not make any repairs or improvements to the property before selling it to Mr. White.

368.	Upon information and belief, Harbour did not obtain an independent appraisal of the home in the course of this transaction.

369.	Mr. White's monthly payment was $532.03 for principal, interest, and property taxes. In addition, the contract required him to obtain homeowner's

insurance.

370.    Mr. White believed that when he signed the papers sent to him by Harbour

Portfolio he was becoming a homeowner.  He believed he was obtaining a deed

and mortgage loan.  He had no idea this transaction was structured any differently

from a traditional home purchase with a mortgage.

371.    Every aspect of the transaction was designed to make it appear that Mr.

White was becoming the owner of the home.  The letter from Harbour enclosing

the documents he needed to sign to complete the transaction stated,

"Congratulations on your decision to buy a home!"  Mr. White received documents

substantially similar to those received by the other Plaintiffs, containing numerous

representations that he was becoming the owner of the home through this

transaction.

372.    The contract stated that Mr. White was responsible for maintaining the

property in good repair during the term of the agreement as well as bringing the

property into habitable condition within a reasonable period of time not to exceed

four months.

373.   Mr. White had experience doing home improvement work, so although the house needed significant repairs, he believed he could do the work himself. However, the repairs needed to bring the house into habitable condition were much more extensive than what Mr. White could observe before signing the contract, because the utilities were turned off when he viewed the house.

374.   Soon after moving in, Mr. White began to make necessary repairs and discovered extensive problems with the home, including but not limited to the following examples.  He replaced the furnace and hot water heater, which were not working.  He replaced PVC pipes that were leaking under the concrete slab. He painted, replaced carpet, replaced sheet rock, repaired and eventually purchased materials to replace the roof.

375.   Mr. White's mother and father were living in the home with him.  After his mother passed away, and her Social Security income was no longer available to supplement his income from employment, Mr. White struggled with the monthly

payment and eventually fell behind.

376. Harbour filed an eviction lawsuit against Mr. White in May 2016.

377. In the eviction lawsuit, Harbour's affiant signed a sworn statement that Harbour was the owner of the property, that Mr. White had failed to pay rent then due, and that Harbour had demanded possession of the property and possession had been refused.

378. Upon information and belief, at the time of Harbour's sworn statement and at the time of Mr. White's forcible eviction from the property, Harbour had not lawfully forfeited or terminated Mr. White's contract for deed. Harbour had not recorded a declaration evidencing any election to terminate the contract in the office of the Clerk of Court of DeKalb County, as provided by the contract. Mr. White has no memory of receiving any letter from Harbour or its attorney terminating the contract. Because the agreement had not been converted to a tenancy and Mr. White's interest in the property had not been terminated, Harbour had no right to evict Mr. White from the property.

379.   Harbour's sworn statement that Mr. White was a "tenant" had failed to "pay rent now due" was false.

380.   Harbour evicted Mr. White from the home, kept all payments made by him, and kept and all of his investment in the home.

381.   Mr. White was devastated by the loss of his home.  He was shocked by the fact that Harbour could take the home from him through an eviction, when he believed he was the owner of the home with a mortgage.  He did not understand how his home could be taken without any of the legal protections a homeowner would normally have.  Upon information and belief, if Harbour had carried out a judicial foreclosure before pursuing a summary eviction, Mr. White could have made arrangements to get caught up on his loan payments and to save his home.

382.   As a result of Harbour's unlawful eviction, Mr. White incurred substantial out of pocket expenses and experienced extreme emotional distress.  He had to pay for a moving van and a storage space.  He had to find a temporary place to stay until he could find a place to rent.  At the time of the eviction, Mr. White, his

girlfriend, her three children, and their newborn baby were all made homeless. For a time they all stayed in one room at a friend's house before Mr. White was able to find a place for them to rent.

383.   Several months after unlawfully evicting Mr. White, Harbour sold his home to Quest IRA, FBO Laurie Ann Davison.

### Zachary Anderson's transaction with Harbour

384.   Zachary Anderson is a 57-year-old African-American man.

385.   Mr. Anderson was working as a mechanic with the City of East Point, Georgia when he entered into this transaction with Harbour. In 2013, Mr. Anderson became disabled and was released from his job. Currently, his only household income is Social Security Disability.

386.   Mr. Anderson had never owned a home, and has no experience or expertise in mortgage lending, real estate transactions, or real property law.

387.   Mr. Anderson has lived in his home at 838 Hartford Place SW, Atlanta, Georgia since July 2011. Mr. Anderson believed that he was the owner of this

home subject to a mortgage, and has invested a substantial amount of money and time making repairs on the home.

388. Mr. Anderson learned about Harbour through its concentrated advertising in parts of Southwest Atlanta, near where he lived and worked. He often saw signs posted around areas of East Point advertising homes for sale with low down payments and monthly payments.

389. In or around July 2011, Mr. Anderson contacted Harbour and asked about opportunities to buy a home.

390. Mr. Anderson provided proof of income and all the other requested information for the application to purchase the home. He was subsequently approved to purchase the home with a loan from Harbour Portfolio.

391. Mr. Anderson, like the other Plaintiffs, received a letter from Harbour that said, "Congratulations on the purchase of your new home." He was excited about becoming a homeowner for the first time.

392. Harbour required Mr. Anderson to sign a promissory note ("note") and agreement for deed ("contract") to memorialize the transaction.

393. The note and contract, dated October 27, 2011, stated that Mr. Anderson was purchasing the property for $46,750. Mr. Anderson made a down payment of $1,000 and signed a promissory note for the remaining $45,750 to be repaid at 10% interest over 30 years. The note and contract required payments of $401.49 per month (principal and interest) in addition to paying taxes and obtaining homeowner's insurance.

394. Unbeknownst to Mr. Anderson, Harbour had purchased the property from Fannie Mae for $10,518 a few months before. Upon information and belief, Harbour did not make any repairs or improvements to the property before selling it to Mr. Anderson.

395. Upon information and belief, Harbour did not obtain an independent appraisal of the home in the course of this transaction.

396.   Mr. Anderson never met with any Harbour representative or agent in person. The closing of the transaction was conducted by mail; Mr. Anderson was asked to sign the papers in front a notary and return them in a FedEx envelope.

397.   Mr. Anderson believed that he was becoming a homeowner at the time he signed the papers. He had no idea that he was not obtaining a deed in his name or that this transaction was any different from a mortgage loan.

398.   Every aspect of the transaction was designed to make Mr. Anderson believe he was becoming a homeowner. He received documents substantially similar to those received by other Plaintiffs, containing varied representations that he was becoming the owner of the home as a result of this transaction.

399.   The contract stated that Mr. Anderson was responsible for maintaining the property in good repair during the term of the agreement as well as bringing the property into habitable condition within a reasonable period of time not to exceed four months.

400.   Mr. Anderson knew there were problems with the house, but discovered after signing the documents that the problems were much more significant than he realized. Upon moving in, he noticed that the roof had collapsed in one of the bedrooms of the home.

401.   The repairs Mr. Anderson made to the home include but are not limited to the following examples. He repaired the roof. He improved the insulation in the home after his first Georgia Power bill totaled more than $500. He improved the landscaping around the house, which involved repairing the sidewalk and the entrance to the porch of the home. The pipes in the home burst twice, once in 2012 and again in 2014. He repaired the pipes. He removed hazardous trees from the property. In addition, there was a gas meter leaking under the house. The problem was resolved in 2016 when the utility company was dispatched to cut the gas meter. Mr. Anderson has never had gas service in the home. He also made significant other improvements to the property, such as: adding shingles and gutters on the home, painting the interior and exterior of the home, adding a screen

to the porch, adding a wooden fence on the property, repairing the porch, repaving the driveway, lowering the ceilings, and installing a new toilet.

402.    The house still has significant repair problems. Last year, another portion of the roof has collapsed. It has since been replaced.

403.    Mr. Anderson has maintained homeowners insurance since 2011, at a cost to him of approximately $65 per month.

404.    Mr. Anderson's contract for deed was sold from Harbour Portfolio to BawldGuy Note Investment Group 1, LLC on or about October 27, 2016 for $32,572.22.

405.    A quitclaim deed dated October 27, 2016 from Harbour Portfolio to BawldGuy Note Investment Group 1, LLC was recorded in the Fulton County deed records on June 26, 2017.

406.    Mr. Anderson has continued to make his monthly payments and is current on the payments.

407.   As of April 2018, Mr. Anderson still allegedly owes $44,012 on the contract. His principal balance has only gone down by around $1,700 since July 2011.

### Jackie Barber's Transaction with Harbour Portfolio

408.   Jackie Barber is a 53-year-old African- American woman who lives in Atlanta, Georgia.

409.   Ms. Barber is employed as Sandwich Board Operator at the Varsity, a local fast food restaurant. She has a tenth grade education. She has no expertise in mortgage lending, real estate transactions, or real property law.

410.   In or around February 2012, Ms. Barber noticed a large sign posted at a home in Bankhead, the Atlanta neighborhood where she rented her very first apartment as a young adult and frequently visited in 2012 to see friends and family.

411.   The sign advertised that the home could be purchased with a down payment of $750 dollars and a monthly payment of $300 dollars.

412.   Ms. Barber was eager to take advantage of this opportunity because she needed to find a new place to live. The bathroom in the house she rented at the time was on the verge of collapsing and the landlord refused to make repairs.

413.   She called the number listed on the sign to inquire about purchasing the home. Representatives at Harbour informed her that there were several other properties available and provided her with the website to view the available properties.

414.   Ms. Barber looked at roughly six properties. Each time, Harbour provided her with a lock box combination to enter the home. The utilities were not on in any of the homes she visited.

415.   She decided to apply to purchase the home located in the Bankhead community at 920 Hall Street, NW, Atlanta, GA 30318 because it was in the best condition of all the properties she visited. She earned about $7.50 dollars an hour at the time she applied to purchase her home from Harbour.

416. Ms. Barber had never purchased a home before and was unfamiliar with the home buying process.

417. Ms. Barber provided Harbour with all the necessary documentation, including copies of her pay stubs and other documents that were required to be notarized. She never met with any representative from Harbour in-person during this process.

418. Harbour approved Ms. Barber's application. The documents are dated March 2, 2012, and are substantially similar to the documents received by other Plaintiffs in this action. Ms. Barber believed that she was purchasing a fixer-upper with a mortgage loan.

419. The purchase price for the home was $33,969. Ms. Barber paid a total of $774.00 at closing. To finance the remaining balance of $33,344, Harbour required that Ms. Barber sign a Promissory Note ("note") and an Agreement for Deed ("contract"). The note and contract were dated March 2, 2012. The note carried a 9% interest rate over 20 years. The monthly principal and interest payment was

$300, plus an initial escrow amount of $74.77 for property taxes, resulting in a monthly payment amount of $374.77, not including home owners insurance.

420. Harbour purchased Ms. Barber's home from Fannie Mae on May 11, 2011 for $11,495. Upon information and belief, Harbour did not make any repairs or improvements to the property before selling it to Ms. Barber.

421. Upon information and belief, Harbour did not obtain an independent appraisal of the home in the course of this transaction.

422. The contract stated that Ms. Barber was solely responsible for bringing the property to a habitable condition within three months and maintaining the property in good repair throughout the contract period.

423. Ms. Barber understood that she would have to invest some sweat equity in the home to make it her own, but she did not know how significant the problems would be. Upon moving in, she discovered problems she had been unable to observe during her first visit to the home.

424.    Before moving into the home, Ms. Barber had her uncle inspect the property. He noticed that the home was missing all of its plumbing pipes. Ms. Barber installed pipes before she moved into the home to make sure she would have running water.

425.    Soon after moving into the home, Ms. Barber was faced with a number of unanticipated repairs. The electrical work was shoddy. She hired someone to rewire all the electrical outlets. A toilet was missing from one of the bathrooms. She purchased a new one. The furnace was beyond repair. After having her car stolen twice, she attempted to open the garage door but it fell off. She replaced the garage door with a normal door and boarded up the remaining space because she could not afford a new garage door. In addition, she replaced the hot water heater and portions of the bathroom and kitchen floors. She fixed the various holes in the walls, ripped out the carpet, and painted the interior of the home.

426.    The house still has significant problems. The furnace and the AC unit need to be replaced.  The kitchen cabinets and floor are in a bad condition. One of the

bathroom floors needs to be replaced. A sink is missing in one of the bathrooms. The doors do not provide adequate security.

427.   Ms. Barber has not been able to obtain homeowner's insurance coverage on the home due to the repair issues.

428.   In 2017, Ms. Barber fell behind on her payments. She has a number of health issues including diabetes and anemia. She was hospitalized several times in 2017 due to her illnesses. At times, she has to get blood transfusions to help with her anemia. She also has a heart murmur.

429.   Ms. Barber attempted unsuccessfully to work out a payment plan so she would not fall too far behind on her payments. She has managed to catch up on her payments recently, in part by using her income tax refund.

430.   Though Ms. Barber has made the majority of her payments over the last 6 years, the principal balance owed is still allegedly $28,858.60.

### *Ithamar Yehudah's Transactions with Harbour Portfolio*

431.   Ithamar Yehudah is a 41-year-old, married, African American man.

432.   Mr. Yehudah lives with his wife and their two children in their home at 1165 Longshore Drive, Decatur, GA 30032. The couple is expecting a third child this year.

433.   Mr. Yehudah is works in home renovation and his wife works as a nurse for Gwinnett County Public Schools. Mr. Yehudah is a high school graduate and has some college experience.  Neither Mr. Yehudah nor Mrs. Yehudah has any experience in mortgage lending, real estate transactions, or real property law.

434.   Mr. Yehudah first learned about the opportunity to purchase a home through Harbour from relatives. He has two brothers who purchased their homes through Harbour.  On their recommendation, Mr.  Yehudah went to Harbour's website and found a number of homes listed for sale.

435.   Mr. Yehudah called the number provided on the website and spoke with representatives at Harbour to inquire about purchasing a home.

436.   He viewed several homes before deciding to purchase the home at 1165 Longshore Drive.

437. Mr. Yehudah applied to purchase the home at 1165 Longshore Drive in July 2013. Harbour called a few days later and informed Mr. Yehudah that he would be required to make a down payment, and provided him with information to deposit the money into a Bank of America checking account.

438. Harbour required Mr. Yehudah to sign a promissory note ("note") and agreement for deed ("contract") to memorialize this transaction. This process was substantially similar to that experienced by the other Plaintiffs.

439. The note and contract, dated July 8, 2013, shows that Mr. Yehudah agreed to purchase the house for $35,500. He made a down payment of $1,460 and signed a promissory note for the remaining $34,040, to be repaid at 9.9% interest over 15 years. The note and contract required payments of $363.72 per month (principal and interest) in addition to paying the property taxes and obtaining homeowner's insurance.

440. Unbeknownst to Mr. Yehudah, Harbour had purchased the property from Fannie Mae for $12,271 on July 26, 2011. Upon information and belief, Harbour

did not make any repairs or improvements to the property before selling it to Mr. Yehudah.

441. Upon information and belief, Harbour did not obtain an independent appraisal of the home in the course of this transaction.

442. Mr. Yehudah returned all requested information for the application to purchase the home with Harbour Portfolio.

443. Mr. Yehudah believed that he was becoming the owner of the home, and did not understand that a contract for deed was any different from a traditional mortgage loan. He received documents substantially similar to those received by the other Plaintiffs, containing numerous representations that he was becoming the owner of the home through this transaction.

444. The contract required Mr. Yehudah to bring the property up to a habitable condition within four months and maintain the property in a good state of repair.

445. Mr. Yehudah understood that significant repairs were needed on the home. He spent nine months improving the home before his family moved in.

446.   The repairs Mr. Yehudah made to the home include but are not limited to the following examples: Mr Yehudah installed new flooring throughout the home. The kitchen was in terrible shape.  He installed new cabinets, appliances, a sink, and improved the plumbing. He installed new toilets, vanities, and other fixtures in the bathroom. Further, he installed a new water heater and HVAC system. Mr. Yehudah also installed all new outlets and sockets, replaced the existing light fixtures, and rewired the entire house. The home was a complete renovation.

447.   Mr. Yehudah spoke to Harbour about purchasing other properties. Harbour informed Mr. Yehudah that there would be no problem with purchasing other homes with a plan to fix them up and sell them. In addition to his family's home at 1165 Longshore Drive, Mr. Yehudah purchased three additional homes from Harbour: (1) 4209 Lindsey Drive, Decatur, GA 30035; (2) 535 Ashburton Avenue, Decatur, GA 30032; and (3) 2319 River Road, Ellenwood, GA 30294.

448.   Mr. Yehudah purchased the home at 4209 Lindsey Drive around September 2013. He asked representatives at Harbour if he would be allowed to purchase,

renovate, and then sell the home. Mr. Yehudah was told that this would not be a problem.

449.   Mr. Yehudah signed the papers to purchase the house at 4209 Lindsey Drive dated September 5, 2013. The contract recited a purchase price of $29,610 and a down payment of $1,460. The remaining $28,150 was to be paid at 9.9 percent interest over a 20 year period.

450.   Unbeknownst to Mr. Yehudah, Harbour had purchased the home from Fannie Mae for $9,641. Upon information and belief, Harbour did not make any repairs or improvements to the property before selling it to Mr. Yehudah.

451.   Upon information and belief, Harbour did not obtain an independent appraisal of the home in the course of this transaction.

452.   Mr. Yehudah made significant repairs on the Lindsey Drive home, including those described below. He installed new gutters and repaired the roof on the home. He replaced the flooring throughout the home, installed new countertops, and painted the interior and exterior of the home. In addition, Mr. Yehudah installed a

new hot water heater and furnace, completed landscaping around the house, and improved a large shed in the back yard of the home.

453. Shortly after he signed the documents for the Lindsey Drive property, Harbour called Mr. Yehudah and told him about the opportunity to purchase the home at 2319 River Road. Harbour reiterated that Mr. Yehudah would be allowed to renovate and sell this home.

454. Mr. Yehudah agreed to purchase the home at 2319 River Road in or around November 2013. Unbeknownst to Mr. Yehudah, Harbour purchased the house from Fannie Mae for only $14,024. Upon information and belief, Harbour did not make any repairs or improvements to the home.

455. Upon information and belief, Harbour did not obtain an independent appraisal of the home in the course of this transaction.

456. Mr. Yehudah made substantial repairs to the home at River Road. Those repairs included: installing new flooring throughout the home, repairing the roof, installing a new HVAC and water heater, and repairing the garage door. In other

parts of the home, Mr. Yehudah repaired numerous broken windows, installed new doors, installed new toilets and vanities in the bathrooms, and refinished portions of the existing hardwood flooring. In the mother-in-law suite in the home, Mr. Yehudah installed a new kitchen equipped with appliances, a corner shower, and a new toilet. He also painted the interior and exterior of the home, and removed several hazardous trees around the home.

457.   Harbour informed Mr. Yehudah about the home at 535 Ashburton Ave in or around January 9, 2014. This was the last home Mr. Yehudah purchased from Harbour. Again, Mr. Yehudah was told that he would be allowed to renovate and sell this home.

458.   This transaction was substantially similar to Mr. Yehudah's prior transactions with Harbour.  He agreed to purchase this home for $21,500 at a 9.9 percent interest rate. Mr. Yehudah made a down payment of $1,460.

459. Unbeknownst to Mr. Yehudah, Harbour purchased the house from Fannie Mae for only $13,294. Upon information and belief, Harbour did not make any repairs or improvements to the home.

460. Upon information and belief, Harbour did not obtain an independent appraisal of the home in the course of this transaction.

461. The home at Ashburton Ave was in better condition when compared to the homes Mr. Yehudah had previously purchased from Harbour. However, he was still required to make repairs and improvements that included: installing new flooring throughout the home, replacing two toilets, tiling the bathroom shower, and installing a new HVAC system. This property had significant plumbing issues, and Mr. Yehudah spent a couple thousand dollars improving the plumbing in the home.

462. In or around September 2014, Mr. Yehudah attempted to sell three of the homes with a licensed real estate agent. He had managed to renovate the homes

and was ready to put them on the market, but Harbour kept providing excuses about why they could not authorize him to sell the homes.

463.    Mr. Yehudah and his real estate agent attempted to arrange the sale of the homes at 2319 River Rd, 535 Ashburton Ave, and 4209 Lindsey Drive for about two months. Harbour did not cooperate with a sale of the homes even though it had represented that Mr. Yehudah would be allowed to sell them. Therefore, Mr. Yehudah decided to try to rent out the homes so he could afford to make the contract payments. He started to fall behind on his payments in February 2015.

464.    In or around October 2015, Harbour sold the three homes Mr. Yehudah had attempted to sell to Orange Capital Funding, LLC ("Orange Capital"). Mr. Yehudah's family home at Longshore Drive was sold separately to Blue Investment Group, LLC ("Blue Investment"), an affiliate of Orange Capital.

465.    Three quitclaim deeds from Harbour Portfolio to either Orange Capital or Blue Investment were recorded on October 26, 2015. The remaining property was

transferred in a quitclaim deed from Harbour to Orange Capital recorded on October 29, 2015.

466.   Orange Capital almost immediately informed Mr. Yehudah that he was in default on all four loans and would be required to cure the defaults on those loans or else it would take the homes.

467.   In or around November 2015, Mr. Yehudah paid about $5,000 to reinstate the loan for his home on Longshore Drive. He signed an agreement titled "Termination of Land Contract," upon Orange Capital's request, as to the other three homes. He feared that if he refused, Orange Capital would also attempt to take his family's home.

468.   Mr. Yehudah has continued to make his monthly payments for the Longshore Drive property and is current on his payments.

469.   To date, Mr. Yehudah still allegedly owes roughly $32,000 on the home.

### *Tonya Tate's transaction with Harbour*

470.   Tonya Tate is a 49-year-old African-American woman.

471. Ms. Tate lives in her home at 4407 Carrollwood Drive, Stone Mountain, Georgia, 30083 with her three children.

472. Ms. Tate is currently working for DeKalb County as an IT Liaison.

473. Ms. Tate completed high school and studied for two years at Omni Tech Institute where she received a technical diploma and an IT certification. Ms. Tate does not have any experience in mortgage lending, real estate transactions, or real property law.

474. In May 2011, Ms. Tate saw a sign in front of one of Harbour's homes in Stone Mountain where her friend lived. The sign advertised the property for sale with a low downpayment and no credit check.

475. After calling the number on the sign, Ms. Tate was given the code to the lockbox in order to look around the home.

476. When she entered the home, she did not observe any obvious defects or repair issues other than paint peeling on the ceiling.

477. She looked another house in the area that Harbour was advertising for sale,

but it was in worse condition, so Ms. Tate decided to purchase the home at 4407 Carrollwood Drive.

478. Ms. Tate applied to purchase the home at 4407 Carrollwood Drive, provided all information that Harbour requested, and was approved to purchase the home.

479. Upon information and belief, Harbour Portfolio did not obtain an appraisal by an independent appraiser in connection with the transaction.

480. The purchase price for the home was $52,500.

481. Harbour had bought the property from Fannie Mae on May 11, 2011 for $18,999. Upon information and belief, Harbour did not make any repairs or improvements to the property before selling it to Ms. Tate.

482. Harbour required Ms. Tate to execute a Promissory Note ("note) and Agreement for Deed ("contract") to purchase the home. The note and contract, dated June 6, 2011, show a downpayment of $1,000. The remaining $51,500 was financed at a 10% interest rate over a 30-year term, for a principal and interest payment of $451.95. The initial escrow payment was set at $152, for a total

monthly payment of $603.95. Ms. Tate was told she had the obligation to obtain her own homeowner's insurance, which she did.

483. Ms. Tate never met with any Harbour representative or agent in person. The closing of the transaction was conducted by mail; Ms. Tate was asked to sign the papers in front a notary and return them in a FedEx envelope.

484. Ms. Tate believed she was buying the home in the transaction and that after signing the papers, she would own the home. Every aspect of the transaction was designed to make it appear that she was the owner of the home. She was given a "Truth in Lending Disclosure Statement" that said that she was giving a security interest in "the goods or property being purchased." She was given a HUD 1 Settlement Statement that described amounts paid by an "owner financed mortgage." She received a letter from Harbour stating, "Congratulations on your purchase of your new home!" and enclosed the documents he was required to sign and return in order to complete the transaction. Ms. Tate received documents substantially similar to those received by other Plaintiffs, containing numerous

representations that he was becoming the owner of the home through this transaction.

485.   The contract stated that Ms. Tate was responsible for maintaining the property in good repair during the term of the agreement as well as bringing the property into habitable condition within a reasonable period of time not to exceed four months.

486.   The repairs needed to bring the house into habitable condition were more extensive than what Ms. Tate could observe before signing the contract.

487.   Soon after moving in, Ms. Tate discovered problems with the home and began making necessary repairs, including having to replace the HVAC system, paint peeling walls, and replace doors. There are still leaking pipes that need to be replaced that are causing mold to grow underneath the home and an unfinished bathroom.

488.   Harbour threatened to file a dispossessory against Ms. Tate in 2012, but Ms. Tate was able to catch up her missed payments by entering into a loan modification

agreement with Harbour wherein Ms. Tate made a lump sum payment of $2,033.00 and Harbour capitalized the additional $2,118.16.

489.   Ms. Tate fell behind on her payments in 2014 and filed a Chapter 13 bankruptcy case in November 7, 2014.

490.   Harbour Portfolio VI, LP filed a dispossessory case against Ms. Tate on November 17, 2014. The dispossessory case was stayed because of Ms. Tate's pending bankruptcy and then dismissed.

491.   Harbour sold Ms. Tate's contract to Rocktop Partners I, LP ("Rocktop") and executed a deed dated December 18, 2014, transferring the property to Rocktop.

492.   According to an Amended Transfer of Claim filed in Ms. Tate's bankruptcy case on June 29, 2017, Rocktop sold Ms. Tate's contract to Redstick Acquisitions, LLC ("Redstick"), although there is no deed recorded in the DeKalb County deed records that reflects the transfer.

493.   Ms. Tate now sends her payments to SN Servicing Corporation.

494.   Ms. Tate received a Chapter 13 discharge on July 12, 2017.

495.  As a result of her plan payments and a subsequent loan modification, Ms. Tate caught up on her payments. She fell behind one month during a brief period of unemployment, but is planning to bring her account current when she returns to work.

### *DeCarlos Butts's transaction with Harbour*

496.  DeCarlos Butts is a 35-year-old African-American man.

497.  DeCarlos Butts lives with his wife and three children in an apartment located in East Point, GA.

498.  Mr. Butts works in distribution for Publix to support his family. Mr. Butts obtained a high school diploma and attended some college at American InterContinental University. Mr. Butts has no experience or expertise in mortgage lending, real estate transactions, or real property law.

499.  In spring 2011, Mr. Butts saw a sign in the window of one of Harbour's homes in the DeKalb County neighborhood where he had grown up and attended high school.

500.   The sign in the window of 3779 Redwing Circle, Decatur, GA 30032 advertised $1200 down, $300/mo., and no credit check.

501.   Mr. Butts never met with any Harbour representative or agent in person. The closing of the transaction was done remotely; Mr. Butts was mailed papers to sign in front a notary and return to Harbour Portfolio.

502.   Mr. Butts notified Harbour that he wanted to buy this property and provided any information that Harbour requested of him. Harbour approved him to purchase the home.

503.   Mr. Butts was required to make an initial payment of $1800 and to sign the documents in front of a notary. Harbour required him to sign a Promissory Note ("note") and Agreement for Deed ("contract" in order to purchase the home. The note and contract, dated July 26, 2011, showed a purchase price for the home of $40,700. According to paperwork Mr. Butts received from Harbour, a $1293 downpayment was applied against the purchase price, and $39,667 was financed at 10% interest over 30 years, for a principal and interest payment of $348.11.

504.    Harbour had purchased the home from Fannie Mae for $13,294 roughly

three month before reselling it to Mr. Butts.  Upon information and belief, Harbour

did not make any repairs or improvements to the property before selling it to Mr.

Butts.

505.    Upon information and belief, Harbour did not obtain an independent

appraisal of the home in the course of this transaction.

506.    Mr. Butts's monthly payment was $531.11 for principal, interest, and

property taxes.  In addition, the contract required him to obtain homeowner's

insurance. Mr. Butts obtained homeowner's insurance and maintained it for several

years after entering into the contract.

507.    Mr. Butts believed that when he signed the papers sent to him by Harbour

Portfolio he was becoming a homeowner.  He believed he was obtaining a deed

and mortgage loan.  He had no idea this transaction was structured any differently

from a traditional home purchase with a mortgage.

508.    Mr. Butts had not previously owned a home.

509.   Every aspect of the transaction was designed to make it appear that Mr. Butts was becoming the owner of the home.  The letter from Harbour enclosing the documents he needed to sign to complete the transaction stated, "Congratulations on your decision to buy a home!"  Mr. Butts received documents substantially similar to those received by the other Plaintiffs, containing numerous representations that he was becoming the owner of the home through this transaction.

510.   Believing he was becoming a homeowner, Mr. Butts referred his uncle, Al Lee Butts, and his mother-in-law to Harbour to purchase homes. Mr. Butts was promised a referral fee, but Harbour refused to pay it.

511.   The contract stated that Mr. Butts was responsible for maintaining the property in good repair during the term of the agreement as well as bringing the property into habitable condition within a reasonable period of time not to exceed four months.

512.   Although the house needed significant repairs, Ms. Butts believed he could

do much of the work himself and with his family's help. However, the repairs needed to bring the house into habitable condition were much more extensive than what Mr. Butts could observe before signing the contract, because the utilities were turned off when he viewed the house.

513.    In order to restore power to the home, Georgia Power conducted an inspection. Georgia Power deemed the property unsafe until Mr. Butts replaced the outdated fuse box and wiring.

514.    Soon after moving in with his wife and two children, Mr. Butts began to make necessary repairs and discovered extensive problems with the home, including but not limited to the following examples. He replaced the plumbing and electrical systems and patched the roof. He removed trees growing over the home and debris from the property. He replaced all the doors and all the windows, and replaced damaged flooring with hardwood floors. He patched holes and painted walls. He built a deck. He sanded and refinished the walkway leading up to the front door and replaced a sidewalk leading up to the side door. He cut a drain in the

front walkway to remove water that would pool in the walkway. He repaired a damaged brick wall of the garage and added insulation. He insulated the attic. He started adding a bathroom to the master bedroom. He knocked out walls to make the master bedroom bigger.

515.   After his wife lost her job in 2015, Mr. Butts struggled with the monthly payment and eventually fell behind.

516.   Mr. Butts requested assistance from Harbour, and after being initially denied, was offered an oral forbearance around June of 2015. Under that arrangement, Mr. Butts understood he could pay $900 to catch up two months and Harbour would put the rest of the delinquency on the back end of the loan.

517.   Harbour informed Mr. Butts that it was selling his home would be sold to Orange Capital Funding, LLC ("Orange Capital") with an effective date of August 15, 2015.

518.   A quitclaim deed from Harbour Portfolio VI, LP dated October 30, 2015 was recorded in the DeKalb County real estate records on November 10, 2015.

519. Mr. Butts sent $900 to Harbour in August 2015 pursuant to the forbearance agreement. Harbour sent the funds back in October 2015. He then sent most of the returned $900 to Orange Capital to stave off eviction.

520. Orange Capital started sending breach letters to Mr. Butts shortly after August 15, 2015.

521. Orange Capital would not honor the forbearance agreement between Mr. Butts and Harbour.

522. Orange Capital sent a representative, an African-American woman claiming to be a relator, to Mr. Butts's home. She told Mr. Butts that Orange Capital owns the house and that he can either pay or her boss would take the house.

523. Orange Capital Funding, LLC filed an eviction lawsuit against Mr. Butts on February 2, 2016.

524. Harbour evicted Mr. Butts from the home, kept all payments made by him, and kept all of his investment in the home.

525. Mr. Butts was devastated by the loss of his home. He was shocked that

Orange Capital could take the home from him through an eviction. He did not understand how his home could be taken without any of the legal protections a homeowner would normally have. Upon information and belief, if Harbour had carried out a judicial foreclosure before pursuing a summary eviction, Mr. Butts could have made arrangements to get caught up on his payments and save his home.

526.   As a result of Orange Capital's unlawful eviction, Mr. Butts incurred substantial out of pocket expenses and experienced extreme emotional distress. He had to pay for a moving van and a storage space. At the time of the eviction, Mr. Butts, his wife, and their two children were all made homeless. His wife and their two children went to live with her sister. For two months, Mr. Butts slept in his car outside 3779 Redwing Circle, the house he thought he bought from Harbour Portfolio.

### *Injury to the Plaintiffs*

527.   Each of the Plaintiffs have been injured by Harbour's racially discriminatory

and abusive contract terms. Specifically, they have spent significant amounts of money and hours of their own labor on a home that is not legally titled in their names. They have paid property taxes on a property not legally titled in their names. They have paid for homeowner's insurance for a home not legally titled in their names. They have been charged an inflated purchase price at an extremely high interest rate. They have faced eviction, or the threat of eviction, despite the fact they were assured they were becoming a homeowner.

528.   Each of the Plaintiffs has suffered significant emotional harm caused by Harbour's racially discriminatory and abusive contract terms. Upon learning that they do not have the rights and protections of a homeowner, contrary to what they were told, Plaintiffs have experienced surprise, frustration, anger, and a feeling of having been duped. They have suffered anxiety knowing that they could lose their home at any moment through a summary eviction, with no opportunity to protect themselves or their hard-earned, but apparently illusory, equity in a home. They have worried over the prospect of themselves and their spouses and children

becoming homeless.  In the case of Mr. and Mrs. Hunter and Mr. White, they have actually experienced being hauled into court for an unlawful eviction, having their belongings forcibly removed from their home, and seeing their families become homeless.  Other Plaintiffs have been haunted by the fear of that same experience.

529.   Harbour's illegal discrimination has caused Plaintiffs to suffer irreparable loss and injury, including, but not limited to, humiliation, embarrassment, emotional distress, financial loss, and deprivation of their civil rights.

530.   None of the Plaintiffs discovered the discrimination underlying Harbour's contract for deed transaction before they consulted with an attorney no earlier than July 2016.  Plaintiffs could not have reasonably discovered the discrimination independently because the information about Harbour's discrimination was not known to them until explained to them by counsel.

## V.  COUNT ONE: VIOLATION OF THE FAIR HOUSING ACT, 42 U.S.C. §§ 3604, 3605, ALL PLAINTIFFS AGAINST HARBOUR PORTFOLIO VI LP AND HARBOUR PORTFOLIO VII LP

531.   Plaintiffs hereby reallege and incorporate the facts and allegations contained

in all preceding paragraphs, as if set forth fully herein.

532.   Plaintiffs are members of a protected class on the basis of race, color, and/or national origin because they are African American.

533.   The Fair Housing Act makes it unlawful to "make unavailable… a dwelling to any person because of race, color… or national origin."  42 U.S.C. § 3604(a).

534.   The Fair Housing Act makes it unlawful to discriminate on the basis of race, color, or national origin against any person in a residential real estate transaction such as the making or purchasing of loans or providing other financial assistance. 42 U.S.C. § 3605(a).

535.   Harbour engaged in residential real estate transactions with respect to the Plaintiffs by making each of them a loan for the purchase of residential real estate.

536.   Harbour's actions violated the Fair Housing Act and constitute actionable discrimination on the basis of race, color, or national origin.

537.   Plaintiffs are aggrieved persons as defined by Section 3602(i) of the Fair Housing Act by virtue of having been subject to Harbour's discriminatory, abusive

contract for deed program.  42 U.S.C. § 3602(i).

538.   Based on the racially-targeted marketing strategy it utilized and the statistically-significant predictive power of racial demographics in the location of properties purchased by Harbour, even controlling for income, age, and owner-occupancy rate, Harbour engaged in a pattern and practice of intentionally targeting African-American consumers and residents of predominantly African-American neighborhoods for its predatory and abusive contract for deed transactions.

539.   Harbour engaged in a facially-neutral practice of purchasing homes exclusively, or almost exclusively, from Fannie Mae's REO portfolio for its predatory and abusive contract for deed program.  This practice had a predictable and actual harmful disparate impact on African-American communities and African-American borrowers, including Plaintiffs.

540.   As a proximate result of such discriminatory housing practices, Plaintiffs have suffered economic loss, mental anguish, deprivation of civil rights, and the

prospective loss of their homes.

541.   Harbour's actions were intentional, wanton, malicious, and taken in reckless disregard of Plaintiff's civil rights.

542.   As a result of these violations of the Fair Housing Act, Harbour is liable to Plaintiffs for:

    a.  Compensatory and punitive damages in an amount to be determined at trial;

    b.  Injunctive relief;

    c.  Costs and disbursements; and

    d.  Attorney's fees.

## VI. COUNT TWO: VIOLATION OF THE EQUAL CREDIT OPPORTUNITY ACT, 15 U.S.C. § 1691 *et seq.*, ALL PLAINTIFFS EXCEPT MRS. BROWN AND MR. HUNTER AGAINST HARBOUR PORFOLIO VI LP AND HARBOUR PORTFOLIO VII LP

543.   Plaintiffs hereby reallege and incorporate the facts and allegations contained

in all preceding paragraphs, as if set forth fully herein.

544. Plaintiffs are members of a protected class on the basis of race, color, or national origin because they are African-American.

545. Harbour is a creditor as set forth in the Equal Credit Opportunity Act because in the ordinary course of its business Harbour extended credit to Plaintiffs.

546. Plaintiffs are applicants as defined by the Equal Credit Opportunity Act because they applied to a creditor directly for an extension of credit.

547. Based on the racially targeted marketing strategy Harbour utilized and the statistically significant predictive power of racial demographics in the location of properties it purchased, even controlling for income, age, and owner-occupancy rate, Harbour engaged in a pattern and practice of intentionally targeting African-American consumers and residents of African-American neighborhoods for its predatory and abusive contract for deed transactions.

548. Harbour engaged in a facially-neutral practice of purchasing exclusively, or almost exclusively, from Fannie Mae's REO portfolio, which had a predictable and

actual disparate and harmful impact on African-American communities, and African-American borrowers, including Plaintiffs.

549.   Harbour's acts, policies, and practices are intentionally discriminatory against African Americans with respect to aspects of credit transactions, constitute reverse redlining, and violate 15 U.S.C. §1691(a)(1).

550.   Harbour's acts, policies, and practices disparately impact African Americans with respect to aspects of credit transactions in violation of 15 U.S.C. § 1691(a)(1).

551.   Plaintiffs are aggrieved persons as defined by the Equal Credit Opportunity Act by virtue of having been parties to Harbour's predatory and abusive contract for deed transactions.

552.   As a result of these violations of the Equal Credit Opportunity Act, Harbour is liable to Plaintiffs for:

   a.  Compensatory and punitive damages in an amount to be determined at trial;

   b.  Injunctive relief;

   c.  Costs and disbursements; and

d.  Attorney's fees.

## VII. COUNT THREE: GEORGIA FAIR HOUSING ACT, O.C.G.A. § 8-3-200 *et seq*., ALL PLAINTIFFS AGAINST HARBOUR PORTFOLIO VI, LP AND HARBOUR PORTFOLIO VII, LP

553.   Plaintiffs hereby reallege and incorporate the facts and allegations contained in all preceding paragraphs, as if set forth fully herein.

554.   Plaintiffs are members of a protected class under O.C.G.A. § 8-3-200 *et seq*. because they are African American.

555.   The Georgia Fair Housing Act makes it unlawful to discriminate against any person in the terms, conditions, or privileges of sale of a dwelling, or in the provision of services or facilities in connection therewith, because of race. O.C.G.A. § 8-3-202.

556.    The Georgia Fair Housing Act makes it unlawful to discriminate on the basis of race, color, or national origin against any person in a residential real estate transaction such as the making or purchasing of loans or providing other financial assistance.  O.C.G.A. § 8-3-204.

557. Harbour Portfolio VI and VII engaged in residential real estate transactions with respect to Plaintiffs by making a loan for the purchase of residential real estate.

558. Harbour Portfolio VI and VII engaged in the sale of a dwelling to Plaintiffs.

559. Harbour's actions violated the Georgia Fair Housing Act and constitute actionable discrimination on the basis of race, color, or national origin.

560. Plaintiffs are aggrieved persons as defined by the Georgia Fair Housing Act by virtue of having been subject to Harbour's discriminatory, abusive contract for deed program.

561. Based on the racially-targeted marketing strategy it utilized and the statistically-significant predictive power of racial demographics in the location of properties purchased by Harbour, even controlling for income, age, and owner-occupancy rate, Harbour engaged in a pattern and practice of intentionally targeting African-American consumers and residents of predominantly African-American neighborhoods for its predatory and abusive contract for deed

transactions.

562.   Harbour engaged in a facially-neutral practice of purchasing homes exclusively, or almost exclusively, from Fannie Mae's REO portfolio for its predatory and abusive contract for deed program.  This practice had a predictable and actual harmful disparate impact on African-American communities and African-American borrowers, including Plaintiffs.

563.   As a proximate result of such discriminatory housing practices, Plaintiffs have suffered economic loss, mental anguish, deprivation of civil rights, and the prospective loss of their homes.

564.   Harbour's actions were intentional, wanton, malicious, and taken in reckless disregard of Plaintiffs's civil rights.

565.   As a result of these violations of the Georgia Fair Housing Act, Harbour is liable to Plaintiffs for:

  e.  Compensatory and punitive damages in an amount to be determined at trial;

  f.  Injunctive relief;

g. Costs and disbursements; and

h. Attorney's fees.

## VIII. COUNT FOUR: VIOLATION OF THE TRUTH IN LENDING ACT, 15 U.S.C. § 1601 *et seq.*, JACKIE BROWN AGAINST HARBOUR PORTFOLIO VI, LP

566.   Plaintiffs hereby reallege and incorporate the facts and allegations contained in all preceding paragraphs, as if set forth fully herein.

567.   At all times relevant hereto, Harbour Portfolio VI, in the ordinary course of its business, regularly extended consumer credit for which a finance charge was imposed.

568.   In the calendar year 2014, Harbour Portfolio VI extended more than five loans primarily for personal, family, or household purposes that were secured by a dwelling.

569.   On or around April 2015, Harbour Portfolio VI extended credit to Mr. Brown in a consumer credit transaction involving a promissory note and a land contract ("the Brown Transaction").  Harbour Portfolio VI was the initial payee on

the promissory note, the loan was payable in more than four installments, and the extended credit was subject to a finance charge. In connection with the Brown Transaction, Harbour Portfolio VI acquired a security interest in residential real property owned by Mr. Brown and used as his principal dwelling.

570. The Brown Transaction is subject to the Federal Truth In Lending Act, 15 U.S.C. § 1601 *et seq.* ("TILA").

571. Harbour Portfolio VI required Mr. Brown to make a downpayment of $1,500, and financed the remaining $33,000 at 9.9% interest over a 30-year term.

572. The Brown Transaction is a "higher priced mortgage loan" as defined by TILA because the annual percentage rate of 9.9% exceeded the average prime offer rate by more than 1.5%. The average prime offer rate on April 15, 2015 was approximately 3.71%.

573. Considering the expected payment on the home loan, including estimated property taxes and the insurance that Harbour Portfolio VI required Mr. Brown to obtain, as well as his other debts at the time, Harbour Portfolio VI knew or should

have known that the loan payment would result in a debt-to-income ratio of over 43%.

574. Upon information and belief, Harbour Portfolio VI did not ask Mr. Brown to sign any loan application setting forth his income, assets, and liabilities as part of its decision to extend credit to Mr. Brown.

575. Harbour Portfolio VI did not conduct a reasonable, good faith evaluation of Mr. Brown's ability to repay the loan. Upon information and belief, Harbour Portfolio VI did not conduct a reasonable evaluation of either Mr. Brown's expected residual income or back-end debt-to-income ratio.

576. Mr. Brown struggled to stay current on the loan and is now in default.

577. Harbour Portfolio VI violated TILA and its implementing regulation, 12 C.F.R. 1026 ("Regulation Z"), by failing to verify Mr. Brown's ability to repay the loan through documented income and assets. Upon information and belief, Harbour Portfolio VI failed to review Mr. Brown's other debts, total debt-to-income ratio, or residual income when it approved the Brown Transaction.

578. Harbour Portfolio VI violated TILA and Regulation Z by, upon information and belief, failing to obtain a written appraisal from a licensed or certified appraiser in connection with the loan, despite the fact that the Brown Transaction was a higher priced mortgage loan. Mr. Brown was never provided a copy or notified of any appraisal of the home.

579. Harbour Portfolio VI violated TILA and Regulation Z by, upon information and belief, failing to escrow for the required property taxes and homeowner's insurance despite the fact that the Brown Transaction was a higher priced mortgage loan.

580. Based on the above-described violations of TILA and Regulation Z, Mr. Brown is entitled to actual damages, statutory damages, costs, and attorney's fees.

**IX. COUNT FIVE: VIOLATION OF THE GEORGIA FAIR BUSINESS PRACTICES ACT, O.C.G.A. 10-1-390 *et seq.* and THE UNFAIR AND DECEPTIVE PRACTICES TOWARDS THE ELDERLY ACT, ALL PLAINTIFFS AGAINST HARBOUR PORTFOLIO VI, HARBOUR PORTFOLIO VII, CWAM II, LLC, JCT CAPITAL, LLC, THE BRADY IMPACT TRUST, and ORANGE CAPITAL FUNDING LLC**

581.    Plaintiffs hereby reallege and incorporate the facts and allegations contained in all preceding paragraphs, as if set forth fully herein.

582.    Plaintiffs have no experience or expertise in mortgage lending, real estate transactions, or real property law.

583.    Defendants have claimed that Plaintiffs are homeowners and pushed onto Plaintiffs the costs of homeownership and the homeowner's duties to repair, maintain, insure, and pay taxes on their homes.  But upon default, Defendants have treated Plaintiffs like tenants, denying them any of the rights of a homeowner.  The transactions were structured to shift all of the responsibilities and burdens of homeownership to Plaintiffs and give them none of the benefits.

584.    Harbour's advertising and communications with Plaintiffs and all documents involved in the transaction were designed to convince Plaintiffs that they were homeowners and should invest in their homes as would a homeowner.

585.    All of the following Plaintiffs have been evicted from their homes by Harbour or its assignee, without any prior foreclosure by Harbour or its assignee of

their ownership interest in the property: Tabitha Hunter, James Hunter, DeCarlos Butts, and Gerry White.

586. All of the following Plaintiffs have had one or more eviction action filed against them in court by Harbour or its assignee, without any prior foreclosure by Harbour or its assignee of their ownership interest in the property: Tabitha Hunter, Tonya Tate, DeCarlos Butts, James Hunter, Gerry White, and Lisa Ellis-Blades.

587. All of the following Plaintiffs have been threatened with summary eviction from their homes, without any prior foreclosure by Harbour or its assignee of their ownership interest in the property: DeMarkus Horne, Nina Horne, Ola Johnson, Michael Johnson, Rita Henigan, Rohan Powell, Tabitha Hunter, James Hunter, Gerry White, Tonya Tate, Al Lee Butts, Veronica Pitts, and Lisa Ellis-Blades.

588. Upon information and belief, Defendants had not properly terminated the contract for deed agreements pursuant to their terms prior to filing evictions against Plaintiffs, and thus had no right to evict Plaintiffs from their homes. Harbour also had no right to seek past due "rent" in any eviction proceeding

because, upon information and belief, the contracts had never been properly terminated.

589.   In threatening, initiating, or carrying out evictions of Plaintiffs from their homes, Defendants took actions that were both unfair and deceptive under the Fair Business Practices Act.

590.   Upon information and belief, Defendants have continued to send communications to the Plaintiffs (either directly or through a servicing agent) containing representations that Plaintiffs are homeowners subject to a mortgage loan.  The standard Loan Statement sent monthly by NAA contains representations to any borrower in default such as, "You are late on your mortgage payments," and claiming that "foreclosure" may be initiated if the delinquency is not cured.  In addition, NAA has sent a loss mitigation packet to at least one Plaintiff containing a "Homeowner Assistance Form" that the Plaintiff was requested to return.  Thus, Defendants have continuously made statements giving the impression that Plaintiffs have the rights, obligations, and protections of homeowners, while at the

same time intending to enforce the draconian forfeiture provisions of the contract for deed.

591. The above-described conduct by Harbour Portfolio and its assignees is unfair, deceptive, and unconscionable. Harbour acted unfairly by requiring Plaintiffs to take on the legal obligations of homeownership, including the repair obligation, when the contract treated him like a tenant. If Plaintiffs were tenants, the landlord's obligation to make repairs could not be legally disclaimed. O.C.G.A. § 44-7-13. In the alternative, Harbour and its assignees acted unfairly by attempting to evict Plaintiffs like tenants when they were in fact the equitable owners of their homes, having made repairs and entered into an agreement structured in substance like a mortgage. These actions by Harbour and its assignees offend established public policy and are immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers.

592. Harbour and its assignees' conduct described herein are not isolated instances. Harbour has entered into similar transactions and has engaged in similar

unfair and deceptive practices against at least ten consumers in Georgia. Upon

information and belief, Harbour has entered into many similar transactions, and

Harbour and its assignees have engaged in similar unfair and deceptive practices

against more than 100 consumers in Georgia. The injury to Plaintiffs and other

consumers caused by this conduct was substantial, was not outweighed by any

countervailing benefits to consumers or increased competition in the marketplace,

and was an injury that consumers themselves could not reasonably have avoided.

593.   Harbour and its assignees' conduct described above was also deceptive.

Plaintiffs' reasonably relied on Harbour's misrepresentations and concealment of

material facts, as unsophisticated consumers with no prior experience with contract

for deed transactions and no background in real property law.

594.   Harbour concealed the unfair and deceptive nature of the transaction at the

time Plaintiffs entered into the transaction through affirmative misrepresentations

and material omissions. Plaintiffs did not learn of the unfair and deceptive conduct

by Harbour at the time of the transaction until meeting with counsel after January

2016.

595.   Plaintiffs have been injured by Harbour Portfolio and its assignees' unfair, deceptive, and unconscionable conduct.  Plaintiffs' actual damages include costs of relocation (for the Hunters and Mr. White), credit impact of having an eviction reported on their credit (for those Plaintiffs against whom an eviction lawsuit was filed), and emotional distress as discussed above.

596.   Harbour and its assignees willfully and intentionally violated the FBPA by its conduct referenced above, causing Plaintiffs to suffer actual damages.  Plaintiffs are therefore entitled to actual damages, treble damages, and attorney's fees.  The Plaintiffs who are disabled, Ola Johnson, Al Butts, and Zachary Anderson are also entitled to statutory damages under the Unfair and Deceptive Practices Towards the Elderly Act, O.C.G.A. § 10-1-850 *et seq*.

597.   The above conduct authorizes the imposition of punitive damages, pursuant to O.C.G.A. § 51-12-5.1, in that it shows willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the

presumption of a conscious indifference to consequences, and Plaintiffs seek such

damages.

### X. COUNT SIX: VIOLATION OF THE GEORGIA RESIDENTIAL MORTGAGE ACT, O.C.G.A. §§ 51-1-6, 51-1-8, ALL SIGNATORY PLAINTIFFS[14] AGAINST HARBOUR PORTFOLIO VI AND HARBOUR PORTFOLIO VII

598.   Plaintiffs hereby reallege and incorporate the facts and allegations contained

in all preceding paragraphs, as if set forth fully herein.

599.   The Georgia Residential Mortgage Act, O.C.G.A. §§ 7-1-1000 *et seq.*,

("GRMA"), prohibits certain conduct by any person transacting a mortgage

business in Georgia.

600.   Harbour Portfolio VI and VII were transacting mortgage business in Georgia

at all times relevant to the claims set forth herein, as they were extending loans that

---

[14] "Signatory Plaintiffs" refers to the group of Plaintiffs who signed the contracts in question:  DeMarkus Horne, Jackie Brown, Ola Johnson, Michael Johnson, Anita Jordan, Laundra Martin, Al Butts, Veronica Pitts, Lisa Ellis-Blades, Rita Henigan, Rohan Powell, LaQuinta Hutchins, Tabitha Hunter, Gerry White, Zachary Anderson, Jackie Barber, Ithamar Yehudah, Tonya Tate, and DeCarlos Butts.

meet the definition of a "mortgage loan" under the GRMA. The GRMA defines

mortgage loan to include "a loan or agreement to extend credit" which is secured

by a deed to secure debt, security deed, mortgage, mortgage, security instrument,

deed of trust, or "or other document representing a security interest or lien upon

any interest in one-to-four family residential property located in Georgia."

O.C.G.A. §7-1-1000 (21). Harbour Portfolio's contract for deed transactions are

loans security by a security interest in the purchaser's interest in the home.

601. At all times relevant hereto, Harbour Portfolio VI and VII transacted

mortgage business in Georgia, as defined by the GRMA, and were subject to

O.C.G.A. § 7-1-1013 of the GRMA.

602. The GRMA protects borrowers by establishing a duty of good faith and fair

dealing, a duty not to misrepresent or conceal material facts, factors, terms, or

conditions of a transaction, a duty not to make false statements or promises or to

pursue a course of misrepresentation, and a duty not to directly or indirectly make

a mortgage loan with the intent to foreclose. O.C.G.A. § 7-1-1013.

603. Harbour Portfolio VI and VII willfully and intentionally breached two or more of the above duties, through the conduct described above.

604. The Plaintiffs have been damaged as a result of the above conduct and are entitled to actual, compensatory, general, and punitive damages under the GRMA and/or O.C.G.A. §§ 51-1-6, 51-1-8.

605. The above conduct authorizes the imposition of punitive damages, pursuant to O.C.G.A. § 51-12-5.1, in that it shows willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care that would raise the presumption of a conscious indifference to consequences, and the Plaintiffs seek such damages.

## XI. COUNT SEVEN: EQUITABLE MORTGAGE
### ALL SIGNATORY PLAINTIFFS, EXCEPT MRS. HUNTER, DECARLOS BUTTS, AND MR. WHITE, AGAINST ALL DEFENDANTS

606. Plaintiffs hereby reallege and incorporate the facts and allegations contained in all preceding paragraphs, as if set forth fully herein.

607. The contract for deed agreements Plaintiffs entered into with Harbour

Portfolio VI and VII should be reformed in equity into a deed and mortgage. Plaintiffs are the equitable owners of the homes in question, and neither Harbour Portfolio nor its assignees have properly foreclosed the right of redemption.

608.    The Restatement of Property (Mortgages) takes the position that a contract for deed creates an equitable mortgage. Georgia authorities also support the position that Plaintiffs are the equitable owners of the homes, and that a forfeiture clause constitutes an unenforceable penalty.

609.    Therefore, Plaintiffs seek an order declaring that they are the owners of the homes in question subject to an equitable mortgage loan for an amount certain.

## XII. COUNT EIGHT: DECLARATORY JUDGMENT
## ALL SIGNATORY PLAINTIFFS, EXCEPT MRS. HUNTER, DECARLOS BUTTS, AND MR. WHITE, AGAINST ALL DEFENDANTS

610.    Plaintiffs hereby reallege and incorporate the facts and allegations contained in all preceding paragraphs, as if set forth fully herein.

611.     The transaction creates an actual controversy that places the parties in a position of uncertainty as to their respective rights in the property.

612. Plaintiffs have no remedy other than declaratory judgment that could adequately protect their ownership interest in their homes. A declaratory judgment is necessary to declare that the properties are titled in Plaintiffs' names and to relieve any uncertainty as to the status of the transactions.

## XIII. COUNT NINE: UNJUST ENRICHMENT
## ALL PLAINTIFFS AGAINST ALL DEFENDANTS

613. Plaintiffs hereby reallege and incorporate the facts and allegations contained in all preceding paragraphs, as if set forth fully herein.

614. As described above, Plaintiffs have spent a significant amount on home repairs and improvements, property taxes, and homeowner's insurance.

615. If their respective contracts are not reformed into equitable mortgages and Plaintiffs are not recognized as the equitable owners of their properties, then Defendants should not be allowed to reap a windfall based on the substantial amount Plaintiffs have spent on home repairs and improvements, property taxes, and homeowner's insurance. Defendants have been unjustly enriched by these

payments, and should be ordered to return them to Plaintiffs.

## XIV. COUNT TEN: VIOLATION OF RESPA, 12 U.S.C. § 2601 ET SEQ., LISA ELLIS-BLADES, ANITA JORDAN, LAQUINTA HUTCHINS, LAUNDRA MARTIN, OLA AND MICHAEL JOHNSON, AL BUTTS AND VERONICA PITTS AGAINST NATIONAL ASSET ADVISORS, LLC

616.   Plaintiffs hereby reallege and incorporate the facts and allegations contained in all preceding paragraphs, as if set forth fully herein.

617.   The contract for deed transactions at issue in this litigation are federally related mortgage loans for purposes of the Real Estate Settlement Procedures Act ("RESPA") because they were made by a "creditor" as defined by the Truth in Lending Act who makes more than $1 million per year in loan transactions secured by a dwelling.

618.   Harbour Portfolio's servicing agent, National Asset Advisors, LLC ("NAA"), is a servicer for purposes of RESPA because it services the covered loan transactions.

619.   NAA has mishandled the servicing of the escrow accounts of Ms. Blades,

Ms. Jordan, Ms. Martin, Ms. Hutchins, Mr. and Mrs. Johnson, and Mr. Butts and Ms. Pitts in at least the following ways: collecting funds in excess of the amount needed to pay required property taxes, failing to timely pay required property taxes, causing fees and interest to accrue and then passing these charges onto the consumer, and failing to pay Homeowner's Association fees while collecting these fees from the consumer.

620. In some instances, NAA has issued a refund of excess amounts in an escrow account. However, upon information and belief, NAA has failed to properly refund any escrow surplus in excess of the allowed amount and have held excess funds improperly and for extended periods of time. During these periods of time, these plaintiffs have not had the use and benefit of these funds.

621. NAA has violated at least the following duties and requirements of RESPA: the duty to make timely payments out of escrow, the duty to provide annual escrow statements, the duty to perform escrow analysis and calculate proper escrow payments, and the requirement to timely refund escrow surpluses.

622.   Because of these violations, these Plaintiffs are entitled to actual damages, statutory damages, costs, and attorney's fees.

## XV. COUNT ELEVEN: BREACH OF CONTRACT AND BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING IMPLIED IN EVERY CONTRACT; LISA ELLIS-BLADES, ANITA JORDAN, LAQUINTA HUTCHINS, LAUNDRA MARTIN, OLA AND MICHAEL JOHNSON, AND AL BUTTS AND VERONICA PITTS AGAINST HARBOUR PORTFOLIO VII AND NAA

623.   Plaintiffs hereby reallege and incorporate the facts and allegations contained in all preceding paragraphs, as if set forth fully herein.

624.   Harbour Portfolio entered into a contractual agreement with the above-listed Plaintiffs that Harbour would collect a monthly escrow payment as necessary to pay required property taxes and, in the case of Ms. Hutchins, Homeowners' Association fees.  Harbour offered to collect a monthly escrow payment for this purpose in a document included with Plaintiffs' closing documents (see, for example, attached Exhibit 1), and Plaintiffs accepted this offer by making the additional monthly payment every month.

625.   Harbour Portfolio, by and through its servicing agent NAA, has mishandled the servicing of the escrow accounts of Ms. Blades, Ms. Jordan, Ms. Martin, Ms. Hutchins, Mr. and Mrs. Johnson, and Mr. Butts and Ms. Pitts in at least the following ways: collecting funds in excess of the amount needed to pay required property taxes, failing to timely pay required property taxes, causing fees and interest to accrue and then passing these charges onto the consumer, failing to pay Homeowner's Association fees while collecting these fees from the consumer.

626.   In some instances, Harbour, through its servicing agent, has issued a refund of excess amounts in an escrow account.  However, upon information and belief, Harbour and its servicing agent have failed to return all overpaid funds to these Plaintiffs, and have held excess funds improperly and for extended periods of time. During these periods of time, these plaintiffs have not had the use and benefit of these funds.

627.   Harbour Portfolio and its servicing agent NAA breached the contractual agreement to escrow for required property tax and HOA payments.

628. Harbour Portfolio and NAA breached the duty of good faith and fair dealing implied in every contract in that it did not carry out the escrow agreement in good faith – by collecting excess amounts, failing to make timely payments out of escrow, and passing on unjustified charges to the Plaintiffs.

629. These Plaintiffs have been harmed by Harbour and NAA's breach of the contractual escrow agreement and breach of the duty of good faith and fair dealing, and are entitled to actual damages caused by these breaches.

## XVI. COUNT TWELVE: NEGLIGENCE
## LISA ELLIS-BLADES, ANITA JORDAN, LAQUINTA HUTCHINS, LAUNDRA MARTIN, OLA AND MICHAEL JOHNSON, AND AL BUTTS AND VERONICA PITTS AGAINST HARBOUR PORTFOLIO VII AND NAA

630. Plaintiffs hereby reallege and incorporate the facts and allegations contained in all preceding paragraphs, as if set forth fully herein.

631. Harbour Portfolio and its servicing agent NAA have mishandled the servicing of the escrow accounts of Ms. Blades, Ms. Jordan, Ms. Martin, Ms. Hutchins, Mr. and Mrs. Johnson, and Mr. Butts and Ms. Pitts in at least the

following ways: collecting funds in excess of the amount needed to pay required property taxes, failing to timely pay required property taxes, causing fees and interest to accrue and then passing these charges onto the consumer, failing to pay Homeowner's Association fees while collecting these fees from the consumer.

632.   In some instances, Harbour, through its servicing agent, has issued a refund of excess amounts in an escrow account.  However, upon information and belief, Harbour and its servicing agent have failed to return all overpaid funds to these Plaintiffs, and have held excess funds improperly and for extended periods of time. During these periods of time, these plaintiffs have not had the use and benefit of these funds.

633.   Harbour and its servicing agent NAA failed to service these Plaintiffs' escrow accounts consistently with the requirements laid out in the Real Estate Settlement Procedures Act and its implementing Regulation X, 12 C.F.R. §§ 1024.17 and 1024.34.  Harbour and NAA have violated at least the following duties and requirements of RESPA: the duty to make timely payments out of

escrow, the duty to provide annual escrow statements, the duty to perform an annual escrow analysis and calculate proper escrow payments, and the requirement to timely refund escrow surpluses.

634. These Plaintiffs have been injured by the breach of these duties, including by the financial stress created by an inflated monthly payment, loss of access to the excess funds, incurring late fees and other charges, and facing the threat of negative consequences based on failure to have property taxes and HOA payments made timely.

635. These Plaintiffs are entitled to their actual damages caused by the Defendants' breach of their legal duties.

## XVII. CONCLUSION AND PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs respectfully pray that the Court grant the following relief:

(1) Enter a declaratory judgment that the foregoing acts, policies, and

practices of Defendants Harbour Portfolio VI and VII violate the Equal

Credit Opportunity Act, 15 U.S.C. § 1691(a) *et seq.*, violate the Fair

Housing Act, and violate the Georgia Fair Housing Act;

(2) Enter an injunction, temporarily during the pendency of this action,

preventing Defendants, their employees, agents, or assigns, from taking

any action to dispossess Plaintiffs from the properties;

(3) Enter a permanent injunction enjoining Defendants Harbour Portfolio VI

and Harbour Portfolio VII from engaging in the conduct described herein

and directing Defendants to take all affirmative steps necessary to

remedy the effects of the conduct described herein and to prevent

additional instances of such conduct or similar conduct from occurring in

the future, including but not limited to requiring the Harbour defendants

to pay off the balance of the loans now owned to Harbour's assignees;

(4) Award compensatory damages to Plaintiffs in an amount to be

determined by a jury that would fully compensate Plaintiffs for their

injuries caused by the conduct of Defendants, including but not limited to compensation for the funds Plaintiffs have paid out of pocket and time spent on repair of the homes;

(5) Award punitive damages to Plaintiffs in an amount to be determined by a jury that would punish Defendants Harbour Portfolio VI and VII for the willful, wanton, and reckless conduct alleged herein and that would effectively deter such conduct in the future;

(6) Award any statutory or damages authorized by law;

(7) Award Plaintiffs reasonable attorneys' fees and costs;

(8) Enter an order declaring that Plaintiffs are the equitable owners of the subject properties;

(9) Enter an order directing Defendants to return to Plaintiffs the amounts by which they have been unjustly enriched;

(10) Award such other and further relief as the Court deems just and proper.

TRIAL BY JURY DEMANDED.

This 18th day of May, 2018,

/s/ Sarah B. Mancini
Sarah Bolling Mancini
Georgia Bar No. 319930
Kristen E. Tullos
Georgia Bar No. 941093
Sarah I. Stein
Georgia Bar No. 598889
Counsel for Plaintiffs

ATLANTA LEGAL AID SOCIETY, INC.
246 Sycamore Street, Suite 120
Decatur, GA 30030
(770) 817-7517 (SBM)
(770) 817-7540 (KET)
(770) 817-7515 (SIS)
(770) 817-7534 (Fax)
ktullos@atlantalegalaid.org
sbmancini@atlantalegalaid.org
sstein@atlantalegalaid.org

/s/ Stuart T. Rossman
Stuart T. Rossman
BBO No. 430640
*Admitted Pro Hac Vice*

NATIONAL CONSUMER LAW CENTER
7 Winthrop Square

184

Boston, MA 02110
(617) 542-8010
srossman@nclc.org